## EXHIBIT A

**Ratification and Amendment Agreement**

-85-

## RATIFICATION AND AMENDMENT AGREEMENT

This RATIFICATION AND AMENDMENT AGREEMENT (the "Ratification Agreement") dated as of December 20, 2013, is by and among WELLS FARGO CAPITAL FINANCE, LLC, a Delaware limited liability company, as administrative and collateral agent for the Lenders (in such capacities, together with its successors and assigns in such capacities, "Agent") the lenders (collectively, the "Lenders") party to the Existing Credit Agreement (as defined below), CONSTAR, INC., a corporation incorporated under the laws of the Commonwealth of Pennsylvania ("Constar"), CONSTAR INTERNATIONAL LLC, a Delaware limited liability company ("Constar International", and together with Constar and each of their respective successors and assigns, each a "US Borrower" and collectively, the "US Borrowers"), CONSTAR INTERNATIONAL U.K. LIMITED, a company incorporated in England and Wales with company number 02407933 (together with its successors and assigns, "UK Borrower" and, together with the US Borrowers, each individually, a "Borrower", and collectively, the "Borrowers"), CONSTAR GROUP INC., a corporation incorporated under the laws of the State of Delaware ("Parent"), CONSTAR FOREIGN HOLDINGS INC., a corporation incorporated under the laws of the State of Delaware ("Holdings"), BFF INC., a corporation incorporated under the laws of the State of Delaware ("BFF"), DT, INC., a corporation incorporated under the laws of the State of Delaware ("DT", and together with Parent, Holdings, BFF and each of their respective successors and assigns, each individually, a "Guarantor" and collectively, "Guarantors") each individually a "Guarantor" and collectively, "Guarantors", and together with Borrowers, each a "Loan Party" and collectively, "Loan Parties").

## W I T N E S S E T H:

WHEREAS, each Borrower and Guarantor has commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, and each Borrower and Guarantor has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Cases (as defined below), Agent and Lenders made loans and advances and provided other financial or credit accommodations to Borrowers secured by substantially all assets and properties of Borrowers and Guarantors as set forth in the Existing Loan Documents and the Existing Guarantor Documents (as defined below);

WHEREAS, the Bankruptcy Court (as defined below) has entered a Financing Order (defined below) pursuant to which Agent and Lenders may make post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantors as set forth in the Financing Order and the Loan Documents (as defined below);

WHEREAS, the Financing Order provides that as a condition to the making of such post-petition loans, advances and other financial accommodations, Borrowers and Guarantors shall execute and deliver this Ratification Agreement;

WHEREAS, Borrowers and Guarantors desire to reaffirm their obligations to Agent and Lenders pursuant to the Existing Loan Documents and acknowledge their continuing liabilities to Agent and Lenders thereunder in order to induce Agent and Lenders to make such post-petition loans and advances, and provide such other financial accommodations, to Borrowers; and

WHEREAS, Borrowers and Guarantors have requested that Agent and Lenders make post-petition loans and advances and provide other financial or credit accommodations to Borrowers and make certain amendments to the Credit Agreement (as defined below), and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lenders, Borrowers and Guarantors mutually covenant, warrant and agree as follows:

1.    DEFINITIONS.

1.1    Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below and the Credit Agreement and the other Loan Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "Bankruptcy Court" shall mean the United States Bankruptcy Court or the United States District Court for the District of Delaware.

(b)    "Budget" shall mean the budget to be delivered to Agent and Lenders in accordance with Section 5.3(a) hereof (a summary of which is attached hereto as Exhibit A), in form and substance satisfactory to Agent, together with any subsequent or amended budget(s) thereto delivered to Agent and Lenders, in form and substance satisfactory to Agent, in accordance with the terms and conditions hereof.

(c)    "Chapter 11 Cases" shall mean the Chapter 11 cases of Borrowers and Guarantors which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

(d)    "Consultant" shall have the meaning set forth in Section 5.6 hereof.

(e)    "DIP Note Purchase Facility" shall mean financing to be provided to Debtors substantially as set forth in the Noteholder Term Sheet, dated on or about the date hereof, with respect to an amount of up to $14,000,000 (but in no event less than the amount contemplated therefor under the Budget), pursuant to definitive documentation in form and substance satisfactory to Agent, and approved by the Bankruptcy Court.

(f)    "DIP Note Purchase Facility Documents" shall mean, collectively, the agreements, documents and instruments executed and/or delivered by the parties thereto in connection with the DIP Note Purchase Facility, as each of the foregoing

may be amended, modified, supplemented, extended, renewed, restated or replaced.

(g)    "DIP Note Purchasers" shall mean the lenders or note purchasers under or party to the DIP Note Purchase Facility Documents.

(h)    "Debtors" shall mean, collectively, Borrowers and Guarantors, each as Debtor and Debtor-in-Possession in the Chapter 11 Cases.

(i)    "Existing Credit Agreement" shall mean the Credit Agreement, dated as of May 31, 2011, as amended by Amendment No. 1 Credit Agreement, dated as of July __, 2012, Forbearance Agreement and Amendment No. 2 to Credit Agreement, dated as of November 18, 2013, and Amendment No. 1 to Forbearance Agreement and Amendment No. 3 to Credit Agreement, dated as of December 19, 2013, each among Agent, Lenders, Borrowers and Guarantors and otherwise as in effect immediately prior to the Petition Date.

(j)    "Existing Guarantor Documents" shall mean, collectively, the General Continuing Guaranty, dated as of May 31, 2011, by and among Parent, Holdings, BFF, and DT, in favor of Agent, the Pledge and Security Agreement, dated as of May 31, 2011, by Parent, Constar International, and Holdings, to and in favor of Agent, and the Deed of Disclosed Pledge Over Registered Shares, dated as of June 10, 2011, by and among Holdings, Constar International Holland (Plastics) B.V. ("Constar Holland"), a Dutch corporation with trade register number 09046375, and Agent, in each case, as in effect immediately prior to the Petition Date.

(k)    "Existing Loan Documents" shall mean the Loan Documents (as defined in the Existing Credit Agreement), including, without limitation, the Existing Credit Agreement, in each case, as in effect immediately prior to the Petition Date.

(l)    "Financing Order" shall mean the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Agent and Lenders to Borrowers on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

(m)    "Guarantor Documents" shall mean, collectively, the Existing Guarantor Documents, as amended by this Ratification Agreement, in each instance, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(n)    "Interim Financing Order" shall have the meaning set forth in Section 9.7 hereof.

(o)    "Lenders" shall have the meaning set forth in the Existing Credit Agreement.  Notwithstanding anything to the contrary set forth in the Existing Credit Agreement, the Lender to UK Borrower shall at all times be Wells Fargo Bank, National Association, acting through its London branch.

(p)    "Permanent Financing Order" shall have the meaning set forth in Section 9.8 hereof.

(q)    "Permitted Budget Variance Percentage" shall mean, with respect to any period of weeks elapsed on a cumulative basis from the date hereof through and including and subsequent period specified on Schedule 5.9 hereto, the percentage corresponding to each variance metric identified on Schedule 5.9 hereto.

(r)    "Petition Date" shall mean the date of the commencement of the Chapter 11 Cases.

(s)    "Post-Petition Collateral" shall mean, collectively, all now existing and hereafter acquired real and personal property of each Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent, for the benefit of each of the Secured Parties, pursuant to the Loan Documents, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

(i)    all of the Pre-Petition Collateral;

(ii)    all Accounts;

(iii)    all general intangibles, including, without limitation, all Intellectual Property;

(iv)    all goods, including, without limitation, Inventory and Equipment;

(v)    all Real Property and fixtures;

(vi)    all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(vii)    all instruments, including, without limitation, all promissory notes;

(viii)    all documents;

(ix)    all deposit accounts;

(x)    all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(xi)    all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of accounts receivable and other Collateral, including (1) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (2) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an

4

unpaid vendor, lienor or secured party, (3) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (4) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(xii)    all (1) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (2) monies, credit balances, deposits and other property of any Borrower or Guarantor now or hereafter held or received by or in transit to Agent, any Lender or its Affiliates or at any other depository or other institution from or for the account of any Borrower or Guarantor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiii)    all commercial tort claims, including, without limitation, those identified in the Information Certificate (as updated on Schedule A to this Agreement);

(xiv)    to the extent not otherwise described above, all Receivables;

(xv)    all Records;

(xvi)    from and after the entry of the Permanent Financing Order, all claims, rights, interests, assets and properties (recovered by or on behalf of each Debtor or any trustee of such Debtor (whether in the Chapter 11 Cases or any subsequent case to which any of the Chapter 11 Cases is converted), including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code; and

(xvii)    all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

(t)    "Post-Petition Obligations" shall mean all Obligations (as defined in the Existing Credit Agreement) arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Cases, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Cases, and whether arising under or related to this Ratification Agreement, the Credit Agreement, the Guarantor Documents, the other Loan Documents, a Financing Order, by operation of law or otherwise, and whether incurred by such Borrower or Guarantor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, debtor-in-possession facility fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(u)    "Pre-Petition Collateral" shall mean, collectively, (i) all "Collateral" as such term is defined in the Existing Credit Agreement as in effect

immediately prior to the Petition Date, and (ii) all other security and collateral for the Pre-Petition Obligations as provided in the Existing Credit Agreement and the other Existing Loan Documents immediately prior to the Petition Date.

(v)    "Pre-Petition Obligations" shall mean all Obligations (as such term is defined in the Existing Credit Agreement) arising at any time before the Petition Date, whether incurred by such Borrower or Guarantor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(w)    "Ratification Agreement" shall mean this Ratification and Amendment Agreement by and among Borrowers, Guarantors, Agent and Lenders, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(x)    "Stated Maturity Date" shall mean a term ending on the earliest of: (a) the date that is 45 days after the entry of the Interim Financing Order if the Final Financing Order has not been entered prior to the expiration of such 45-day period, (b) February 10, 2014, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, the date of confirmation of a plan of reorganization or liquidation for Borrowers or Guarantors in the Chapter 11 Cases, (d) conversion of any of the Chapter 11 Cases to a Chapter 7 Case under the Bankruptcy Code, or (e) the consummation of the sale of all or substantially all of the assets of Loan Parties on terms and conditions acceptable to Agent and pursuant to which all Obligations are fully and finally repaid and satisfied.  The deadline set forth in Subsection (b) may be extended upon the request of Borrowers and the consent of the agent in respect of the DIP Note Purchase Facility together with a written representation by the DIP Note Purchasers that (i) the maturity date with respect to the DIP Note Purchase Facility has been extended through the proposed extension date hereunder, (ii) no Event of Default (as defined under the DIP Note Purchase Facility) exists or has occurred and is continuing thereunder, (iii) all conditions precedent to the availability of loans under the DIP Note Purchase Facility shall have been satisfied as of such date, and (iv) Loan Parties have not requested any loans or other financial accommodation under the DIP Note Purchase Facility as of such date (including during such extension period) that have been declined or rejected by DIP Note Purchasers; provided, that, (A) such date cannot be extended beyond February 18, 2014 without the written consent of Agent, (B) as of the date of any such extension, Excess Availability of Borrowers shall comply with the covenant set forth in Section 5.9(a) hereof, (C) on or before February 10, 2014, Borrowers shall have delivered to Agent an update to the Budget with respect to the extension period, which shall be in form and substance satisfactory to Agent and shall reflect that Excess Availability of Borrowers shall comply with the covenant set forth in Section 5.9(a) hereof at all times during the period of the extension, and (iv) either Amcor, or a qualified alternative bidder in accordance with the terms of the Bidding Procedures Order, shall not have terminated, or has not sent a notice or threatened

6

to terminate, its obligations to close the Sale under the APA in accordance with the terms of the Bidding Procedures Order.

    1.2    <u>Amendments to Definitions</u>.

    (a)    <u>Interest Rates</u>.

    (i)    <u>Base Rate</u>. All references to "Base Rate" shall mean, for any day, a fluctuating rate per annum equal to the highest of (i) the federal funds effective rate, as in effect from time to time, plus one-half of one percent (0.50%), (ii) the LIBO Rate (using the three month rate), which rate shall be determined on a daily basis, plus one percent (1.00%), or (iii) the rate of interest publicly announced by Wells Fargo Bank, National Association. as its "prime rate", subject to each increase or decrease in such prime rate, effective as of the day any such change occurs.

    (ii)    <u>Base Rate Margin</u>. All references to "Base Rate Margin" shall mean 2.25% as to Advances bearing interest using the Base Rate, and 3.25% as to Advances bearing interest using the LIBOR Rate.

    (iii)    <u>LIBOR Rate</u>. All references to "LIBOR Rate" shall mean: (i) with respect to US Borrowers, the rate per annum rate appearing on Bloomberg L.P.'s (the "Service") Page BBAM1/(Official BBA USD Dollar Libor Fixings) (or on any successor or substitute page of such Service, or any successor to or substitute for such Service) two (2) Business Days prior to the commencement of the requested Interest Period, for a term and in an amount comparable to the Interest Period and the amount of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by Borrowers in accordance with the Credit Agreement, which determination shall be conclusive in the absence of manifest error, and (ii) in the case of UK Borrower, in respect of any LIBOR Rate Loan denominated in Sterling, the rate per annum rate appearing on Bloomberg L.P.'s (the "Service") Page [relevant page number]/([Official BBA Sterling Libor Fixings]) (or on any successor or substitute page of such Service, or any successor to or substitute for such Service) two (2) Business Days prior to the commencement of the requested Interest Period, for a term and in an amount comparable to the Interest Period and the amount of the LIBOR Rate Loan requested by Borrowers in accordance with the Credit Agreement (as supplemented and amended by this letter), as determined by the Agent (which determination shall be conclusive in the absence of manifest error).

    (b)    <u>Collateral</u>. All references to the term "Collateral" in the Credit Agreement, this Ratification Agreement or the other Loan Documents, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

    (c)    <u>Credit Agreement</u>. All references to the term "Loan Agreement" or "Credit Agreement" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean the Existing Credit Agreement, as amended by this Ratification Agreement and as

ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(d)     Debtors.  All references to Debtors, including, without limitation, to the terms "Borrower", "Borrowers", "Guarantor", "Guarantors", "Loan Party" or "Loan Parties" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean and include the Debtors as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(e)     Eligible In-Transit Inventory.  The definition of "Eligible In-Transit Inventory" shall be amended to add the following sentence at the end of such definition: "Notwithstanding the foregoing, from and after the Petition Date, none of the Inventory of any Debtor shall be deemed to constitute Eligible In-Transit Inventory."

(f)     Loan Documents.  All references to the term "Loan Documents" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Existing Loan Documents, as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(g)     Material Adverse Change.  All references to the term "Material Adverse Change", "material adverse change" or "material adverse change" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to add at the end thereof: ";provided, that, the commencement and ongoing administration of the Chapter 11 Cases shall not be deemed to constitute a Material Adverse Change or material adverse effect".

(h)     Obligations.  All references to the term "Obligations" in the Credit Agreement, this Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

(i)     Certain Modifications.  Notwithstanding anything to the contrary contained in the Credit Agreement (including Section 14.1 thereof), the dates set forth in Section 5.8 of this Ratification Agreement, may be extended with the consent of the Agent and the Borrowers.

1.3     Interpretation.

(a)     For purposes of this Ratification Agreement, unless

3221844.8

otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Existing Credit Agreement.

(b)     All references to the term "Agent", "Lender," "Borrower," "Guarantor," "Debtor" or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its respective successors and assigns.

(c)     All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(d)     All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

2.     ACKNOWLEDGMENT.

2.1     Pre-Petition Obligations.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that, as of December 18, 2013, Borrowers are, jointly and severally, indebted to Agent and Lenders in respect of (a) all Pre-Petition Obligations in the aggregate principal amount of not less than $16,135,801.93 consisting of: (i) Advances in the aggregate principal amount of not less than $14,875,801.93, and (ii) Letters of Credit in the aggregate amount of not less than $1,260,000, together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and expenses), and (b) other charges owed by Borrowers to Agent and Lenders, all of which are unconditionally owing by Borrowers, jointly and severally, to Agent and Lenders, pursuant to the terms of the Existing Loan Documents without offset, defense or counterclaim of any kind, nature and description whatsoever.

2.2     Guaranteed Obligations.  Each Guarantor hereby acknowledges, confirms and agrees that:

(a)     all obligations of such Guarantor under the Guarantor Documents are unconditionally owing by such Guarantor to Agent and Lenders without offset, defense or counterclaim of any kind, nature and description whatsoever, and

(b)     the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by such Guarantor pursuant to the Guarantor Documents extends to all Post-Petition Obligations, subject only to the limitations set forth in the Guarantor Documents.

2.3     Acknowledgment of Security Interests.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that Agent, for the benefit of each of the Secured Parties, has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Agent pursuant to the Existing Loan Documents as in effect immediately prior to the Petition Date to

secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Agent, for the benefit of each of the Secured Parties, under the Financing Order or hereunder or under any of the other Loan Documents or otherwise granted to or held by Agent, in each case, subject only to liens or encumbrances expressly permitted by the Credit Agreement and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent and Lenders.

>2.4    Binding Effect of Documents.  Each Borrower and Guarantor hereby acknowledges, confirms and agrees that: (a) each of the Existing Loan Documents to which it is a party was duly executed and delivered to Agent and Lenders by such Borrower or Guarantor and each (as amended hereby) is in full force and effect as of the date hereof, (b) the agreements and obligations of such Borrower or Guarantor contained in the Existing Loan Documents (as amended hereby) constitute the legal, valid and binding obligations of such Borrower or Guarantor enforceable against it in accordance with the terms thereof, except as enforceability may be limited by equitable principles or applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, and such Borrower or Guarantor has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Agent and Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Loan Documents and the Financing Order.

3.    ADOPTION AND RATIFICATION

Each Borrower and Guarantor hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Existing Loan Documents, as amended hereby, and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Existing Loan Documents, as amended by this Ratification Agreement, and in accordance with the Financing Order.  All of the Existing Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrowers and Guarantors, each as Debtor and Debtor-in-Possession, and considered as agreements between such Borrowers or Guarantors, on the one hand, and Agent and Lenders, on the other hand.  Each Borrower and Guarantor hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Loan Documents, as amended and supplemented pursuant hereto and the Financing Order, and each Borrower and Guarantor agrees to be fully bound, as Debtor and Debtor-in-Possession, by the terms of the Loan Documents to which such Borrower or Guarantor is a party.

4.    GRANT OF SECURITY INTEREST.

As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), Borrowers and Guarantors, each as Debtor and Debtor-in-Possession, hereby grant, pledge and assign to Agent, for the benefit of each of the Secured Parties, and also confirm, reaffirm and restate the prior grant to Agent of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

5.    ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS.

In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Borrowers and Guarantors to Agent and Lenders, whether pursuant to the Loan Documents or otherwise, and not in limitation thereof, each Borrower and Guarantor hereby represents, warrants and covenants to Agent and Lenders the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of Loans by Agent and Lenders or the issuance of Letters of Credit:

5.1    <u>Financing Order</u>. The Interim Financing Order (and, following the expiration of the Interim Financing Period defined therein, the Permanent Financing Order) has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal, stay or motion for reconsideration as to which an effective stay exists.

5.2    <u>Use of Proceeds</u>. All Loans provided by Agent or any Lender to Borrowers or Letters of Credit issued pursuant to the Financing Orders, the Credit Agreement or otherwise, shall be used by Borrowers for general operating and working capital purposes in the ordinary course of business of Borrowers and administration of the Chapter 11 Cases (including, without limitation, the payment of Allowed Professional Fees (as defined in the Financing Order) with respect thereto) all in accordance with the Budget pursuant to Section 5.3 of this Ratification Agreement. Unless otherwise provided for in the Budget or authorized by the Bankruptcy Court and approved by Agent in writing, no portion of any administrative expense claim or other claim relating to the Chapter 11 Cases shall be paid with the proceeds of such Loans or Letters of Credit provided or issued by (or on behalf of) Agent and Lenders to Borrowers.

5.3    <u>Budget</u>.

(a)    Borrowers have prepared and delivered to Agent and Lenders a post-petition Budget with respect to the period from the Petition Date through and including February 18, 2014. The Budget has been thoroughly reviewed by the Borrowers and their management and sets forth, for the periods covered thereby, projected weekly operating cash disbursements for each week of the period from the Petition Date through and including February 10, 2014, subject to the variances with respect thereto permitted herein.

(b)    Not later than 5:00 p.m. (Eastern time) on December 27, 2013 and January 2, 2014 and otherwise on Wednesday of each week, Borrowers shall furnish to Agent, in form and substance satisfactory to Agent , a report (the "Budget Compliance Report") that sets forth, on a cumulative, weekly roll-forward basis through the end of the immediately preceding week, a comparison of the actual cash disbursements to the projected cash disbursements set forth in the Budget for such period, together with a certification from the Chief Financial Officer of Constar as to whether or not a Material Budget Deviation has occurred in respect of disbursements or receipts. Notwithstanding anything to the contrary set forth in this Ratification Agreement or any of the other Loan

11

Documents, Agent shall be provided with weekly (not daily) reporting with respect to disbursements by Borrowers, and such disbursement in accordance with the Budget (subject to the variances with respect thereto permitted herein) shall not be subject to daily review or reconciliation with the Budget by Agent (which review and reconciliation shall be conducted weekly).

(c)     Each Debtor hereby confirms, acknowledges and agrees that, unless waived in writing by Agent, (i) any Material Budget Deviation (as hereinafter defined) and (ii) the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Agent, as provided in Section 5.3(b) hereof, shall each constitute an Event of Default, subject to cure pursuant to Section 5.9(c). Notwithstanding any approval by Agent or any Lender of the Budget or any subsequent or amended Budget(s), Agent and Lenders will not, and shall not be required to, provide any Loans or Letters of Credit to Borrower pursuant to the Budget, but shall only provide Loans and Letters of Credit in accordance with the terms and conditions set forth in the Credit Agreement as amended by this Ratification Agreement, the other Loan Documents and the Financing Order. Agent and Lenders are relying upon the Borrowers' delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

(d)     Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Agent and Lenders that are reimbursable by Borrowers or any other amounts owing by Borrowers to Agent and Lenders (including, without limitation reasonable attorneys and consulting fees and expenses) in accordance with the Credit Agreement and the other Loan Documents, such projections shall not limit, impair, modify or waive the Loan Parties' obligation to pay the actual amounts due to Agent and/or Lenders in respect of such costs, expenses and other amounts owing to Agent and Lenders in accordance with the Credit Agreement and the other Loan Documents.

5.4     Ratification of Blocked Account Agreements. To the extent Agent deems it necessary in its discretion and upon Agent's reasonable request, Borrowers and Guarantors shall promptly use their best efforts to provide Agent with evidence, in form and substance reasonably satisfactory to Agent, that the all deposit account arrangements provided for under Section 2.7 of the Existing Credit Agreement have been ratified and amended by the parties thereto, or their respective successors in interest, in form and substance satisfactory to Agent, to reflect the commencement of the Chapter 11 Cases, that each Borrower and Guarantor, as Debtor and Debtor-in-Possession, is the successor in interest to such Borrower or Guarantor, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for herein.

5.5     ERISA. Each Loan Party hereby represents and warrants as of the date hereof with, to and in favor of Agent and Lenders that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of any Borrower or Guarantor arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of

any Borrower or Guarantor and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of any Borrower or Guarantor.

5.6    Consultant.

(a)    Agent shall (i) continue to retain, at all times during which the Obligations remain outstanding, on terms and conditions acceptable to Agent and at the sole cost and expense of Debtors, Winter Harbor LLC , or such other Person acceptable to Agent as their Consultant (the "US Consultant"), and (ii) engage on terms and conditions acceptable to Agent and at the sole cost and expense of Debtors, Deloitte, LLP or such other Person acceptable to Agent with respect to the assets and properties of the UK Borrowers (the "UK Consultant," together with the US Consultant, collectively, the "Consultant"). The Consultant shall monitor and report on the management of the businesses and properties of Debtors and shall, among other things, assist Debtors in the preparation of and compliance with, on an ongoing basis, the Budget and compliance with the terms and conditions set forth in the Loan Documents. The Consultant shall report directly to the Agent, and shall be authorized to share information with the agent for the DIP Note Purchasers.

(b)    Debtors hereby irrevocably authorize and direct the Consultant to consult with Agent and to share with Agent and Lenders all budgets, records, projections, financial information, reports and other information prepared by or in the possession of the Consultant relating to the Collateral, or the financial condition or operations of the businesses of Debtors. Debtors agree to provide the Consultant with complete access on a reasonable basis to all of the books and records of Debtors, all of the premises of Debtors and to all management and employees of Debtors as and when reasonably necessary for the Consultant to perform its obligations.

(c)    Debtors acknowledge and agree that Debtors shall keep the Consultant (i) fully informed of the progress of the business and operations of Debtors and respond fully to any inquiries of Agent and Lenders regarding the business and operations of Debtors and (ii) communicate and fully cooperate with the Consultant and authorize Consultant to share all information with Agent and Lenders regarding Debtors, and the business and operations of Debtors.

5.7    Limit on Outstanding Loans and Letters of Credit. Notwithstanding anything to the contrary contained in the Credit Agreement or the other Loan Documents, Borrowers shall not permit the aggregate amount of (a) outstanding Advances and Letters of Credit to exceed $30,000,000, or (b) outstanding Advances and Letters of Credit to UK Borrower denominated in British Pounds Sterling to exceed the US Dollar Equivalent of £5,000,000. Borrowers will be required to repay Advances and provide cash collateral to the extent that Advances and LCs exceed the lesser of the sum of the UK Borrowing Base and the US Borrowing Base, each as then in effect, or the Maximum Credit (in each case, in cash without any prepayment premium or penalty, but including all breakage or similar costs), or that Advances and LCs to UK Borrower exceed the lesser of the UK Borrowing Base or the UK Maximum Amount or that Advances and LCs to US Borrowers exceed the lesser of the US Borrowing Base or the Maximum Credit, on the customary terms of Agent.

5.8     Sale Process.

(a)     On the Petition Date, the Debtors shall, all in form and substance acceptable to Agent, file with the Bankruptcy Court the following:

(i)     The Interim Order;

(ii)     a motion seeking entry of the Bidding Procedures Order (as hereinafter defined) and a hearing on entry of the Bidding Procedures Order as promptly as permitted under the applicable local bankruptcy rules and to be held after the appointment of a Committee, if any;

(iii)     a motion seeking entry of an order (the "Sale Order") approving the Sale (as hereinafter defined).

(b)     The Interim Order shall be entered within 2 days of the Petition Date.

(c)     An asset purchase agreement executed by Amcor (as hereinafter defined) with respect to substantially all of the assets of the Debtors (other than Constar Holland and Constar International U.K. Limited ("Constar UK")) on terms and conditions and with a purchase price in form and substance acceptable to Agent, and pursuant to which all Obligations of Debtors to Agent and Lenders will be fully and finally paid and satisfied (the "APA").

(d)     The Bidding Procedures Order shall be entered 15 days after the Petition Date;

(e)     The auction shall take place two business days after the bid deadline set forth in the Bidding Procedures Order;

(f)     The Final Order with respect to the Sale shall be entered within 35 days of the Petition Date;

(g)     The Sale Order shall be entered within 40 days of the execution of the APA and shall provide for the full and final payment and satisfaction of all Pre-Petition and Post-Petition Obligations due Agent and Lenders and the termination of the Credit Agreement as amended hereby in accordance with its terms;

(h)     The Sale shall have closed within 50 days after execution of the APA.

(i)     "Bidding Procedures Order" means an order of the Bankruptcy Court approving (i) bidding procedures relating to the sale of the Debtors' (other than Constar Holland and Constar UK) assets and other rights (the "Sale") pursuant to which all Obligations of Debtors to Agent and Lenders will be fully and finally paid and satisfied, (ii) appointing Amcor Rigid Plastics USA, Inc. ("Amcor") as the stalking horse bidder with respect to the Sale ("Buyer").

(j)      To the extent Borrowers seek to extend any of the Milestones set forth above with the prior written consent of DIP Note Purchasers on written notice to Agent and Lenders, such Milestone in the DIP Credit Facility shall be automatically extended provided that (i) such date cannot be extended to a date which would result in the Sale closing after February 18, 2014 without the written consent of Agent, (ii) either Amcor, or a qualified alternative bidder in accordance with the terms of the Bidding Procedures Order, has not terminated, or has not sent a notice or threatened to terminate, its obligations to close the Sale in accordance with the terms of the Bidding Procedures Order, (iii) as of the date of any such extension, Excess Availability of Borrowers shall comply with the covenant set forth in Section 5.9(a) hereof, including, without limitation, a written representation by the DIP Note Purchasers that (A) the maturity date with respect to the DIP Note Purchase facility has been extended through the proposed extension date hereunder, (B) no Event of Default (as defined under the DIP Note Purchase Facility) exists or has occurred and is continuing thereunder, (C) all conditions precedent to the availability of loans under the DIP Note Purchase Facility shall have been satisfied as of such date, and (D) Loan Parties have not requested any loans or other financial accommodation under the DIP Note Purchase Facility as of such date (including under such extension period) that have been declined or rejected by DIP Note Purchasers, (iv) on or before February 10, 2014, Borrowers shall have delivered to Agent an update to the Budget with respect to the extension period, which shall be in form and substance satisfactory to Agent and shall reflect that Excess Availability of Borrowers shall comply with the covenant set forth in Section 5.9(a) hereof at all times during the period of the extension, and (v) the Maturity Date cannot be extended beyond February 18, 2014 without the written consent of Agent. Debtors confirm, acknowledge and agree that notwithstanding anything to the contrary set forth in the Credit Agreement or any of the other Loan Documents, any failure to comply with the requirements set forth in this Section 5.8 shall constitute an additional immediate Event of Default under the Loan Documents. The dates set forth in this Section 5.8 are collectively referred to as the "Sale Milestones".

5.9      <u>Financial Covenants</u>.

(a)      Borrowers shall maintain Excess Availability (after giving effect to the Special Availability Reserve) at all times greater than $-0-. In the event Excess Availability falls below such minimum at any time, it shall constitute an Event of Default and Agent and Lenders have the right to cease lending, unless the deficiency is cured within one (1) Business Day after receipt of notification of such Event of Default from Agent of its occurrence to the Chief Financial Officer of Constar, with copies to each of: The Wilmington Trust Company,  Rodney Sq. North, 1100 N. Market Street, Wilmington, Delaware 19890; Telecopier No.: 302-651-8937, and Samantha Good, Esq., Kirkland & Ellis LLP, 555 California Street, San Francisco, California 94104; Telecopier No.: 213-808-8104.

(b)      None of the actual (i) aggregate cumulative cash receipts of US Borrowers or UK Borrower with respect to each week specified in the Budget, (ii) aggregate cumulative cash disbursements of US Borrowers or UK Borrower with respect to each week specified in the Budget, (iii) aggregate cumulative capital expenditures of US Borrowers or UK Borrower with respect to each week specified in the Budget, (iv)

aggregate cumulative payroll of US Borrowers or UK Borrower with respect to each week specified in the Budget, or (v) Excess Availability for such week as set forth in the Budget, shall fall outside the Permitted Budget Variance applicable thereto as set forth on Schedule 5.9 hereto (each, a "Material Budget Deviation").

(c)    In the event of a default with respect to a covenant set forth in Section 5.9(a) or 5.9(b) hereof, Debtors shall request to draw such amounts under the DIP Note Purchase Facility and remit such amounts to Agent for application to the Obligations, in accordance with the Cash Management provisions of the DIP Note Purchase Facility as in effect as of the date, as may be necessary thereby to cure such Events of Default (i) within one (1) Business Day after receipt of notification from Agent of the occurrence of Excess Availability falling below the minimum amount set forth in Section 5.9(a) as set forth in such section, to cure the breach thereof, and (ii) within two (2) Business Days after the occurrence of a Material Budget Deviation, to cure a breach thereof.

5.10    <u>DIP Note Purchase Facility</u>.  The DIP Note Purchase Facility (a) has been entered into on or prior to the date hereof, (b) is in full force and effect, and constitutes the valid, binding and enforceable obligation of the parties thereto in accordance with the terms thereof, except as enforceability may be limited by equitable principles or applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, (c) has not been amended or modified, nor has there been any breach of the terms thereof by any party thereto which, with respect to the Debtors, would constitute an event of default thereunder.

5.11    <u>Certain Tax Matters</u>.  The parties hereby acknowledge and agree that, with respect to Advances or other financial accommodations to or for the benefit of UK Borrower as made by the London branch of Wells Fargo Bank, National Association, for UK tax purposes, such London branch is a UK-qualified Lender and, as such, the transaction is deemed to be a transaction between two UK parties, and withholding tax is not applicable.

5.12    <u>UK Borrower Assets</u>.  From and after the date that is thirty (30) days following the Petition Date, in the event that Agent and the agent in respect of the DIP Note Purchase Facility (at the direction of the required purchasers thereunder) shall both direct Borrowers to cause the UK Borrower to take any actions with respect to the sale or liquidation of the UK Borrowers' assets and properties, Borrowers shall comply with such direction and take such actions in the UK, upon five (5) days prior written notice from Agent and the agent in respect of the DIP Note Purchase Facility, utilizing commercially reasonable efforts to implement such direction, including without limitation, revising the Budget in a manner mutually agreed among Agent, the agent in respect of the DIP Note Purchase Facility and Borrowers, with respect thereto.

6.    <u>LIMITED WAIVER</u>

6.1    Agent and Lenders have not waived, are not by this Ratification Agreement waiving, and have no intention of waiving any Event of Default which may have occurred on or prior to the date hereof, whether or not continuing on the date hereof, or which

16

may occur after the date hereof (whether the same or similar to the Specified Events of Default or otherwise), other than the Specified Events of Default, as heretofore waived.  The foregoing waiver shall not be construed as a bar to or a waiver of any other or further Event of Default on any future occasion, whether similar in kind or otherwise and shall not constitute a waiver, express or implied, of any of the rights and remedies of Agent and Lenders arising under the terms of the Credit Agreement or any other Loan Documents on any future occasion or otherwise, provided that, the occurrence of any Event of Default prior to the Petition Date (collectively, the "Pre-Petition Events of Default") shall not constitute an Event of Default under the terms of this Agreement, provided further that, notwithstanding the foregoing, (i) Agent may, in its sole discretion, take or commence any action or pursue any, claims, rights or remedies against any Borrower, Guarantor or their respective agents, officers, directors, employees and representatives arising from any acts or omissions that resulted in or contributed to any Pre-Petition Event of Default, (ii) Agent may, in its sole discretion, adjust the Borrowing Base in respect of any Pre-Petition Event of Default to the extent any such Pre-Petition Event of Default would otherwise permit Agent to adjust the Borrowing Base in accordance with the terms of the Credit Agreement, and (iii) in the event that an Event of Default arises from any action taken or omitted to be taken by Agent or Lenders in connection with any Pre-Petition Event of Default, such Events of Default shall not constitute a Post-Petition Event of Default.

## 7.    AMENDMENTS TO EXISTING FINANCING AGREEMENTS.

7.1    Bankruptcy Code.  The definition of "Bankruptcy Code" set forth in the Credit Agreement is hereby amended by deleting such definition in its entirety and replacing it with the following:

> "Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

7.2    Advances.  Notwithstanding anything to contrary set forth in Section 2.1 of the Credit Agreement, or otherwise in the Credit Agreement or the other Loan Documents:

> (a)    (i) US Borrowers may elect that Advances to them, or for their benefit, bear interest at a rate per annum equal to (A) the Base Rate plus the Base Rate Margin or (B) the LIBOR Rate plus the LIBOR Rate Margin, and (ii) UK Borrower may elect that Advances to it, or for its benefit, bear interest at a rate per annum equal to (A) the Base Rate plus the Base Rate Margin or (B) the LIBOR Rate plus the LIBOR Rate Margin.

> (b)    Advances and LCs shall be provided to Borrowers, subject to the terms and conditions of the Loan Documents and availability under the Borrowing Base, which will be calculated as follows:

With respect to the UK Borrowing Base:

> (a)    the lesser of:

> > (i)    US$15,000,000, and

17

(ii)     the amount equal to (A) eighty-five (85%) percent of the US Dollar Equivalent of outstanding balance of Eligible Accounts of UK Borrower, plus (B) the least of (1) sixty-five (65%) percent multiplied by the US Dollar Equivalent of the Value of the Eligible Inventory of UK Borrower, (2) the sum of eighty-five (85%) of the Net Recovery Cost Percentage of each category of Eligible Inventory of UK Borrower multiplied by the US Dollar Equivalent of the Value thereof, and (3) the UK Inventory Loan Limit, minus

(b)     the aggregate amount of reserves, if any, established by Agent under Section 2.1(c) of the Credit Agreement in respect of Advances to be made to UK Borrower.

With respect to the US Borrowing Base:

(a)     the amount equal to eighty-five (85%) percent of the US Dollar Equivalent of the outstanding balance of Eligible Accounts of US Borrowers; plus

(b)     the lesser of (i) sixty-five (65%) percent multiplied by the US Dollar Equivalent of the Value of the Eligible Inventory of US Borrowers, or (ii) the sum of eighty-five (85%) percent of the Net Recovery Cost Percentage of each category of Eligible Inventory of US Borrowers multiplied by the Value thereof, in each case as determined by Agent in accordance with the applicable Borrowing Base Certificate, minus

(c)     the aggregate amount of reserves, if any, established by Agent under Section 2.1(c) of the Credit Agreement in respect of Advances to be made to US Borrowers.

7.3     Fees.  Notwithstanding anything to the contrary set forth in the Credit Agreement:

(a)     Borrowers shall pay to Agent, for the account of Lenders (to the extent and in accordance with the arrangements by and among Lenders) an unused line fee calculated at .375% per annum multiplied by the difference between the Maximum Credit and the average outstanding Advances and LCs during the immediately preceding month, payable monthly in arrears.

(b)     Borrowers shall pay to (i) Agent, for the account of Lenders (to the extent and in accordance with the arrangements by and among Lenders), on the daily outstanding balance of LCs a letter of credit fee at a per annum rate equal to the LIBOR Rate Margin times the Daily Balance of the undrawn amount of all outstanding LCs, and (ii) to Issuing Bank, a fronting fee equal to 0.25% per annum, in each case under clauses (i) and (ii) above, payable monthly in arrears.  In addition, Borrowers shall pay customary issuance, arranging and other fees of the Issuing Bank.

(c)     Borrowers shall pay to Agent, for the account of Lenders, a DIP Facility Fee in the amount of $175,000, which Agent shall have either received in cash, or shall have charged to a loan account of Borrowers, which fee is full earned and payable as of the date hereof.

18

7.4     Reserves. Reserves shall continue to include (i) all reserves that have been established prior to the Petition Date, including, without limitation, the Special Availability Reserve ($5,000,000), (ii) any agreed Professional Fee Carve Out (as defined in the Financing Order)in respect of the Chapter 11 Cases, (iii) the amount of any senior liens or claims in or against the Collateral that have priority over the liens and claims of Agent, (iv) the amount of the projected costs of administration in the UK, which amount shall not exceed $2,000,000, (v) the continued maintenance of a reserve in respect of the Priority Payables, which reserve shall be maintained in the amount of the US Dollar Equivalent of US$1,525,833 from and after the Petition Date, and (vi) the grant of an administrative expense claim in any Chapter 11 Case, other than such administrative expense claim permitted by the Financing Order or this Ratification Agreement, which is superior to or ranks in parity with Agent's Superpriority Claim (as defined in the Financing Order), or which Agent determines Borrowers would be directed to pay before the obligations due Agent and Lenders. Except as provided in this Section 7.4 and notwithstanding Section 2.3(c) of the Credit Agreement, Agent shall not implement any new reserves during the period the Borrowers remain in compliance with the Sale Process covenants in Section 5.8 and the Excess Availability covenant in Section 5.9 (including if such covenants have been cured in accordance with the terms hereof).

7.5     Limits and Sublimits. The Credit Agreement is hereby amended to add the following Section 2.16:

> "Section 7.16 Sublimits. All limits and sublimits set forth in this Agreement, and any formula or other provision to which a limit or sublimit may apply, shall be determined on an aggregate basis considering together both the Pre-Petition Obligations and the Post-Petition Obligations."

7.6     Payments. Notwithstanding anything to contrary set forth in Section 2.3 of the Credit Agreement, or otherwise in the Credit Agreement or the other Loan Documents, Agent may (a) in its discretion, apply any such payments or proceeds first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full and (b) apply, in its discretion, any and all such proceeds, irrespective of the currency in which received, in an amount equal to the US Dollar equivalent thereof, with the amount of any currency conversion cost, expense, loss or adjustment being solely and exclusively for the account of Loan Parties.

7.7     Conditions Precedent to All Extensions of Credit. Section 3.2(a) of the Credit Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

> "(a)     all representations and warranties contained herein and in the other Loan Documents (including, without limitation the Ratification Agreement) shall be true and correct with the same effect as though such representations and warranties had been made on and as of the date of the making of each such Loan or providing each such Letter of Credit Accommodation and after giving effect thereto, except to the extent that such representations and warranties expressly relate (i) solely to an earlier date (in which case such representations and warranties shall have been

3221844.8

true and accurate on and as of such earlier date) and (ii) to the Specified Defaults;"

7.8    Maturity. The first sentence of Section 3.3 of the Credit Agreement is hereby deleted in its entirety and the following substituted therefor:

"This Agreement and the other Loan Documents shall continue in full force and effect for a term ending on the earlier to occur of (i) the Stated Maturity Date, (ii) the consummation of the sale or sales of all or substantially all of the Debtors' assets and properties or of all equity interests in Debtors, (iii) the last termination date set forth in the Interim Financing Order, unless the Permanent Financing Order has been entered prior to such date, and in such event, then the last termination date set forth in the Permanent Financing Order, or (iv) the occurrence of an Event of Default under the Loan Documents as amended by the Ratification Agreement (the earlier to occur of clauses (i), (ii), (iii) and (iv) referred to herein as the "Termination Date") "

7.9    Additional Financial Reporting Requirements. Without limitation upon Schedule 5.1 to the Credit Agreement or any other provision thereof, Borrowers shall deliver to Agent copies of all financial reports, schedules and other materials and information at any time furnished by or on behalf of any Borrower or Guarantor to the Bankruptcy Court, or the U.S. Trustee or to any creditors' committee or such Borrower's or Guarantor's shareholders, concurrently with the delivery thereof to the Bankruptcy Court, creditors' committee, U.S. Trustee or shareholders, as the case may be.

7.10    Indebtedness. Notwithstanding anything to the contrary contained in Section 6.1 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness (other than (a) Indebtedness permitted under Section 6.1 of the Credit Agreement existing as of the Petition Date, (b) Indebtedness evidenced by the Credit Agreement and the other Loan Documents and (c) Indebtedness under the DIP Note Purchase Facility, to the extent authorized under this Ratification Agreement and approved by the Bankruptcy Court; provided, that, all such permitted Indebtedness is specifically provided for in the Budget), without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender).

7.11    Encumbrances. Notwithstanding anything to the contrary contained in Section 6.2 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume or suffer to exist, directly or indirectly, any lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom (other than (a) liens permitted under the definition of "Permitted Liens" set forth in the Credit Agreement existing on the Petition Date, (b) liens securing the Obligations, and (c) liens arising after the Petition Date in respect of the DIP Note Purchase Facility and

20

otherwise permitted under clauses (a), (b) and (c) of the definition of "Permitted Liens" set forth in the Credit Agreement; provided, that, the priority of such liens permitted under clauses (a), (b) and (c) of the definition of "Permitted Liens" set forth in the Credit Agreement are subject to the provisions of the Term Intercreditor Agreement and have the same priority as existing Liens in favor of the Agent or the Term Agent, as applicable, with respect to Collateral of such type as of the date hereof.

      7.12   Sale of Assets. Notwithstanding anything to the contrary contained in Section 6.4 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any portion of Borrower's or its Subsidiaries' Collateral or other assets, including, without limitation, assume, reject or assign any leasehold interest or enter into any agreement to return Inventory to vendor, whether pursuant to section 546 of the Bankruptcy Code or otherwise; provided, that, such sales are permitted by Section 5.8 of the Ratification Agreement or are in accordance with the Budget), (b) any other sales expressly provided for in the Budget), (c) the Sale, and (d) the sale of the Old Bay Lane facility, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender), except to the extent specifically set forth in the Budget.

      7.13   Restricted Payments. Notwithstanding anything to the contrary contained in the Credit Agreement or any of the other Loan Documents, each Borrower and Guarantor shall not, directly or indirectly, declare or pay any dividends on account of any shares of class of any Capital Stock of such Borrower or Guarantor now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Capital Stock (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender), except to the extent specifically set forth in the Budget.

      7.14   Investments; Controlled Investments. Notwithstanding anything to the contrary contained in the Credit Agreement or any of the other Loan Documents, Borrowers and Guarantors will not, and will not permit any Subsidiary, after the date hereof, to, directly or indirectly, make or acquire any investment or incur any liabilities (including contingent obligations) for or in connection with any investment (other than investments permitted under clause (a) of the definition of "Permitted Investments" existing on the Petition Date), without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender), except to the extent specifically set forth in the Budget.

      7.15   Events of Default. The Credit Agreement is hereby amended by adding the following Section 8.13:

      "8.13 The occurrence of any of the following:

3221844.8

(a)     any condition or event which permits Agent, and Lenders to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in the Financing Order)."

(b)     the termination or non-renewal of the Loan Documents as provided for in the Financing Order;

(c)     conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(d)     dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(e)     the grant of a lien on or other interest in any property of any Borrower or Guarantor, other than a lien permitted under Section 9.8 hereof or a lien or encumbrance permitted by the Financing Order, which is superior to or ranks in parity with Agent's security interest in or lien upon the Collateral;

(f)     the grant of an administrative expense claim in any Chapter 11 Case, other than such administrative expense claim permitted by the Financing Order or this Ratification Agreement, which is superior to or ranks in parity with Agent's Superpriority Claim (as defined in the Financing Order);

(g)     the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent or any Lender);

(h)     the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(i)     the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(j)     the filing of a plan of reorganization or liquidation by or on behalf of any Borrower or Guarantor, to which Agent has not consented in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

(k)     the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of any Borrower or Guarantor, to which Agent has not consented to in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

(l)     entry of an order granting relief from the automatic stay to the holder or holders of security interests to permit foreclosures (or granting similar relief) on any property of the Debtors having a value in excess of $100,000 without the prior written consent of the Agent and the Required Lenders;

3221844.8

(m)     the filing of a motion by any Debtor (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Agent or any of the Lenders directly) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise);

(n)     if a Borrower or any of its Subsidiaries suspends or discontinues or is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of Borrowers and their Subsidiaries, taken as a whole, or a trustee, receiver or custodian is appointed for any Loan Party, or any of their respective properties, except to the extent such suspension or discontinuance of business occurs in accordance with the Budget and the terms of the Ratification Agreement;

(o)     an event of default by any Loan Party or any of their Affiliates under, or with respect to, the DIP Note Purchase Facility Documents, after the expiration of any applicable cure period with respect thereto, unless waived prior thereto;

(p)     the failure by any DIP Note Purchaser to perform all of its obligations under the DIP Note Purchase Facility Documents, including, without limitation, the making of loans or purchasing of notes as contemplated thereunder.

7.16    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver. Section 12(a) of the Credit Agreement is hereby amended by deleting the period and adding the following at the end thereof: ", except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing."

8.    RELEASE.

8.1    Release of Pre-Petition Claims.

(a)     Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of the Secured Parties contained herein and the making of any Loans by Agent and Lenders, each Loan Party, pursuant to the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges each of the Secured Parties and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (each of the Secured Parties and all such other parties, in their capacities as such, being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims,

counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Loan Party, or any of their respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Ratification Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Credit Agreement, as amended and supplemented through the date hereof, and the other Loan Documents.

(b)     Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Loan Party pursuant to this Section 8.1. If any Loan Party violates the foregoing covenant, Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.2     Release of Post-Petition Claims. Upon (a) the receipt by Agent, on behalf of itself and the other Lenders, of payment in full of all Obligations in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Agent to secure any Obligations that survive or continue beyond the termination of the Loan Documents, and (b) the termination of the Loan Documents (the "Payment Date"), in consideration of the agreements of the Secured Parties contained herein and the making of any Loans by Agent and Lenders, each Loan Party hereby covenants and agrees to execute and deliver in favor of each of the Secured Parties a valid and binding termination and release agreement, in form and substance satisfactory to Agent. If any Loan Party violates such covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.3     Releases Generally.

(a)     Each Loan Party understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)     Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

3221844.8

9.    CONDITIONS PRECEDENT.

In addition to any other conditions contained herein or the Credit Agreement, as in effect immediately prior to the Petition Date, with respect to the Loans and other financial accommodations available to Borrowers (all of which conditions, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Loans and be applicable to other financial accommodations available to Borrowers), the following are conditions to Agent's and Lenders' obligation to extend further loans, advances or other financial accommodations to Borrowers pursuant to the Credit Agreement:

9.1    Borrowers and Guarantors shall furnish to Agent and Lenders all financial information, projections, budgets, business plans, cash flows and such other information as Agent and Lenders shall reasonably request from time to time;

9.2    as of the Petition Date, the Existing Loan Documents shall not have been terminated;

9.3    no trustee, examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code or receiver or the like shall have been appointed or designated with respect to any Loan Party, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief;

9.4    the execution and delivery of this Ratification Agreement and all other Loan Documents by the Loan Parties, Agent and Lenders, and the payment to Agent by Borrowers of a DIP Financing Fee in the amount of $175,000;

9.5    the Interim Financing Order or other Order(s) of the Bankruptcy Court shall ratify and amend the deposit account arrangements of the Loan Parties to reflect the commencement of the Chapter 11 Cases, that each Debtor, as Debtor and Debtor-in-Possession, is the successor in interest to such Loan Party, as the case may be, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in this Ratification Agreement;

9.6    the execution or delivery to Agent and Lenders of all other Loan Documents, and other agreements, documents and instruments which, in the good faith judgment, of Agent are necessary.  The implementation of the terms of this Ratification Agreement and the other Loan Documents, as modified pursuant to this Ratification Agreement, all of which contains provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Agent and its counsel;

9.7    Each Loan Party shall comply in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner prescribed by the Bankruptcy Code and the applicable Bankruptcy Rules, and an Interim Financing Order shall have been entered by the Bankruptcy Court (the "Interim Financing Order") authorizing the secured financing under the Loan Documents as ratified and amended hereunder on the terms and conditions set forth in this Ratification Agreement and, among other things, modifying the automatic stay, authorizing and

granting the senior security interest in liens in favor of Agent described in this Ratification Agreement and in the Financing Order, and granting super-priority expense claims to Agent and Lenders with respect to all obligations due Agent and Lenders. The Interim Financing Order shall authorize post-petition financing under the terms set forth in this Ratification Agreement in an amount consistent with the Budget, and it shall contain such other terms or provisions as Agent and its counsel shall require;

9.8    with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered a Permanent Financing Order authorizing the secured financing on the terms and conditions set forth in this Ratification Agreement, granting to Agent (for the benefit of each of the Secured Parties) the senior security interests and liens described above and super-priority administrative expense claims described above (except as otherwise specifically provided in the Interim Financing Order), and modifying the automatic stay and other provisions required by Agent and its counsel ("Permanent Financing Order"). Neither Agent nor any Lender shall provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order with respect to which an effective stay exists;

9.9    other than the voluntary commencement of the Chapter 11 Cases, no material impairment of the priority of Agent's security interests in the Collateral shall have occurred from the date of the latest field examinations of Agent to the Petition Date;

9.10    Excess Availability after the application of proceeds of any initial funding and the issuance of any LCs hereunder and after provision for payment of all fees and expenses of the transaction, of not less than -0-, after giving effect to the Special Availability Reserve and the implementation of any other reserves in accordance with Section 7.4 hereof; and

9.11    no Event of Default, other than the Specified Events of Default, shall have occurred or be existing under any of the Existing Loan Documents, as modified pursuant hereto, and assumed by Borrowers and Guarantors.

10.    <u>MISCELLANEOUS.</u>

10.1    <u>Amendments and Waivers.</u> Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

10.2    <u>Further Assurances.</u> Each Loan Party shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Agent and Lenders of all the rights and remedies hereunder, under any of the

3221844.8

other Loan Documents, any Financing Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent and Lenders, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Loan Documents or the Financing Order. Upon the request of Agent, at any time and from time to time, each Loan Party shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office, the financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and Lenders such instruments evidencing items of Collateral as may be requested by Agent.

10.3     Headings.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

10.4     Counterparts.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

10.5     Additional Events of Default.  The parties hereto acknowledge, confirm and agree that the failure of any Loan Party to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by such Loan Party in connection herewith shall constitute an immediate Event of Default under the Loan Documents.

10.6     Costs and Expenses.  Borrowers shall pay to Agent and Lenders on demand all costs and expenses that Agent, or Lenders pay or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, defense (whether in connection with any adversary proceeding or otherwise) and termination of this Ratification Agreement and the other Loan Documents and the Financing Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Agent and Lenders; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification Agreement, the other Loan Documents, the Financing Order and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing

statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Agent in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of the Loan Parties under the Loan Documents or the Financing Order that Loan Parties fail to pay or take; (e) costs of appraisals, inspections and verifications of the Collateral and including reasonable travel, lodging, and meals for inspections of the Collateral and the Debtors' operations by Agent or its agent and to attend court hearings or otherwise in connection with the Chapter 11 Cases; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations of the Collateral and Debtors' operations, plus a per diem charge at the rate of $1,200 per person per day for Agent's examiners in the field and office; and (h) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Agent, sell or otherwise realize upon the Collateral, defend against, or respond in connection with, any action or proceeding relating to the Debtors, the Loan Documents or the Financing Order, and otherwise enforce the provisions of this Ratification Agreement, the other Loan Documents and the Financing Order, or to defend any claims made or threatened against any of the Secured Parties arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters). The foregoing shall not be construed to limit any other provisions of the Loan Documents regarding costs and expenses to be paid by Borrowers. All sums provided for in this Section 10.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Loan Documents. Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to any Loan Party.

       10.7   <u>Conflicts with Other Loan Documents</u>. Unless otherwise expressly provided in this Ratification Agreement (or in another Loan Document by specific reference to the applicable provision contained in this Ratification Agreement), if any provision contained in this Ratification Agreement conflicts with any provision of any other Loan Document, the provision contained in this Ratification Agreement shall govern and control.

       10.8   <u>Effectiveness</u>. This Ratification Agreement shall become effective upon the execution hereof by Agent and Lenders and the entry of the Interim Financing Order.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

3221844.8

Schedule 5.9

Permitted Budget Variance Percentage or Amount

| Cumulative Receipts (for each of all US, and for UK) from the date of the Ratification Agreement through and including the week ending: | Cumulative Disbursements (for each of all US, and for UK) from the date of the Ratification Agreement through and including the week ending: | Cumulative Capital Expenditures (for each of all US, and UK) from the date of the Ratification Agreement through and including the week ending: | Cumulative Payroll (for each of all US, and UK) from the date of the Ratification Agreement through and including the week ending: | Excess Availability from the date of the Ratification Agreement through and including the week ending: |
|---|---|---|---|---|
| 12/20; 25% | 12/20; 25% | 12/20 and each week thereafter; 10% | 12/20 and each week thereafter; 10% | 12/20; $1.5MM |
| 12/27; 25% | 12/20; 25% | | | 12/27; $1.5MM% |
| 1/3; 25% | 12/20; 25% | | | 1/3; $1.5MM% |
| 1/10; 25% | 12/20; 25% | | | 1/10; $1.5MM% |
| 1/17 and thereafter; 15% | 1/17 and thereafter; 15% | | | 1/17 and thereafter; $1.0MM |
| | | | | |

3221844.8

## Schedule A to Ratification and Amendment Agreement

**Commercial Tort Claims**

3221844.8

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

**<u>BORROWERS</u>**

**CONSTAR, INC.**

By: _____

Title: _____

**CONSTAR INTERNATIONAL LLC**

By: _____

Title: _____

**CONSTAR INTERNATIONAL U.K. LIMITED**

By: _____

Title: _____

**<u>GUARANTORS</u>:**

**CONSTAR GROUP, INC.**

By: _____

Title: _____

**CONSTAR FOREIGN HOLDINGS, INC.**

By: _____

Title: _____

**BFF INC.**

By: _____

Title: _____

**[SIGNATURES CONTINUE ON NEXT PAGE]**

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**DT, INC.**

By:        _____

Title:     _____


**AGENT AND LENDERS**:

**WELLS FARGO CAPITAL FINANCE, LLC**, a
Delaware limited liability company, as Agent

By:        _____

Title:     _____

**WELLS FARGO BANK, NATIONAL
ASSOCIATION**, as a Lender

By:        _____

Title:     _____