# EXHIBIT B

## DIP Term Sheet

3221841.6

3225859.2

KIRKLAND & ELLIS LLP DRAFT DATED DECEMBER 19, 2013

# Term Sheet
## for a Senior Secured Term Loan Priority Collateral Priming Super-Priority DIP Note Purchase Facility
### provided to
### Constar International LLC, Constar, Inc., Constar Foreign Holdings, Inc., DT, Inc., and BFF Inc.

Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to them in that certain Intercreditor Agreement, dated as of May 31, 2011 (the "**Master Intercreditor Agreement**"), among (a) Wells Fargo Capital Finance, LLC, in its capacity as administrative and collateral agent for the "Revolving Loan Secured Parties" (the "**Revolving Loan Agent**"), (b) Black Diamond Commercial Finance, L.L.C., in its capacity as administrative agent and collateral agent for the "Shareholder Debt Holders" (the "**Shareholder Term Loan Agent**"), (c) Black Diamond Commercial Finance, L.L.C., in its capacity as administrative agent and collateral agent for the "Roll-Over Debt Holders" (the "**Roll-Over Term Loan Agent**"), and the Companies (as defined below) or if not defined therein in the Roll-Over Facility Agreement or if not defined therein, in the Shareholder Facility Agreement.

The Facility described herein shall be provided in conjunction with that certain DIP Credit Facility provided by Wells Fargo Capital Finance, LLC, the term sheet with respect to which is attached hereto as **Exhibit I** (the "**DIP Credit Facility**")[1].

| | |
|---|---|
| **ISSUERS:** | Constar International LLC, a Delaware limited liability company ("**Holdings**"), Constar, Inc., a Pennsylvania corporation ("**Lead Issuer**"), Constar Foreign Holdings, Inc., a Delaware corporation, BFF Inc., a Delaware corporation, and DT, Inc., a Delaware corporation, in their capacities as debtor-in-possession and debtor-in-possession affiliates and subsidiaries in cases (the "**Cases**") to be commenced under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Code**"). |
| **GUARANTORS:** | Constar Group, Inc., a Delaware corporation ("**Parent**") and each subsidiary (other than Constar International Holland (Plastics) B.V. ("**Constar Holland**") of Holdings that is not an Issuer (the |

---

[1] Reserves shall be hard-wired at: (a) $5 million special availability reserve, (b) $1.175 million existing reserves, (c) professional reserve build-up pursuant to Budget, (d) $2 million UK reserve and (e) $560,000 special UK reserve.

CONFIDENTIAL

| | |
|---|---|
| | Guarantors together with the Issuers, the "**Companies**"). |
| **PURCHASER:** | Initially, Sola Ltd, Ultra Master Ltd, Northeast Investors Trust, JP Morgan High Yield Fund, JP Morgan Strategic Income Opportunities Fund, and/or any of their designated affiliates ("**Initial Purchasers**") will commit to provide the Facility, provided, that to the extent JP Morgan High Yield Fund or JP Morgan Strategic Income Opportunities Fund so request, Sola Ltd and Ultra Master Ltd shall fund their allocations. However, upon the effectiveness of the Purchaser Allocation (defined below), Initial Purchasers and each entity designated pursuant to the Purchaser Allocation shall constitute Purchasers in such portions as are applicable pursuant to the Purchaser Allocation, with the commitments of the Initial Purchasers ratably reduced thereby.<br><br>"**Purchaser Allocation**": Each Roll-Over Secured Party and Shareholder Secured Party shall be given the opportunity prior to the entry of the Final Order (defined below) to be a Purchaser hereunder in an amount equal to the greater of (a) a percentage of the New Money Facility equal to the Term Loan Debt it holds divided by all Term Loan Debt and (b) an amount agreed to by Initial Purchasers. |
| **AGENT:** | Wilmington Trust. |
| **FACILITY:** | To the extent permitted by the Bankruptcy Court and pursuant to the terms herein, $56 million priming delayed draw note purchase facility payable in full on the Maturity Date, (a) consisting of a "**New Money Facility**" equal to $14 million which shall be (i) available based on satisfaction of the conditions precedent set forth below (the "**Conditions Precedent**") and the other terms and conditions herein, (ii) funded to Agent's Disbursement Account (as defined below) on the Closing Date in an amount equal to $7 million (the "**Initial New Money Notes**") and with the remaining amount funded on the date of entry of the Final Order, provided, that to the extent approved in the Interim Order, the full $14 million shall be funded on the date of entry of the Interim Order and (iii) disbursed from the Agent's Disbursement Account on a weekly basis in accordance with the Budget until the Maturity Date (or more frequently as may be determined by Required Purchasers and notified to the Agent in writing) or in order to effectuate a Cure (as defined below), and (b) consisting of a "**Roll Up Facility**" equal to $42 million which (i) shall be issued on the Closing Date to each Initial Purchaser on a 3:1 basis for every dollar of the New Money Facility committed by such Initial Purchaser and (ii) when issued shall be exchanged on a dollar-for-dollar basis for the Term Loan |

2

CONFIDENTIAL

Debt identified by such Initial Purchaser as being subject to such exchange (i.e., such Purchaser may identify Roll-Over Facility Indebtedness and/or Shareholder Facility Indebtedness held by it or its affiliates as the subject of such roll-up). The Roll Up Facility shall be restructured to reflect any Purchaser Allocation pursuant to mechanics to be agreed. On the date of the first funding of the New Money Facility, $200,000 of such proceeds shall be applied as a payment to the Roll-Over Secured Parties that provided the funding to the Companies on December 18, 2013 in the amount of $200,000 (the "**$200,000 Advance**") so that the Companies could pay fees of counsel associated with preparation of the Cases. **<u>Notwithstanding anything herein to the contrary</u>**, the Roll Up Facility shall not be implemented until the date of the Final Hearing nor shall it be implemented to the extent that one or more affiliates of Black Diamond Commercial Finance commit no later than 5 business days prior to such hearing to participate in the New Money Facility on a percentage basis equivalent to the percentage ownership of all such Black Diamond affiliates in the Roll-Over Facility Agreement (the "**BD Participation**"), provided further that such commitment shall be subject to no additional terms and conditions.

The "**Agent's Disbursement Account**" shall mean a non-interest bearing trust account established by Initial Purchasers and maintained by Agent in the name of the Agent on behalf of the Purchasers. All amounts funded to the Agent's Disbursement Account shall be deemed payments made by Purchasers for DIP Notes issued by Issuers to Purchasers and shall accrue interest at the applicable rate set forth herein. Agent shall be entitled to pay interest, fees, expenses and indemnification amounts as set forth herein which are due and payable to Agent or Purchasers from amounts on deposit in the Agent's Disbursement Account. Companies shall have no right, title or interest in amounts on deposit in Agent's Disbursement Account.

Notwithstanding anything herein to the contrary, without the consent of the Required Purchasers, no more than $7 million of the Facility (the "**Interim Facility**") shall be available prior to the entry of the Final Order (as defined below) except to the extent that the Interim Order permits the full funding of the New Money Facility on the date of entry thereof. The Facility shall be due and payable on the date that is thirty-five (35) days from the date of entry of the Interim Order (as defined below) (the "**Interim Facility Maturity Date**") unless a Final Order has been entered by the Bankruptcy Court on or before such date.

**CONFIDENTIAL**

| | |
|---|---|
| **RATE:** | 12% per annum paid in cash weekly in arrears. Upon an event of default, such Rate shall be increased by 2%. |
| **FEES:** | $560,000 up front fee payable to Initial Purchasers which shall be paid from the proceeds of the Initial New Money Notes. |
| | 2% per annum unused commitment fee payable to Purchasers, payable weekly in arrears. |
| | $60,000 administration fee due and payable to Agent in advance upon closing and such additional fees and expenses as are set forth in such Agent's fee letter provided to Companies. |
| | An exit fee payable to the Purchasers on the earlier of (a) repayment of any portion of the New Money Facility in an amount equal to 2% of the amount so repaid and (b) the Maturity Date in an amount equal to 2% of the New Money Facility less any amounts paid under clause (a). |
| | A prepayment fee of 4% of the total New Money Facility if the New Money Facility is repaid prior to the Maturity Date (defined below); provided, however, such fee is waived (a) if the New Money Facility is repaid in cash in connection with the Sale on or prior to the applicable Milestone for the closing date of the sale and (b) with respect to any prepayment made with the proceeds of the sale of the facility located at Old Bay Lane. |
| **MATURITY DATE:** | The Notes shall be repaid in full on the date that is the earliest of (i) the Interim Facility Maturity Date if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) February 10, 2014 or, if applicable, the Extension Date defined below (the "**Scheduled Maturity Date**"), (iii) the closing of the sale of all or substantially all of the assets of the Companies, (iv) the substantial consummation (as defined in 11 U.S.C. §1101(2)) of a plan of reorganization of the Companies, which has been confirmed by an order entered by the Bankruptcy Court (the "**Confirmation Order**"), (v) conversion of one or more of the Cases into a case under Chapter 7 of the Bankruptcy Code and (vi) declaration of the "Maturity Date" by Required Purchasers at any time when an Event of Default has occurred and is continuing (such earliest date, the "**Maturity Date**"). The joint and several obligations of Issuers and the Guarantors to the Agent and the Purchasers under the Facility may only be satisfied and discharged by the payment in full in cash to the Agent and the Purchasers of all obligations under the Facility. |
| | At the request of the Lead Issuer, the Required Purchasers may, in |

|  |  |
|---|---|
|  | their sole discretion, agree to provide an extension of the Facility (with written notice to the Agent) to any date agreed by the Required Purchasers and the Lead Issuer (the "**Extension Date**"), provided, that any such extension (a) shall require the payment of an extension fee to the Purchasers equal to 2.0% of the then outstanding principal amount of the New Money Facility, (B) shall require extension of the DIP Credit Facility on terms and conditions acceptable to Required Purchasers, and (b) shall require modification of the Budget and certain other terms and conditions required by Required Purchasers reflecting such extension and the terms thereof, which may include changes to rate and other fees. |
| **CLOSING DATE:** | The Facility shall close on the first date on or after which all of the following have occurred: (i) the Bankruptcy Court has entered the Interim Order (as defined below), (ii) all definitive note documentation for the Facility, which shall be satisfactory to the Initial Purchasers and the covenants in such documents shall be no more permissive than the documentation evidencing the DIP Credit Facility (the "**DIP Note Documentation**") has been executed by Issuers, the Guarantors, the Agent, and the Purchasers and (iii) all Conditions Precedent have been satisfied or waived by the Purchasers, which date shall not be later than December 20, 2013. |
| **USE OF PROCEEDS:** | To provide for payment of fees and expenses (including indemnities of the Agent and other amounts under the Facility), interest, adequate protection payments described herein (including repayment of the $200,000 Advance), postpetition working capital and other general corporate purposes of Issuers and Guarantors in accordance with a budget from the Petition Date through the Scheduled Maturity Date approved by the Initial Purchasers ("**Budget**"). At the sole initiative of Required Purchasers (without any consent required from Issuers), proceeds may also be directed by Required Purchasers towards the repayment of the DIP Credit Facility or the prepetition Revolving Loan Agreement in order to cure or cash collateralize ("**Cure**") borrowing base deficiencies or Material Budget Deviations (as defined in Exhibit I). Any modifications to the Budget in effect on the Closing Date shall only require the consent of Issuers and Required Purchasers. |
| **MILESTONES:** | Failure to achieve any of the following Milestones shall constitute an immediate Event of Default under the Facility unless the Required Purchasers have provided written pre-approval for an extension (which Agent shall do upon direction of Required Purchasers):<br><br>(1) The petition date ("**PD**") shall be not later than December 19, |

CONFIDENTIAL

2013;

(2) On the PD, the Debtors shall, all in form and substance acceptable to the Initial Purchasers, file with the Bankruptcy Court the following:

(a)   a motion to approve an interim order in form and substance acceptable to Purchasers (the "**Interim Order**") and a final order in form and substance acceptable to Purchasers (the "**Final Order**"), which will incorporate the Budget and authorize the Facility and the DIP Credit Facility;

(b)   a motion seeking entry of the Bidding Procedures Order and a hearing on entry of the Bidding Procedures Order as promptly as permitted under the applicable local bankruptcy rules and to be held after the appointment of a Committee, if any;

(c)   a motion seeking entry of an order approving the Sale (the "**Sale Order**").

(3) The Interim Order shall be entered within 2 days of the PD.

(4) The Bidding Procedures Order shall be entered within 15 days after the PD;

(5) The auction shall take place two business days after the bid deadline set forth in the Bidding Procedures Order;

(6) The Sale Order shall be entered within 40 days of the execution of the APA;

(7) The Final Order shall be entered within 35 days of the PD;

(8) The Sale shall have closed within 50 days after execution of the APA.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving (i) bidding procedures relating to the sale of the Companies assets and other rights (the "**Sale**"), (ii) appointing Amcor Rigid Plastics USA, Inc. ("**Amcor**") as the stalking horse bidder with respect to the Sale ("**Buyer**") and (iii) approving bid protections for Buyer, in each case in form and substance and otherwise on terms and for a price acceptable to Required Purchasers.

To the extent Purchasers extend any Milestone, such Milestone in

6

CONFIDENTIAL

the DIP Credit Facility shall be automatically extended provided that the extension shall not modify the "Term" of the DIP Credit Facility.

**MANDATORY PREPAYMENTS:** Issuers shall make mandatory prepayments, subject to exceptions, thresholds, and reinvestment rights to be mutually agreed, from the net cash proceeds of (i) non-ordinary course asset sales by any of the Companies to a third party (including, but not limited to, the proposed sale of the "Old Bay Lane" facility), (ii) insurance with respect to casualty events involving the Companies and occurring after the Closing Date, (iii) extraordinary receipts, and (iv) the deposit with respect to the Sale, with such mandatory prepayments to be applied as set forth in the definitive note documentation. In accordance with the Collateral/Priority scheme set forth below, if the deposit under the APA is paid to Companies, it shall be distributed as follows, assuming $20M outstanding under the DIP Credit Facility and $56M outstanding under the Facility: (a) 20/76 of amount to DIP Credit Facility and (b) 56/76 to the Facility.

**COLLATERAL/PRIORITY:** All obligations of the Companies to the Purchasers and the Agent in respect of the Facility shall be:

(X) entitled to superpriority administrative expense claim status pursuant to 11 U.S.C. § 364(c)(1), in each case, subject only to the agreed-upon carve out ("**Carve Out**") but pari passu with the DIP Credit Facility, and

(Y) secured pursuant to 11 U.S.C. §§ 364(c)(2), 364(c)(3), and 364(d) by a security interest in and lien on all now owned or hereafter acquired assets and property of the Companies, real and personal, tangible or intangible (the "**Collateral**").

The security interests in and liens on the Collateral in respect of the Facility shall be perfected first priority, not subject to subordination other than to permitted liens acceptable to the Required Purchasers, but shall be subject to (a) the Carve Out and (b) the lien with respect to the DIP Credit Facility with respect to Revolving Loan Priority Collateral and of the Revolving Loan Secured Parties with respect to Revolving Loan Priority Collateral, which shall have priority over the lien on the Revolving Loan Priority Collateral securing the Facility.

The Interim Order and the Final Order shall provide that the first priority liens granted in favor of the Agent in respect of the Facility, for the benefit of the Purchasers, shall "prime" all existing liens except as set forth in clauses (a) and (b) above.

7

CONFIDENTIAL

|  |  |
|---|---|
|  | Notwithstanding anything herein to the contrary, the DIP Credit Facility and Facility shall have superpriority liens with respect to (a) the proceeds of the Sale, (b) the deposit with respect to the APA and (c) all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to, inter alia, Sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, which liens shall be pari passu to one another and only subject to the Carve Out. By way of example, if the Sale is consummated with $65M of net cash proceeds, the proceeds shall be applied (a) first, ratably to (i) the DIP Credit Facility and the Carve Out and (ii) the New Money Facility, (b) second to the Roll Up Facility (c) third to the Roll-Over Secured Parties, and (d) fourth to the Shareholder Secured Parties. |
| **CASH MANAGEMENT:** | All disbursements from Agent's Disbursement Account shall be made to Issuers at their existing operating accounts within their cash management system (with wire instructions to be provided to Agent) and promptly used by Issuers for the purposes set forth in the Budget, subject to permitted variances. All other receipts from whatever source received by the Companies shall be immediately deposited into their existing cash management system and applied as set forth in Exhibit I. |
| **CARVE OUT** | Liens granted to the Agent for the benefit of the Purchasers will be subject to an agreed upon carve out for the payment of the following amounts: (i) fees pursuant to 28 U.S.C. § 1930(a), and (ii) the aggregate allowed unpaid fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professional persons retained pursuant to an order of the Bankruptcy Court by the Companies or an official committee of unsecured creditors appointed in the Cases (the "**Committee**"), (x) to the extent incurred prior to delivery of a notice of an Event of Default and the imposition of the Carve Out (such notice a "**Carve Out Trigger Notice**") and (y) incurred after delivery of the Carve Out Trigger Notice in the aggregate amount not to exceed $175,000; *provided, however,* that the Carve Out shall not include, apply to or be available for (a) any success fee or similar payment to any professionals or other persons payable in connection with a restructuring or asset disposition with respect to the Companies or otherwise except that the Carve Out shall include the payment of the Lincoln Fees, or (b) any fees or expenses incurred by any party, including any Companies or the Committee, or their respective professionals in connection with, or relating to, the prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Roll-Over Secured Parties or |

8

CONSTAR DIP TERM SHEET

CONFIDENTIAL

|  |  |
|---|---|
|  | Shareholder Secured Parties (whether in their capacities as creditors or equityholders) (the "**Carve Out**"). "**Lincoln Fees**" mean (a) the "Sale Transaction Fee" payable upon consummation of the Sale to Lincoln Partners Advisors LLC ("**Lincoln**") pursuant to that certain engagement letter between Holdings and Lincoln dated October 10, 2013 (the "**Lincoln Letter**"), (b) the "Monthly Retainers" due and owing with respect to the period prior to the Carve Out Trigger Notice delivery to the extent such "Monthly Retainers" are set forth in the Lincoln Letter and (c) the expense reimbursements and indemnification amounts described in the Lincoln Letter. |
| **USE OF CASH COLLATERAL:** | Issuers shall be authorized to use cash collateral in accordance with the Budget (with such variances as are permitted hereby), unless an Event of Default has occurred and the Required Purchasers direct that cash collateral may not be used. |
| **ADEQUATE PROTECTION FOR CERTAIN SECURED CREDITORS:** | As adequate protection for any diminution in the value of their collateral from and after the PD, (a) the Revolving Loan Secured Parties shall be paid current interest at the applicable non-default rate, and (b) the Revolving Loan Secured Parties and Term Loan Secured Parties shall receive (i) liens on all existing and future tangible and intangible assets of the Debtors allocated in such priority as set forth below, subject only to the Carve Out, the security interests and liens securing the Facility and the DIP Credit Facility and the liens in favor of the Revolving Loan Secured Parties on the Revolving Loan Priority Collateral and (ii) reimbursement of the reasonable fees and expenses of their respective professionals. To the extent such replacement liens are insufficient to provide adequate protection, such creditors shall have adequate protection claims arising under § 507(b) of the Bankruptcy Code, which claims shall be junior to the DIP Credit Facility claims and the Facility claims and shall be payable from and have recourse to all assets and property of the Companies. |

| *Relative Priorities* | **Revolving Loan Priority Collateral** | **Term Loan Priority Collateral** | **Proceeds of the Sale or any Sale Deposit** |
|---|---|---|---|
| (1) | DIP Credit Facility | The Facility | Ratably to DIP Credit Facility and The New Money Facility, provided that each shall be paid in full in cash from the Sale |
| (2) | Revolving Loan | Roll-Over Secured | The Roll Up |

9

CONFIDENTIAL

|     | Secured Parties | Parties | Facility |
|-----|-----------------|---------|----------|
| (3) | The Facility | Shareholder Secured Parties | |
| (4) | Roll-Over Secured Parties | DIP Credit Facility | Then in accordance with relative priorities for Revolving Loan Priority Collateral and Term Loan Priority Collateral |
| (5) | Shareholder Secured Parties | Revolving Loan Secured Parties | |

**CONDITIONS PRECEDENT:** The DIP Note Documentation shall include usual and customary conditions precedent to the Facility acceptable to the Initial Purchasers, including but not limited to:

1. The Interim Order and Final Order, and the motion to be filed with respect thereto, shall be satisfactory to the Required Purchasers in form and substance.

2. The execution and delivery of all agreements, instruments, and other documents evidencing or securing the DIP Notes consistent with this term sheet and in form and substance satisfactory to the Initial Purchasers, it being agreed that (x) no security documents shall be required to be delivered prior to entry of the Final Order, (y) Issuers shall exercise commercially reasonable efforts to obtain within 15 days from the date of the Interim Order the original stock certificates and other collateral in the possession of existing creditors, and (z) Issuers shall exercise commercially reasonable efforts to obtain within 15 days from the entry of the Interim Order any requested deposit account control agreements, insurance policy endorsements with respect to loss payee and additional insured status of Agent, as appropriate, and real property mortgages.

3. The DIP Credit Facility shall be in form and substance acceptable to Agent and Purchasers and shall be in full force and effect.

4. There shall be an asset purchase agreement executed by Amcor with respect to substantially all of the assets of the Companies (other than Constar Holland and Constar International U.K. Limited ("**Constar UK**")) on terms and conditions and with a purchase price in form and substance

10

CONSTAR DIP TERM SHEET

KE 28940818.3

acceptable to Purchasers (the "APA").

5. All necessary governmental, shareholder, and third-party approvals and/or consents have been obtained by the Companies and remain in effect.

6. Issuers and Guarantors have insurance that is satisfactory to the Required Purchasers.

7. Issuers have paid to the Initial Purchasers and the Agent all fees and expenses then owing to them.

8. Any orders entered by the Bankruptcy Court shall have been satisfactory in form and substance to the Required Purchasers.

9. The Initial Purchasers shall have the Budget, which shall be acceptable to them.

10. No default or event of default shall exist under the DIP Note documents, the DIP Credit Facility, the Interim Order, or the Final Order.

11. (a) Accuracy of all representations and warranties in material respects and (b) the absence of (i) any information disclosed after the date hereof that is inconsistent in a material and adverse manner with any material information previously provided in writing to Initial Purchasers or their affiliates, (ii) a default or event of default under the Facility, and (iii) any binding applicable law, regulation, ruling, judgment, order, injunction or other restraint that restrains, prevents, prohibits, restricts or imposes materially adverse conditions upon the Issuers, the Guarantors, the Facility (and the funding thereof) or the transactions contemplated hereby.

12. Such other conditions as are usual and customary for debtor-in-possession financing facilities of this type.

**CONDITIONS PRECEDENT TO DISBURSEMENTS OF DIP NOTE PROCEEDS FROM AGENT'S DISBURSEMENT ACCOUNT:**

Until the Maturity Date, disbursements of the DIP Note proceeds from the Agent's Disbursement Account shall be made in an aggregate amount not to exceed the Facility on a weekly basis (or more frequently as determined by Required Purchasers) subject to the following conditions precedent:

- Receipt by the Agent and Purchasers of a customary notice of disbursement request prior to the time specified in the DIP Note

11

> Documents (unless disbursed as part of a Cure);
>
> - Absence of a default or Event of Default under the Facility;
>
> - Accuracy of all representations and warranties under the Facility in all material respects (provided that such materiality qualifier shall not apply to any provision already qualified by materiality or material adverse effect);
>
> - The use of proceeds of such DIP Notes shall comply with the Budget (with permitted variances) or shall be applied in accordance with the Cure;
>
> - The effectiveness of the Interim Order or Final Order, as applicable; and
>
> - If the Roll Up Facility is not implemented (except as a result of the BD Participation) at the Final Hearing, no additional disbursements or fundings shall be made under the New Money Facility.

| | |
|---|---|
| **REPRESENTATIONS & WARRANTIES:** | Usual and customary representations and warranties, including, but not limited to, corporate existence and good standing, authority to enter into note documentation, governmental approvals, non-violation of other agreements, financial statements, litigation, compliance with environmental, pension, and other laws, taxes, insurance, absence of default or unmatured default, validity of the Interim Order or Final Order (as applicable), and priority of the Agent's liens. |
| **OTHER COVENANTS:** | Customary covenants, including, but not limited to, provision of financial statements and other customary reporting with respect to sales, accounts receivable, inventory and payables, defaults and unmatured defaults, and other information (including pleadings, motions, applications, and other documents filed with the Bankruptcy Court or distributed to any official committee appointed in the case); compliance with laws; inspection of properties, books, and records; maintenance of insurance; limitations with respect to liens and encumbrances, dividends and retirement of capital stock, guarantees, sale and leaseback transactions, consolidations and mergers, investments (including prohibiting payments to and investments in Constar Holland except to the extent both (x) constituting payments for goods purchased post-PD, on terms agreed by Initial Purchasers and (y) not in excess of the Constar Holland line item for such period set forth in the Budget ), non-ordinary |

CONFIDENTIAL

course disposition of assets or property to a third party, capital expenditures, restricted payments, notes and advances, indebtedness, transactions with affiliates, prepayment of other indebtedness; and compliance with pension, environmental, and other laws—in each case subject to materiality qualifiers, exceptions, and thresholds to be mutually agreed including facts disclosed to Purchasers prior to the date hereof regarding pension liabilities, and subject to qualifications to be agreed, the sale of the facility located at Old Bay Lane. Companies shall exercise commercially reasonable efforts to subject Constar Holland to the liens provided for herein and make Constar Holland a party hereto. To the extent the required lenders under the DIP Credit Facility and Required Purchasers both direct the Issuers to take any actions with respect to the sale or liquidation of Constar UK, such Issuers shall exercise commercially reasonable efforts to implement such actions, including, but not limited to, revising the Budget in a manner mutually agreed. Upon request of Required Purchasers, Companies shall retain a consultant selected by Required Purchasers on terms reasonably acceptable to the Companies and Required Purchasers.

**FINANCIAL COVENANTS:** The Budget will be tested weekly (on a weekly basis of Monday through Sunday, beginning Monday 12:01 a.m. NYT, December 16, 2013) and will be reported on December 24, 2013, December 31, 2013, and then each Wednesday thereafter, as follows, provided, that the Required Purchasers shall have the authority to provide written pre-approval for any deviations:

- in each of the US and UK individually, negative variances of more than 20% in weeks 1-4 and 10% thereafter with respect to cumulative receipts (other than non-ordinary course dispositions such as Old Bay Lane sale) on a cumulative basis to the Budget shall constitute non-compliance; and

- in each of the US and UK individually, negative variances of more than 20% in weeks 1-4 and 10% thereafter with respect to cumulative disbursements (other than professional expenses of Companies' counsel, expenses of Agent and Purchasers and their counsel) on a cumulative basis to the Budget shall constitute non-compliance;

- in the US and UK individually, negative variances of more than 5% with respect to cumulative capital expenditures on a cumulative basis to the Budget shall constitute non-compliance;

- in the US and UK individually, negative variances of more than

    5% with respect to cumulative payroll to the Budget shall constitute non-compliance;

- negative variances of more than 5% with respect to the line item for payments to Constar Holland for goods on either a weekly or cumulative basis shall constitute non-compliance; and

- negative variances of more than $1,000,000 in weeks 1-4 and $500,000 thereafter with respect to the "Availability"[2] set forth in the Budget shall constitute non-compliance (such Event of Default, a "**Borrowing Base Variance Default**").

The Budget and the weekly reporting required with respect thereto shall be in the form attached hereto as **Exhibit II**.

**EVENTS OF DEFAULT:** Usual and customary events of default, including, but not limited to, defaults relating to payment, cross-default to other indebtedness in excess of an amount to be agreed, violation of covenants, breach of representations or warranties, failure to satisfy or stay execution of judgment in excess of an amount to be agreed, and ERISA, environmental, and other events of default which are customary in facilities of this nature.

In addition, an Event of Default shall occur if:

1. any of the Milestones is not satisfied or the APA is terminated, rejected or cancelled or any event occurs such that the APA may be terminated or the Sale pursuant to the APA is not likely to be consummated;

2. there is an "event of default" under the DIP Credit Facility;

3. one or more of the Cases is dismissed or converted to a Chapter 7 case;

4. a Chapter 11 trustee or an examiner with enlarged powers is appointed;

5. any lien or superpriority administrative expense claim which is senior to or *pari passu* with the Purchasers' or the Agent's liens and/or claims under the Facility is granted other than to

---

[2] To be calculated in accordance with DIP Credit Facility as in effect on the PD.

CONFIDENTIAL

       the extent permitted hereby;

6. the Interim Order or the Final Order, as the case may be, is stayed, amended, modified, reversed, or vacated in a manner adverse to the Purchasers and without the prior written consent of the Purchasers;

7. a plan of reorganization is confirmed that does not provide for termination of the Facility;

8. an order is entered which dismisses one or more of the Companies' Chapter 11 cases that does not provide for termination of the Facility and payment in full in cash of all obligations owing thereunder;

9. the Companies take any action in support of any of the foregoing, including failing to contest any application or request by another party in support of any of the foregoing;

10. the Bankruptcy Court enters an order granting relief from the automatic stay to the holder of any security interest in any asset of the Companies having a fair market value in excess of an amount to be mutually agreed.

| | |
|---|---|
| **ASSIGNMENTS AND PARTICIPATIONS:** | The DIP Notes shall be freely assignable provided that any assignee shall consent to the APA, but shall require notice to Agent. |
| **VOTING:** | Except as otherwise set forth herein, any amendments, consents or waivers shall require the consent of Agent and "**Required Purchasers**" which means Purchasers holding not less than 50.1% of all outstanding commitments under the Facility and other principal obligations under the Facility. Yank-a-bank provisions shall be included to the extent Initial Purchasers consent to any amendment. |
| **GOVERNING LAW:** | The DIP Note Documentation shall be governed by the laws of the state of New York, except as governed by the Bankruptcy Code. |
| **WAIVERS OF RIGHTS:** | Each Issuer and Guarantor shall waive certain rights and causes of action. Also, the Final Order will prohibit the assertion of all other claims under section 506(c) or against Agent, Purchasers or any of their affiliates in any capacity. |
| **WAIVER OR MODIFICATION OF THE** | The automatic stay shall be vacated to permit the exercise of |

15

| | |
|---|---|
| **AUTOMATIC STAY:** | remedies by Agent and Purchasers. |
| **RELEASE:** | Customary for DIP financing facilities and to include release of Agent and Purchasers in all relationships (as equity holders and creditors) with Companies with respect to any matters prior to the PD. |
| **EXPENSES:** | Issuers shall promptly pay the expenses incurred by Agent and Purchasers (including, without limitation, reasonable fees and disbursements of separate counsel to Agent (Seward & Kissel LLP) and separate counsel to Purchasers (Kirkland & Ellis LLP), consultant costs and expenses, and costs and expenses associated with due diligence, travel, appraisals, valuations, and audits) in connection with the negotiation, drafting and execution of a binding commitment letter with respect to the Facility and the documentation evidencing the Facility, regardless of whether any transaction contemplated hereby is ever actually consummated (the "**Facility Transactions**"). |
| **RIGHTS AND PROTECTIONS OF THE AGENT:** | The Agent undertakes to perform such duties and only such duties as are specifically set forth in this Term Sheet and the definitive note documents. The Agent shall not be a trustee for or have any fiduciary obligation to any party hereto and the Agent shall take such action with respect to this Agreement as it shall be directed by Required Purchasers, and the Agent shall not be liable except for the performance of such duties and obligations, and no implied covenants or obligations shall be read into this this Term Sheet and the definitive note documents against the Agent. |
| | The Agent shall not be liable for any error of judgment made in good faith by an officer or officers of the Agent, unless it shall be conclusively determined by a court of competent jurisdiction that the Agent was grossly negligent in ascertaining the pertinent facts. |
| | The Agent shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with any direction of the Required Purchasers. |
| | None of the provisions of this Term Sheet and the definitive note documents shall require the Agent to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it. |

CONFIDENTIAL

The Agent may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

Whenever in the administration of the provisions of this Agreement the Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action to be taken hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of gross negligence or bad faith on the part of the Agent, be deemed to be conclusively proved and established by a certificate signed by the Required Purchasers delivered to the Agent and such certificate, in the absence of gross negligence or bad faith on the part of the Agent, shall be full warrant to the Agent for any action taken, suffered or omitted by it under the provisions of this Agreement upon the faith thereof.

**CONFIDENTIALITY:** This outline of terms is for Companies' confidential use only and neither its existence nor the terms hereof will be disclosed by any Company to any person other than as consented by Initial Purchasers, or to any Company's officers, directors, employees, accountants, attorneys and other advisors, agents and representatives (the "**Company Representatives**"), and then only on a confidential and "need to know" basis in connection with the Facility Transactions; provided, however, that any Company may disclose the existence and terms hereof to the extent required, in the opinion of such Company's counsel, by applicable law. Each Company's obligations under this paragraph shall survive any termination of the negotiations of the Facility Transactions.

17

**CONFIDENTIAL**

# EXHIBIT I
# TERM SHEET FOR
# DIP CREDIT FACILITY

CONFIDENTIAL

# EXHIBIT II
# FORM OF REPORTING