## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONSTAR INTERNATIONAL HOLDINGS LLC, et al., | ) | Case No. 13-13281 (CSS) |
| | ) | |
| | ) | Jointly Administered |
| Debtors.[1] | ) | |
| | ) | |

**MOTION OF DEBTORS FOR ORDERS: (I) APPROVING (A) BIDDING PROCEDURES; (B) BID PROTECTIONS; (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING DATES TO CONDUCT AUCTION AND HEARING TO CONSIDER FINAL APPROVAL OF SALE, INCLUDING TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF; AND (IV) (A) APPROVING SALE OF CERTAIN OF THE DEBTORS' ASSETS; (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), by and through their undersigned proposed attorneys, hereby file this motion (the "**Motion**") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of an order (the "**Bidding Procedures Order**"), substantially in the form attached hereto as **Exhibit A**: (a) approving bidding procedures, substantially in the form attached hereto as **Exhibit B** (the "**Bidding Procedures**") and approving the "**Bid Protections**" (as defined in the Bidding Procedures), to govern the sale of substantially all of the assets of Debtor Constar International U.K. Limited (collectively, the "**Purchased U.K. Assets**"); (b) approving the form and manner

---

[1]   The Debtors in these cases along with the last four digits of their federal tax identification number are: Constar International Holdings LLC (1880); Constar Group Holdings, Inc. (3047); Constar Intermediate Holdings, Inc. (4242); Constar Group, Inc. (4281); Constar International LLC (9304); BFF Inc. (1229); DT, Inc. (7693); Constar, Inc. (0950); Constar Foreign Holdings, Inc. (8591); and Constar International U.K. Limited (Foreign). The Debtors' corporate headquarters is located at, and the mailing address for each Debtor is, 1100 Northbrook Drive, 2nd Floor, Trevose, PA 19053.

of notices in connection with the Bidding Procedures; (c) scheduling dates to conduct an auction

(the "**Auction**") and a hearing (the "**Sale Hearing**") to consider final approval of the sale of the

Purchased U.K. Assets (the "**Sale**"), including treatment of executory contracts and unexpired

leases; and (d) granting related relief.  At the Sale Hearing, the Debtors request entry of an order

(the "**Sale Order**"):[2] (a) approving the sale of substantially all of the Purchased U.K. Assets; (b)

authorizing the assumption and assignment of executory contracts and unexpired leases; and (c)

granting related relief.  In support of this Motion, the Debtors rely upon the *Declaration of J.*

*Mark Borseth in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 17] (the

"**First Day Declaration**"),[3] and respectively represent as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware dated as of February 29, 2012.  Venue of these cases and this Motion

in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(A) & (M).  The predicates for the relief requested herein are

sections 105, 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 3007, 6004, 6006,

9007, and 9014, and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the

United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").  Pursuant to

Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order

with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to

enter such final order or judgment absent the consent of the parties.

---

[2]    Notwithstanding the requirement of Local Rule 6004-1, the proposed Sale Order will be negotiated with the Successful Bidder and, accordingly, is not attached hereto.  The Debtors will file a proposed Sale Order, and serve such proposed order, on interested parties in advance of the Sale Hearing.

[3]    Capitalized terms used in this Motion but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

## BACKGROUND

### A.    The Chapter 11 Filing

2.    On the date hereof (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No chapter 11 trustee or examiner has been appointed in these cases. Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases for procedural purposes only, pursuant to Rule 1015(b) of the Bankruptcy Rules.

3.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the First Day Declaration.

### B.    The Debtors' Marketing and Sales Efforts

4.    In the second quarter of 2013, the Debtors were contacted by Amcor Rigid Plastics USA, Inc. ("**Amcor**"), a strategic party interested in acquiring certain of the Debtors' assets.  Thereafter, through management, the Debtors engaged in a marketing process, in which they contacted a number of other potential buyers for all or substantially all of the Debtors' assets.

5.    On October 10, 2013, the Debtors engaged Lincoln Partners Advisors LLC ("**Lincoln Advisors**"), as financial advisors and investment bankers to, among other things, assist the Debtors with negotiations with interested parties, including Amcor, preparing for and initiating marketing efforts, as well as facilitating due diligence by various parties.  On October 27 and 29, 2013, the Debtors received non-binding written offers from two interested parties, including Amcor, setting forth the terms upon which those parties would purchase substantially

all of the Debtors' assets, both of which required, as an inducement to conduct due diligence, a

short period of exclusivity.  Amcor's offer included a purchase price sufficient to satisfy all

amounts due and outstanding under the Revolving Loan Facility, and provided significant value

to the Term Lenders.  Due to the Debtors' capital structure and declining financial performance

(as described in the First Day Declaration), Amcor's offer was contingent on the filing of a

chapter 11 bankruptcy case, and included an agreement by Amcor to act as a stalking horse

bidder in an auction conducted pursuant to section 363 of the Bankruptcy Code.  Amcor's offer

did not include an offer to purchase the Purchased U.K. Assets.

6.    Accordingly, the Debtors intend to conduct an auction for the Purchased

U.K. Assets on the same timeline as the auction for the Debtors' U.S. assets.  This procedure will

enable bidders to submit bids for the Debtors' U.S. assets, the Purchased U.K. Assets, or all of

the Debtors' assets at the same time.  The Debtors' believe that this is in the best interests of their

estates and is likely to result in the maximization of value for the Debtors' stakeholders.  From

and after the date hereof, the Debtors, through Lincoln Advisors, will continue to reach out to as

many potential purchasers as possible.  As part of these efforts, the Debtors are seeking a suitable

stalking horse bidder for the Purchased U.K. Assets (the "**Stalking Horse Bidder**").  If a suitable

Stalking Horse Bidder is not found, the Debtors propose running a "naked" auction for

substantially all of the Purchased U.K. Assets, in accordance with the Bidding Procedures

outlined below.

7.    To facilitate an orderly sale process, certain of the Debtors' secured

lenders have agreed to fund the operations of Debtor Constar International U.K. Limited as part

of a proposed debtor in possession financing facility for a very limited time.  Such funding will

01:14620830.1

allow the Debtors to continue operating Constar International U.K. Limited, preserving its going concern value and consequently maximizing the potential sale price at the Auction.

8.        Prior to a Sale Hearing, a representative of Lincoln Advisors will submit a declaration detailing its postpetition marketing efforts to the Court.  In addition, the Debtors propose to publish a notice of sale and Bidding Procedures in the <u>Financial Times</u> to alert other potential investors and buyers of the opportunity to acquire the Purchased U.K. Assets and business.   Given the circumstances of these cases, the Debtors believe that the sale of substantially all of the Purchased U.K. Assets to a party submitting the bid with the greatest value to the Debtors at an auction will maximize the value of the Debtors' estates for the benefit of all stakeholders.

**C.        The Proposed Bidding Procedures and Bid Protections**

9.        A summary of the principal terms of the Bidding Procedures, including terms that are required to be highlighted pursuant to Local Rule 6004-1, is as follows:[4]

| Provisions Governing the Qualification of Bidders:<br><br><u>See</u> Bid. Proc., § D. | To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in purchasing the Purchased U.K. Assets (a "**Potential Bidder**") must deliver (unless previously delivered) to each of (1) counsel to the Debtors, Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, Attn.: Michael J. Sage (michael.sage@dechert.com) and Brian E. Greer (brian.greer@dechert.com); and (2) proposed financial advisors to the Debtors, Lincoln Partners Advisors LLC, 633 West Fifth Street, Suite 6650, Los Angeles, California 90071, Attn.: Alexander W. Stevenson (astevenson@lincolninternational.com), the following preliminary documentation:<br><br>1.  an executed confidentiality agreement (a "**Confidentiality Agreement**") reasonably acceptable to the Debtors; and<br><br>2.  preliminary proof by the Potential Bidder of its financial capacity to close the proposed transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased U.K. Assets, the party that will bear liability for a breach), the |

---

[4]    This summary is provided for the convenience of the Court and parties-in-interest.  To the extent there is any conflict between this summary and the Bidding Procedures, the Bidding Procedures govern in all respects. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Bidding Procedures.

<table>
<tr>
<td></td>
<td>adequacy of which the Debtors and their advisors will determine.</td>
</tr>
</table>

adequacy of which the Debtors and their advisors will determine.

The Debtors shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable preliminary documentation so that the Potential Bidder may conduct a due diligence review with respect to the Purchased U.K. Assets.  Only those Potential Bidders that have submitted acceptable preliminary documentation (each, an "**Acceptable Bidder**") may submit bids to purchase the Purchased U.K. Assets.

| **Provisions Governing Qualified Bids:**<br><br>See Bid. Proc., §§ F–G. | To participate in the Auction, on or prior to the Bid Deadline (as defined in Section G.), an Acceptable Bidder must deliver to the Debtors and their advisors an irrevocable offer that must:<br><br>1. be in writing;<br><br>2. at a minimum, provide value equal to (a) the cash amount of the Stalking Horse Bid plus the Overbid, or (b) if there is no Stalking Horse Bid, then such amount set by the Sellers no later than the Stalking Horse Selection Deadline (as defined below) (the "**Minimum Bid**");<br><br>3. constitute a good faith, bona fide offer to purchase the Purchased U.K. Assets;<br><br>4. be accompanied by a proposed asset purchase agreement, which (a) may not be inconsistent with the Bidding Procedures, and (b) must be redlined against the form of Asset Purchase Agreement provided by the Debtors, or, if a Stalking Horse Bid has been identified by the Debtors pursuant to Section H., must be redlined against the asset purchase agreement submitted by the Stalking Horse Bidder;<br><br>5. identify with particularity each and every condition to closing, including identifying any and all Contracts and Leases that the Bidder wishes to have assumed and assigned to it at closing;<br><br>6. not be conditioned on any contingency, including, but not limited to, obtaining any of the following: (a) financing; (b) shareholder, board of directors, or other approval; or (c) the outcome or completion of a due diligence review by the Potential Bidder;<br><br>7. include a written acknowledgement and representation that the Acceptable Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Purchased U.K. Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased U.K. Assets in making its Bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Purchased U.K. Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Acceptable Bidder's proposed asset purchase agreement as provided for in Section F.4. above;<br><br>8. remain irrevocable until the Bankruptcy Court enters a Sale Order approving the Successful Bid; and<br><br>9. in the event such offer is chosen as the Back-Up Bid, remain irrevocable until the Debtors and the Successful Bidder consummate the Sale. |
| --- | --- |

| | |
|---|---|
| | In addition to the above, each Acceptable Bidder shall:<br><br>1. provide the Debtors, on or before the Bid Deadline, with sufficient and adequate information to demonstrate, to the satisfaction of the Debtors, that such Potential Bidder has the financial wherewithal and ability to consummate a Sale;<br><br>2. fully disclose the identity of each entity that will be bidding for or purchasing the Purchased U.K. Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties;<br><br>3. on or before the Bid Deadline, submit a cash deposit of 10% of the amount of the Minimum Bid by wire transfer of immediately available funds to an account or accounts designated by the Debtors (a "**Good Faith Deposit**"); and<br><br>4. not be entitled to any break-up fee, transaction fee, termination fee, expense reimbursement, or any similar type of payment or reimbursement.<br><br>Bids fulfilling all of the preceding requirements may, at the Debtors' sole discretion, be deemed to be "**Qualified Bids**," and those parties submitting Qualified Bids may, at the Debtors' sole discretion, be deemed to be "**Qualified Bidders**." Within 12 hours after the Bid Deadline, the Debtors shall determine which Acceptable Bidders are Qualified Bidders after consultation with their advisors and will notify the Acceptable Bidders whether bids submitted constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. Any bid that is not deemed a Qualified Bid shall not be considered by the Debtors.<br><br>Binding bids must be received by (1) counsel to the Debtors, Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, Attn.: Michael J. Sage (michael.sage@dechert.com) and Brian E. Greer (brian.greer@dechert.com); and (2) proposed financial advisors to the Debtors, Lincoln Partners Advisors LLC, 633 West Fifth Street, Suite 6650, Los Angeles, California 90071, Attn.: Alexander W. Stevenson (astevenson@lincolninternational.com), in each case so as to be actually received no later than January 22, 2014 at [●] (prevailing Eastern Time) (the "**Bid Deadline**"). |
| **Stalking Horse Bid Protections:**<br><br>See Bid. Proc., §§ H, I, K. | At any time on or before January 16, 2014 (the "**Stalking Horse Bid Deadline**"), an Acceptable Bidder that wishes to be considered as a stalking horse bidder at the Auction may submit a proposed bid meeting the requirements of Section F. (a) 1, 4, and 6, and Section F. (b) 1 and 2 (a "**Proposed Stalking Horse Bid**"). The Debtors shall evaluate any Proposed Stalking Horse Bids submitted prior to the Stalking Horse Bid Deadline and, at any time prior to January 21, 2014 (the "**Stalking Horse Selection Deadline**"), the Debtors may identify a Proposed Stalking Horse Bid to serve as the stalking horse bid at the Auction (the "**Stalking Horse Bid**"), and the party submitting the Stalking Horse Bid shall serve as the "**Stalking Horse Bidder**." The Stalking Horse Bid may include an expense reimbursement and break-up fee of up to two and one-half percent (2.5%) of the cash consideration provided by the Stalking Horse Bid (the "**Bid Protections**"). In the event the Debtors select a Stalking Horse Bid, the Debtors will file a notice with the Bankruptcy Court including the Stalking Horse Bid and distribute copies of the Stalking Horse Bid to each Acceptable Bidder. In the event that the Debtors do not select a Stalking Horse Bidder, the Debtors shall notify the Acceptable Bidders of the Minimum Bid on or prior to the Stalking Horse Selection Deadline.<br><br>In advance of the Auction, the Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, the highest or otherwise best bid for |

| | |
|---|---|
| | the Purchased U.K. Assets (a "**Starting Bid**"), which in no event shall be less than the Minimum Bid or the Stalking Horse Bid.  Prior to the date of the Auction, the Debtors shall distribute copies of the Starting Bid to each Qualified Bidder that has submitted a Qualified Bid.<br><br>Bidding shall begin at the Starting Bid and subsequent bids shall (a) be made in minimum increments of $250,000 (the "**Overbid**") and (b) comply with the bid requirements set forth in <u>Section F.</u>, provided that, if a Stalking Horse Bid has been identified, the first bid subsequent to the Starting Bid must be a minimum of the (i) Stalking Horse Bid, <u>plus</u> (ii) the Bid Protections, <u>plus</u> (iii) the Overbid (the "**Stalking Horse Initial Overbid**"), and all subsequent bids to the Stalking Horse Initial Overbid shall be in minimum increments of the Overbid. |
| **Modifications of Bidding Qualifications or Auction Procedures:**<br><br><u>See</u> Bid. Proc., § P. | The Debtors reserve their rights, following consultation with their advisors, to modify the Bidding Procedures in any manner that will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customary terms and conditions on the Sale, including, without limitation, modifying the requirements for a Qualified Bid, extending the deadlines set forth in the Bidding Procedures, adjourning the Auction at the Auction, and/or adjourning the Sale Hearing in open court without further notice, canceling the Auction, and rejecting any or all Qualified Bids if, in the Debtors' business judgment, following consultation with their advisors, the Debtors determine that such Qualified Bid is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code or any related rules or the terms set forth herein, or (3) contrary to the best interests of the Debtors. |
| **Closing with Alternative Backup-Bidders:**<br><br><u>See</u> Bid. Proc., § M. | If for any reason a Successful Bidder fails to consummate the purchase of the Purchased U.K. Assets within the time permitted after the entry of the Sale Order approving the Sale to such Successful Bidder, then the Qualified Bidder with the second highest or otherwise best bid (the "**Back-Up Bid**") to purchase the Purchased U.K. Assets (the "**Back-Up Bidder**"), as determined by the Debtors after consultation with their advisors at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the Successful Bid, and the Back-Up Bidder shall be deemed a Successful Bidder and shall be required, at the sole discretion of the Debtors, to consummate the Sale with the Debtors as soon as is commercially practicable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court. |

### D.    <u>The Proposed Assumption and Assignment Procedures</u>

10.    The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts for the assumption and assignment of contracts and leases pursuant to section 365 of the Bankruptcy Code (the "**Assumption and Assignment Procedures**").

11.    On or before three (3) business days after the entry of the Bidding Procedures Order, the Debtors propose to file with the Court a notice, substantially in the form

01:14620830.1

8

attached hereto as **Exhibit C** (the "**Cure Notice**") and serve by first-class postage-prepaid the Cure Notice on all non-Debtor counterparties (the "**Contract Parties**") to the Debtors' executory contracts and unexpired leases (each a "**Contract**" or "**Lease**").  The Cure Notice shall provide notice of the potential assumption and assignment of the Contacts and Leases and any cure amounts relating thereto.  Schedules to the Successful Bidder's (including any Stalking Horse Bidder's) proposed asset purchase agreement will then list Contracts and Leases that may be included in the Purchased U.K. Assets, subject to the right of the Successful Bidder (including any Stalking Horse Bidder) to determine whether such Contract or Lease shall be assumed and assigned under section 365 of the Bankruptcy Code in accordance with the asset purchase agreement.

12.    Unless the Contract Party to any Contract or Lease files an objection to its scheduled cure amount or to the assumption and assignment of a Contract or Lease and serves a copy of such objection so as to be received no later than two (2) hours before the Sale Hearing (the "**Contract Objection Deadline**") by the Notice Parties, such Contract Party shall be forever barred and estopped from objecting (a) to the cure amount and from asserting that any additional amounts are due or defaults exist, (b) that any conditions to assumption and assignment must be satisfied under such Contract or Lease before it can be assumed and assigned or that any required consent to assignment has not been given, or (c) that the Successful Bidder (including any Stalking Horse Bidder) has not provided adequate assurance of future performance.

13.    The Debtors propose that, in the event of a timely filed objection and dispute regarding: (a) any cure amount with respect to any of the Contracts and Leases; (b) the ability of the Successful Bidder (including any Stalking Horse Bidder) to provide adequate

assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under any of the Contracts and Leases; or (c) any other matter pertaining to assumption or assignment of any of the Contracts and Leases, the cure amount shall be paid as soon as reasonably practicable after the Closing, in accordance with the applicable asset purchase agreement following the entry of a final order resolving the dispute and approving the assumption and assignment of such Contract or Lease; **provided, however**, that the Debtors (consistent with the applicable asset purchase agreement) should be authorized to consensually resolve with an applicable counterparty any dispute regarding the amount of any cure amount or assignment to the Successful Bidder (including any Stalking Horse Bidder), without any further notice to or action, order, or approval of the Bankruptcy Court.

14.    The Debtors propose that the Successful Bidder (including any Stalking Horse Bidder) should be permitted to designate in writing any Contract or Lease to be assigned to it under the applicable asset purchase agreement in accordance with such agreement, and, to the extent identified, the Debtors will file a list of all such designated Assigned Contracts no later than five (5) business days following the Closing Date (as that term is defined in the applicable asset purchase agreement).  For Contracts or Leases assumed and assigned after the closing in accordance with the relevant asset purchase agreement, the Debtors will file a similar notice shortly after such assumption and assignment.  The Debtors propose that payment to satisfy all cure amounts be made as soon as reasonably practicable after the effectiveness of the assumption and assignment of Assigned Contracts to the Successful Bidder or on such other terms as the parties to each such Assigned Contract may otherwise agree without any further notice to or action, order or approval of the Bankruptcy Court.

01:14620830.1

E.    **Notice Procedures**

15.    Within three (3) business days of the Bidding Procedures Order, (A) the Debtors shall serve by first class mail, postage prepaid, copies of: (i) the Bidding Procedures Order; (ii) the Bidding Procedures; (iii) the Motion; (iv) the Sale Notice, substantially in the form attached hereto as **Exhibit D**; and (v) the Cure Notice, upon the following entities: (a) the Office of the United States Trustee for Region 3, serving the District of Delaware (the "**U.S. Trustee**"); (b) the creditors (excluding insiders) holding the 30 largest unsecured claims against the Debtors, or any official committee of unsecured creditors appointed in these cases, if such committee has been formed; (c) counsel to Wells Fargo Capital Finance, LLC, as Agent Under the Revolving Loan Facility; (d) counsel to Certain Lenders Under the Term Facilities; (e) counsel to the proposed debtor in possession financing facilities; (f) counsel to the Board; (g) all taxing authorities having jurisdiction over any of the assets subject to the Sale, including the Internal Revenue Service; (h) the Environmental Protection Agency; (i) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (j) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; (k) all persons or entities known to the Debtors that have or have asserted (including through recorded documents) a lien on, or security interest in, all or any portion of the assets subject to the Sale; (l) all Potential Bidders previously identified or otherwise known to the Debtors; and (m) the Office of the United States Attorney for the District of Delaware (collectively, the "**Notice Parties**") and (B) the Debtors shall serve by first class mail, postage prepaid, copies of the Sale Notice upon all other persons or entities that hold a claim, lien, interest or encumbrance against the Debtors or the Purchased U.K. Assets.

01:14620830.1

16.     Not later than five (5) days after entry of an Order approving the Bidding Procedures Motion, the Debtors shall cause the Sale Notice to be published in the <u>Financial Times</u>, pursuant to Bankruptcy Rule 2002(1).  Such publication notice conforms to the requirements of Bankruptcy Rules 2002(l) and 9008 and is reasonably calculated to provide notice to any affected party that does not receive hard copy notice, including any Potential Bidders, and affords the affected party the opportunity to exercise any rights affected by the Motion and the relief granted by the Bidding Procedures Order and no other notice is required.

17.     As soon as possible after the conclusion of the Auction the Debtors shall file, but not serve, a notice identifying any Successful Bidder, the deadline for objecting to the sale of the Purchased U.K. Assets to the Successful Bidder and the date and time of the Sale Hearing (the "**Post Auction Notice**"), substantially in the form attached hereto as **<u>Exhibit E</u>**.

**<u>RELIEF REQUESTED</u>**

18.     By this Motion, the Debtors first request entry of the Bidding Procedures Order, which will, among other things, (a) authorize use of the Bidding Procedures (including the Bid Protections) in connection with the sale of the Purchased U.K. Assets, (b) approve the form and manner of notice of the Bidding Procedures and sale of the Purchased U.K. Assets, (c) schedule the Auction and the Sale Hearing to consider the Sale, (d) authorize procedures governing the assumption and assignment of executory contracts and unexpired leases, and (e) grant related relief.

19.     Second, at the Sale Hearing, the Debtors will request entry of the Sale Order, which will, (a) designate the entity or entities submitting the highest or otherwise best Qualified Bid (the "**Successful Bid**") as the "**Successful Bidder**" and approve the sale of the Purchased U.K. Assets in accordance with the asset purchase agreement between the Debtors

and the Successful Bidder,[5] which Sale shall be free and clear of all liens, claims, encumbrances, and other interests (other than expressly specified permitted encumbrances and assumed liabilities, all as more specifically set forth in the Successful Bid), (b) approve the assumption and assignment of certain executory contracts and unexpired leases related to the Sale, and (c) grant related relief.  The Debtors are requesting that the Sale Hearing take place no later than January 27, 2014.  Objections, if any, to the Sale will then be required to be filed in this Court and served so as to be received within one (1) day from the Auction (the "**Sale Objection Deadline**").

**BASIS FOR RELIEF REQUESTED**

A.     **The Sale is Within the Sound Business Judgment of the Debtors and Should be Approved.**

       20.     Section 363(b)(l) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(l).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors.  See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery

---

[5]     Notwithstanding the requirement of Local Rule 6004-1, the form of the proposed asset purchase agreement is not attached hereto.  The Debtors will file a form asset purchase agreement prior to the hearing on this Motion. If the Debtors locate a suitable Stalking Horse Bidder, a form of asset purchase agreement between the Debtors and the Stalking Horse Bidder will be filed with the Court as soon as practicable.

Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del.

1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

21.     The "sound business judgment" test requires a debtor to establish four

elements in order to justify the sale or lease of property outside the ordinary course of business,

namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary

course of business, (b) that adequate and reasonable notice has been provided to interested

persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith.

Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country

Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd, 104 B.R. 702,

704 (Bankr. E.D. Pa. 1989).  In this case, the Debtors submit that the decision to proceed with

the Sale and the Bidding Procedures related thereto are based upon their sound business

judgment and should be approved.  A debtor's showing of a sound business purpose need not be

unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition

with sound business reasons."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio

1984).  Whether or not there are sufficient business reasons to justify a transaction depends

upon the facts and circumstances of each case.  Lionel, 722 F.2d at 1071; Montgomery Ward,

242 B.R. at 155 (approving funding of employee incentive and severance program; business

purpose requirement fulfilled because stabilizing turnover rate and increasing morale were

necessary to successful reorganization).

22.     Additionally, section 105(a) of the Bankruptcy Code provides a

bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.

Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. §

105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a

result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is

proper.  In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan

Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a

court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.

See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986)

("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant

to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R.

531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such

it has a duty to protect whatever equities a debtor may have in property for the benefit of its

creditors as long as that protection is implemented in a manner consistent with the bankruptcy

laws.").

23.     The Debtors submit that more than ample business justification exists to

sell the Purchased U.K. Assets pursuant to the Bidding Procedures.  As described in the First

Day Declaration, the Debtors' financial condition has steadily deteriorated in recent months.

Thus, the Debtors have determined that, under the circumstances, a targeted sale process is most

likely to achieve the highest and best price for the Purchased U.K. Assets.  Simply stated, since

the Debtors do not have sufficient cash resources to continue to operate the business for an

extended period of time, the Purchased U.K. Assets will continue to decline in value absent a

prompt sale.  Thus, the relief sought herein is not only reasonable, but necessary, to maximize

the value of the Debtors' estates for the benefit of their stakeholders.

24.     The Sale Notice is designed to provide adequate notice to all potentially

interested parties, including those who have previously expressed an interest in purchasing the

Purchased U.K. Assets.  Indeed, the Debtors and their financial advisor have marketed and will

continue to market the Purchased U.K. Assets, and have solicited the most likely interested

competing bidders.  Accordingly, the proposed Sale satisfies the second prong of the <u>Abbotts</u>

<u>Dairies</u> standard.

25.    Moreover, under the circumstances, the Bidding Procedures are adequate

to maximize the value received for the Purchased U.K. Assets.  The process proposed by the

Debtors allows for a timely and efficient auction process, given the extremely difficult

circumstances facing the Debtors, while providing bidders with adequate time and information

to submit a bid and to perform diligence.  Through the Bidding Process, the Debtors will subject

the value of the Purchased U.K. Assets to a market test, permitting prospective purchasers to bid

on the Purchased U.K. Assets in a court-supervised auction process as set forth in the Bidding

Procedures.  Accordingly, the Debtors and all parties-in-interest can be assured that the

consideration received for the Purchased U.K. Assets is likely to be fair and reasonable, and,

therefore, the third prong of the <u>Abbotts Dairies</u> standard is satisfied.  As discussed below, the

"good faith" prong of the <u>Abbotts Dairies</u> standard is also satisfied here.

**B.    The Sale is Proposed in "Good Faith" Under Section**
**363(m) of the Bankruptcy Code.**

26.    The Debtors request that the Court find that the Successful Bidder is

entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in

connection with the Sale.

27.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

The reversal or modification on appeal of an authorization under
subsection (b) . . . of this section of a sale . . . of property does not
affect the validity of a sale . . . under such authorization to an
entity that purchased . . . such property in good faith, whether or

01:14620830.1

> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

28.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of

assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its

interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms,

section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as

the Purchased U.K. Assets.

29.    The Debtors will present evidence at the Sale Hearing that the asset

purchase agreement between the Debtors and the Successful Bidder was an intensely negotiated,

arm's-length transaction between two separate and independent parties, in which both the

Successful Bidder and the Debtors acted in good faith.  Accordingly, the Debtors request that

the Court find at the Sale Hearing that the Successful Bidder has purchased the Purchased U.K.

Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**C.    The Sale Satisfies the Requirements of Section 363(f)
of the Bankruptcy Code.**

30.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may

sell all or any part of its property free and clear of any and all liens, claims or interests in such

property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party

asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the

purchase price for the property is greater than the aggregate amount of all liens on the property;

(iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or

interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction

for such interest.  11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94

B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in

the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of

the subsections is met).  Because the Debtors expect that they will satisfy, at minimum, the

second and fifth of these requirements, if not others as well, approving the sale of the Purchased

U.K. Assets free and clear of all adverse interests is warranted.  Furthermore, courts have held

that they have the equitable power to authorize sales free and clear of interests that are not

specifically covered by section 363(f).  See, e.g., In re Trans World Airlines, Inc., 2001 WL

1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); Volvo White Truck Corp. v. Chambersburg

Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr, N.D. Ohio 1987).

      31.    As noted above, the Debtors kept the Revolving Loan Agent and certain

of the lenders under the Term Loan Agreements fully apprised of the Debtors' marketing and

sales process.

**D.    The Bid Protections are Reasonable and Appropriate
Under the Circumstances.**

      32.    Approval of the Bid Protections, consisting of a break-up fee and expense

reimbursement, is governed by standards for determining the appropriateness of bidding

incentives in the bankruptcy context established by the Third Circuit in Calpine Corp. v.

O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999)

("In re O'Brien").  In In re O'Brien, the Third Circuit concluded that "the determination whether

break-up fees or expenses are allowable under § 503(b) must be made in reference to general

administrative expense jurisprudence.  In other words, the allowability of break-up fees . . .

depends upon the requesting party's ability to show that the fees were actually necessary to

preserve the value of the estate." In re O'Brien, 181 F.3d at 535.  Here, the Bid Protections

should be approved because they will provide a benefit to the Debtors' estates.

01:14620830.1

33.    The Third Circuit identified at least two instances in which bidding incentives may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second:

> if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.

Id.

34.    In In re O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors' committees of break-up fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee."  In re O'Brien, 181 F.3d at 536.

35.    After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees as a percentage of the purchase price as being appropriate under the facts and circumstances of the case.  See, e.g., In re Chi-Chi's Inc., Case No. 03-

01:14620830.1

13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); In re Great Northern Paper,

Inc., Case No. 03-10048 (Bankr. D. Me, February 18, 2003) (fee of 5.4% plus reimbursement of

expenses upheld).

      36.    Whether evaluated under the "business judgment rule" applied by many

courts or the Third Circuit's "administrative expense" standard, the Bid Protections should be

approved because the Bid Protections will act as a material inducement for any Stalking Horse

Bidder, and the Debtors believe that the value of having a Stalking Horse Bidder act as a floor

bid will be worth the Bid Protections and compensate the Stalking Horse Bidder for the delay

and risks inherent in an Auction.  Moreover, the Bid Protections will not hamper any other

party's ability to offer a higher or better bid.  Given the size of the Bid Protections relative to the

total amount of consideration, the Bid Protections are not so large as to have a "chilling effect"

on other prospective bidders' interest.  In fact, a Stalking Horse Bid would increase the

likelihood of competitive bidding at the Auction by establishing a floor price, or by providing an

initial indication of value, against which other bidders can assess their interest.

      37.    The Debtors believe that the Bid Protections are reasonable and

appropriate relative to the size of the proposed transaction for the Purchased U.K. Assets.  The

potential break-up fee and expense reimbursement will be no more than two and one-half

percent (2.5%) of the cash consideration of any Stalking Horse Bid.  The Debtors will exercise

their business judgment to ensure their estates will not be negatively affected by the Bid

Protections.

      38.    The Debtors' payment of the Bid Protections under the circumstances

described herein would be (i) an actual and necessary cost and expense of preserving the

Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code; (ii) of

01:14620830.1

substantial benefit to the Debtors' estates; and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that would be expended by a Stalking Horse Bidder.

39.    The Debtors have demonstrated a sound business justification for authorizing the Bid Protections and its necessity and benefit to these estates.  Thus, the Debtors request that this Court approve and authorize payment of the Bid Protections.

**E.    The Assumption and Assignment Procedures Provide Adequate Notice and Opportunity to Object and Should be Approved.**

40.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  See, e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp., 872 F.2d 36, 39-40 (3d Cir. 1989).  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting Stable Mews Assoc., 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  See Richmond Leasing Co.

v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

41.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  See In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

42.     Section 365(o) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(o)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed

01:14620830.1

willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

43.     The Debtors respectfully submit that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to provide the Contract Parties with adequate notice in the form of the Cure Notice, of the proposed assumption and/or assignment of their applicable Contract or Lease, as well as proposed cure amounts, if applicable.  The Contract Parties will then be given an opportunity to object to such notice.  The Assumption and Assignment Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues).  Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases.

**F.    Relief from the Fourteen Day Waiting Period Under
       Bankruptcy Rule 6004(h) is Appropriate.**

44.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately by providing that the 14 day stay under Bankruptcy Rule 6004(h) is waived.

45.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14 day stay period, Collier on Bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy 15th Ed. Rev., 16064.09 (L. King, 15th rev. ed.

1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

46.    As described above, time is of the essence, since the Debtors are on the verge of losing key customers and vendors, and have insufficient cash to operate the business on a prolonged basis, resulting in a decline in the value of their assets.  Since the closing of the Sale promptly is of critical importance, the Debtors hereby request that the Court waive the  14 day stay periods under Bankruptcy Rule 6004(h) and 6006(d).

## NOTICE

47.    Notice of this Motion will be provided to (i) the U.S. Trustee; (ii) the creditors (excluding insiders) holding the 30 largest unsecured claims against the Debtors, or any official committee of unsecured creditors appointed in these cases, if such committee has been formed; (iii) counsel to Wells Fargo Capital Finance, LLC, as Agent Under the Revolving Loan Facility; (iv) counsel to Certain Lenders Under the Term Facilities; (v) counsel to the debtor in possession lenders; (vi) counsel to the Board; (vii) all taxing authorities having jurisdiction over any of the assets subject to the Sale, including the Internal Revenue Service; (viii) the Environmental Protection Agency; (ix) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (x) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; (xi) all persons or entities known to the Debtors that have or have asserted (including through recorded documents) a lien on, or security interest in, all or any portion of the assets subject to the Sale; (xii) all Potential Bidders previously identified or otherwise known to the Debtors; and (xiii) the Office of the United

01:14620830.1

States Attorney for the District of Delaware.  In light of the nature of the relief requested, the

Debtors submit that no further notice is required or needed under the circumstances.

<u>**CONCLUSION**</u>

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding

Procedures Order substantially in the form attached hereto as <u>**Exhibit A**</u> granting the relief

requested herein, and grant the Debtors such other and further relief as may be just and proper.


Dated:   December 23, 2013
         Wilmington, Delaware

         *   /s/ Maris J. Kandestin*
         YOUNG CONAWAY STARGATT &
         TAYLOR, LLP
         Robert S. Brady (No. 2847)
         Sean T. Greecher (No. 4484)
         Maris J. Kandestin (No. 5294)
         1000 North King Street
         Wilmington, DE 19801
         Telephone: (302) 571-6600
         Facsimile: (302) 571-1253

         - and -

         Michael J. Sage
         Brian E. Greer
         Stephen M. Wolpert
         Janet Bollinger Doherty
         DECHERT LLP
         1095 Avenue of the Americas
         New York, New York 10036
         Telephone: (212) 698-3500
         Facsimile: (212) 698-3599


         *Proposed Attorneys for the*
         *Debtors and Debtors in Possession*

01:14620830.1