## EXHIBIT A

**DIP Note Agreement**

**[without exhibits]**

**SENIOR SECURED TERM LOAN PRIORITY COLLATERAL PRIMING SUPER-PRIORITY DEBTOR IN POSSESSION
NOTE PURCHASE AGREEMENT**

**Dated as of January 15, 2014**

**by and among**

**CONSTAR INTERNATIONAL LLC, BFF INC., DT, INC., CONSTAR, INC., and
CONSTAR FOREIGN HOLDINGS, INC.
as the Issuers,**

**THE OTHER PERSONS PARTY HERETO THAT ARE
DESIGNATED AS NOTE PARTIES,**

**BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.
as Agent for all Purchasers,**

**and**

**THE OTHER INSTITUTIONS PARTY HERETO,
as Purchasers**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Table of Contents**

**Page**

Article I THE NOTES ..............................................................................................2
    1.1    Sale and Purchase of Notes.........................................................2
    1.2    Procedure for Disbursements from Agent's Disbursement Account;
           Proceeds in Agent's Disbursement Account........................................4
    1.3    Interest..............................................................................6
    1.4    Note Accounts.......................................................................7
    1.5    Extension............................................................................8
    1.6    [Reserved] ..........................................................................8
    1.7    Voluntary Prepayment of the Notes..................................................8
    1.8    Mandatory Prepayments of the Notes.................................................8
    1.9    Fees ................................................................................10
    1.10   Payments by any Issuer.............................................................10
    1.11   Accountings ........................................................................11
    1.12   Priming and Super Priority Nature of Obligations and Purchasers' Liens ............13
    1.13   Discharge ..........................................................................14
    1.14   Payment of Obligations.............................................................14
    1.15   Restriction on Payments ...........................................................14
    1.16   Adequate Protection................................................................14

Article II CONDITIONS PRECEDENT ..........................................................................15
    2.1    Conditions to Subsequent New Money Note Issuance .................................15
    2.2    Conditions to Subsequent New Money Note Issuance and Disbursements
           from Agent's Disbursement Account ................................................16

Article III REPRESENTATIONS AND WARRANTIES ..............................................................18
    3.1    Corporate Existence and Power .....................................................18
    3.2    Corporate Authorization; No Contravention ........................................18
    3.3    Governmental Authorization ........................................................19
    3.4    Binding Effect......................................................................19
    3.5    Litigation..........................................................................19
    3.6    No Default..........................................................................20
    3.7    ERISA Compliance....................................................................20
    3.8    Use of Proceeds; Margin Regulations................................................21
    3.9    Ownership of Property; Liens.......................................................21
    3.10   Taxes ..............................................................................21
    3.11   Financial Condition................................................................22
    3.12   Environmental Matters..............................................................23
    3.13   Regulated Entities.................................................................23
    3.14   Reorganization Matters.............................................................24
    3.15   Labor Relations....................................................................24
    3.16   Intellectual Property..............................................................24
    3.17   Broker's Fees; Transaction Fees....................................................25
    3.18   Insurance...........................................................................25

i

3.19    Ventures, Subsidiaries and Affiliates; Outstanding Stock ....................................25
3.20    Jurisdiction of Organization; Chief Executive Office ............................................26
3.21    Locations of Inventory, Equipment and Books and Records ................................26
3.22    Deposit Accounts and Other Accounts ..................................................................26
3.23    Customer and Trade Relations................................................................................26
3.24    Bonding; Licenses...................................................................................................26
3.25    [Reserved] ...............................................................................................................26
3.26    Full Disclosure........................................................................................................26
3.27    Foreign Assets Control Regulations and Anti-Money Laundering ......................26
3.28    Patriot Act ...............................................................................................................27

Article IV AFFIRMATIVE COVENANTS ...............................................................................27
4.1     Financial Statements ...............................................................................................27
4.2     Appraisals; Certificates; Other Information............................................................28
4.3     Notices .....................................................................................................................30
4.4     Preservation of Corporate Existence, Etc ..............................................................31
4.5     Maintenance of Property..........................................................................................32
4.6     Insurance ..................................................................................................................32
4.7     Payment of Obligations............................................................................................33
4.8     Compliance with Laws ............................................................................................34
4.9     Inspection of Property and Books and Records.......................................................34
4.10    Use of Proceeds........................................................................................................35
4.11    Cash Management Systems ......................................................................................35
4.12    Landlord Agreements................................................................................................36
4.13    Further Assurances....................................................................................................36
4.14    Environmental Matters..............................................................................................36
4.15    Additional Collateral and Guaranties.......................................................................36
4.16    Bankruptcy Court......................................................................................................37
4.17    Conference Calls.......................................................................................................37
4.18    UK Pension Plans .....................................................................................................38
4.19    Constar UK ...............................................................................................................38
4.20    Roll-Up Facility .......................................................................................................38

Article V NEGATIVE COVENANTS ........................................................................................39
5.1     Limitation on Liens...................................................................................................39
5.2     Disposition of Assets ...............................................................................................39
5.3     Consolidations and Mergers ....................................................................................40
5.4     Acquisitions; Loans and Investments ......................................................................40
5.5     Limitation on Indebtedness.......................................................................................41
5.6     Employee Loans and Transactions with Affiliates ..................................................41
5.7     Compensation ...........................................................................................................41
5.8     Margin Stock; Use of Proceeds.................................................................................41
5.9     Contingent Obligations .............................................................................................41
5.10    Compliance with ERISA...........................................................................................41
5.11    Restricted Payments..................................................................................................42
5.12    Change in Business ...................................................................................................42
5.13    Change in Organizational Documents ......................................................................42

5.14    Changes in Accounting, Name or Jurisdiction of Organization ............................42
5.15    Amendments to DIP Credit Facility ........................................................................42
5.16    Amendment to Pre-Petition Term Loan Documents and Intercreditor
        Agreements.............................................................................................................42
5.17    No Negative Pledges..............................................................................................43
5.18    OFAC; Patriot Act..................................................................................................43
5.19    Sale-Leasebacks.....................................................................................................43
5.20    Hazardous Materials...............................................................................................43
5.21    Prepayments of Other Indebtedness.......................................................................44
5.22    Bankruptcy Matters................................................................................................44
5.23    Chapter 11 Claims..................................................................................................44
5.24    The Orders ..............................................................................................................44
5.25    Certain Expenses....................................................................................................44
5.26    Payments to Constar Holland.................................................................................45

Article VI FINANCIAL COVENANTS ..................................................................................45
6.1     Budget Compliance.................................................................................................45

Article VII EVENTS OF DEFAULT .......................................................................................47
7.1     Events of Default ....................................................................................................47
7.2     Remedies.................................................................................................................52
7.3     Rights Not Exclusive ..............................................................................................53

Article VIII THE AGENT .........................................................................................................53
8.1     Appointment and Duties .........................................................................................53
8.2     Binding Effect.........................................................................................................54
8.3     Use of Discretion ....................................................................................................54
8.4     Delegation of Rights and Duties.............................................................................55
8.5     Reliance and Liability .............................................................................................56
8.6     Agent Individually ..................................................................................................57
8.7     Purchaser Credit Decision.......................................................................................58
8.8     Expenses; Indemnities; Withholding .....................................................................58
8.9     Resignation of Agent ..............................................................................................60
8.10    Release of Collateral or Guarantors.......................................................................60
8.11    [Reserved] ...............................................................................................................61

Article IX MISCELLANEOUS.................................................................................................61
9.1     Amendments and Waivers.......................................................................................61
9.2     Notices ....................................................................................................................61
9.3     Electronic Transmissions........................................................................................62
9.4     No Waiver; Cumulative Remedies ..........................................................................63
9.5     Costs and Expenses.................................................................................................64
9.6     Indemnity................................................................................................................64
9.7     Marshaling; Payments Set Aside ............................................................................65
9.8     Successors and Assigns...........................................................................................66
9.9     Assignments and Participations; Binding Effect ....................................................66
9.10    Non-Public Information; Confidentiality.................................................................68

9.11   Set-off; Sharing of Payments ............................................................................. 70
9.12   Counterparts; Facsimile Signature ..................................................................... 71
9.13   Severability ......................................................................................................... 71
9.14   Captions ............................................................................................................... 71
9.15   Independence of Provisions ................................................................................ 71
9.16   Interpretation ....................................................................................................... 72
9.17   No Third Parties Benefited .................................................................................. 72
9.18   Governing Law and Jurisdiction ......................................................................... 72
9.19   Waiver of Jury Trial ............................................................................................ 73
9.20   Entire Agreement; Release; Survival .................................................................. 73
9.21   Patriot Act ........................................................................................................... 74
9.22   Replacement of Purchaser ................................................................................... 74
9.23   Joint and Several .................................................................................................. 74
9.24   Creditor-Debtor Relationship .............................................................................. 75
9.25   Actions in Concert ............................................................................................... 75
9.26   Representations and Warranties of Purchasers ................................................... 76
9.27   Reduction in Payments on Shareholder Notes                          76
9.28   Payments                          76

Article X TAXES, YIELD PROTECTION AND ILLEGALITY      76
10.1   Taxes .................................................................................................................... 76
10.2   [Reserved] ............................................................................................................ 79
10.3   [Reserved] ............................................................................................................ 79
10.4   Funding Losses .................................................................................................... 80
10.5   [Reserved] ............................................................................................................ 80
10.6   [Reserved] ............................................................................................................ 80
10.7   Certificates of Purchasers ................................................................................... 80

Article XI DEFINITIONS ............................................................................................... 80
11.1   Defined Terms ..................................................................................................... 80
11.2   Other Interpretive Provisions ............................................................................. 105
11.3   Accounting Terms and Principles ....................................................................... 106
11.4   Payments .............................................................................................................. 106
11.5   Dollar Equivalent ................................................................................................ 107
11.6   Electronic Transmission ...................................................................................... 107

**SCHEDULES**

| | |
|---|---|
| Schedule I | Purchasers & Note Commitments |
| Schedule 1.1 | Ineligible Pre-Petition Shareholder Debt Holders |
| Schedule 1.12 | Existing Liens |
| Schedule 3.5 | Litigation |
| Schedule 3.5(a) | Audits |
| Schedule 3.7(a) | ERISA |
| Schedule 3.7(b) | UK Pension Plans |
| Schedule 3.7(c) | Dutch Pension Plans |
| Schedule 3.9 | Real Property |
| Schedule 3.10 | Taxes |
| Schedule 3.12 | Environmental |
| Schedule 3.15 | Labor Relations |
| Schedule 3.16 | Intellectual Property |
| Schedule 3.18 | Insurance |
| Schedule 3.19 | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Schedule 3.20 | Jurisdiction of Organization; Chief Executive Office |
| Schedule 3.21 | Locations of Inventory, Equipment and Books and Records |
| Schedule 3.24 | Bonding; Licenses |
| Schedule 4.1 | Purchaser Contacts |
| Schedule 4.18 | UK Pension Plan Compliance |

**EXHIBITS**

| | |
|---|---|
| Exhibit 1.1(a) | Form of New Money Note |
| Exhibit 1.1(b)(i) | Form of Roll-Up Note |
| Exhibit 1.1(b)(ii) | Form of Roll-Up Election Notice |
| Exhibit 1.2 | Form of Notice of Disbursement Request |
| Exhibit 2.1 | Form of Notice of Note Purchase Request |
| Exhibit 4.2(f) | Form of Approved Budget Compliance Certificate |
| Exhibit 4.15 | Form of Joinder Agreement |
| Exhibit 9.9 | Form of Assignment |
| Exhibit 11.1(a) | Approved Budget |
| Exhibit 11.1(b) | Interim Order |

## SENIOR SECURED TERM LOAN PRIORITY COLLATERAL PRIMING SUPER-PRIORITY DEBTOR IN POSSESSION NOTE PURCHASE AGREEMENT

This SENIOR SECURED TERM LOAN PRIORITY COLLATERAL PRIMING SUPER-PRIORITY DEBTOR IN POSSESSION NOTE PURCHASE AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, modified and/or restated from time to time, this "**Agreement**") is entered into as of January 15, 2014, by and among Constar, Inc., a Pennsylvania corporation (the "**Issuer Representative**"), Constar International LLC, a Delaware limited liability company ("**Holdings**"), BFF Inc., a Delaware corporation ("**BFF**"), DT, Inc., a Delaware corporation ("**DT**"), Constar Foreign Holdings, Inc., a Delaware corporation ("**Foreign Holdings**" and together with each of Issuer Representative, Holdings, BFF, and DT, a debtor and a debtor in possession under chapter 11 of the Bankruptcy Code (as defined below) and each an "**Issuer**" hereunder), each of the other Persons Party hereto, each a debtor and a debtor in possession under chapter 11 of the Bankruptcy Code, that, together with each Issuer, is designated as a "**Note Party**", Black Diamond Commercial Finance, L.L.C. (in its individual capacity, "**BDCF**"), as Agent for the entities from time to time party hereto as purchasers of the "**Notes**" (as defined below) issued under this Agreement (collectively, the "**Purchasers**" and individually each a "**Purchaser**") (in such capacity, "**Agent**"), and such Purchasers.

WITNESSETH:

WHEREAS, on December 19, 2013 (the "**Petition Date**"), each of the Note Parties filed a voluntary petition for relief (collectively, the "**Cases**") under chapter 11 of the Bankruptcy Code, Case No. 13-13281-CSS (jointly administered) with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, the Note Parties are continuing to operate their respective businesses and manage their respective properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Issuers have jointly and severally authorized the issuance and sale to the Purchasers of, and the Purchasers are, subject to the terms hereof, willing to purchase, secured notes of the Issuers in the form of Exhibit 1.1(a) or Exhibit 1.1(b)(i) hereto, as applicable, on the terms described herein (collectively, the "**Notes**");

WHEREAS, each Issuer desires to secure all of its Obligations under the Note Documents by granting to Agent, for the benefit of the Secured Parties, a security interest in and lien upon the Collateral owned by it pursuant to the Collateral Documents (including, without limitation, (a) in the case of Holdings, a pledge to Agent, for the benefit of the Secured Parties, of all of the Stock and Stock Equivalents of the other Issuers (other than Constar UK) and (b) in the case of Foreign Holdings, a charge over all Stock and Stock Equivalents of Constar UK and Constar Holland); and

WHEREAS, Constar Group, Inc., a Delaware corporation ("**Parent**") is willing to guarantee all of the Obligations and to grant to Agent, for the benefit of the Secured Parties, a

security interest in and lien upon the Collateral owned by it pursuant to the Collateral Documents (including, without limitation, a pledge to Agent, for the benefit of the Secured Parties, of all of the Stock and Stock Equivalents of Holdings) and Constar International U.K. Limited, a company organized under the laws of England and Wales ("**Constar UK**") is willing to guarantee all of the Obligations and to grant to Agent, for the benefit of the Secured Parties, a security interest in and lien upon the Collateral owned by it pursuant to the Collateral Documents.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

## ARTICLE I
## THE NOTES

1.1     Sale and Purchase of Notes.

(a)     New Money Facility.

(i)     Interim Order Issuance.  On the Interim Order Issuance Date, the Issuers will issue, on a joint and several basis, an aggregate principal amount of New Money Notes equal to $7,000,000 and each of the Purchasers will purchase, on a several and not joint basis, an aggregate principal amount of New Money Notes equal to such Purchaser's Initial New Money Note Commitment (such New Money Notes, the "**Initial New Money Notes**"), which such amounts will be funded by the Purchasers directly to the Agent's Disbursement Account. Notwithstanding anything to the contrary set forth herein or in any other Note Document, the parties hereto acknowledge and agree that immediately upon the effectiveness of this Agreement, (a) the Initial New Money Notes shall be deemed New Money Notes and part of the New Money Facility for all purposes under this Agreement and the Note Documents and (b) the purchase of such Initial New Money Notes by each such Purchaser shall be deemed to have occurred in reliance upon the representations and warranties of the Note Parties and their Subsidiaries contained herein and in each other Note Document.  Notwithstanding anything herein to the contrary, without the consent of the Agent and the Required Purchasers, no more than $7,000,000 of the Facility shall be available prior to the entry of the Final Order.

(ii)     Subsequent Issuance. Subject to the terms and conditions hereof and to the extent permitted by the Bankruptcy Court, on the Final Order Note Purchase Date, the Issuers will, jointly and severally, issue and sell an aggregate principal amount of additional New Money Notes equal to $7,500,000 and, subject to the terms and conditions hereof and in reliance upon the representations and warranties of the Note Parties and their Subsidiaries contained herein and in each other Note Document and the satisfaction of the conditions specified in Section 2.2, each of the Purchasers will purchase from the Issuers, on a several and not joint basis, Subsequent New Money Notes in an amount equal to each such Purchaser's Subsequent New Money Note Commitment; provided, however, all such amounts shall be funded by the Purchasers directly to the Agent's Disbursement Account in accordance with Section 1.1(d) herein (the "**Subsequent New Money Notes**").

2

(iii)    Required Sale. Each Pre-Petition Shareholder Debt Holder (other than the entities listed on Schedule 1.1 and their respective Affiliates, managed funds, related parties and assignees) shall be entitled to purchase from the Purchasers, on a pro rata basis, an amount of New Money Notes and Subsequent New Money Note Commitments equal to the greater of (a) the product of (A) the sum of the principal amount of New Money Notes then outstanding plus Subsequent New Money Note Commitments times (B) a percentage equal to the Pre-Petition Shareholder Term Loan Debt held by such prospective purchaser divided by the aggregate amount of Pre-Petition Shareholder Term Loan Debt then outstanding and (b) an amount agreed to by Purchasers (the "**Assignment Amount**") and each such Purchaser shall be required to sell, transfer and assign to such Pre-Petition Shareholder Debt Holder its pro rata share of such Assignment Amount pursuant to Section 9.9 herein (a "**Required Sale**"); provided, however, the Agent and each Purchaser must receive written notice of such Pre-Petition Shareholder Debt Holder's commitment to consummate a Required Sale within five (5) Business Days after the date of the Final Hearing and such Required Sale must be consummated within five (5) Business Days thereof (as such dates may be extended in the Purchasers' discretion).

(b)    Roll-Up Facility.  Within five (5) Business Days after entry of the Final Order, as consideration for the issuance of New Money Notes, upon request, Issuers shall issue Notes substantially in the form of Exhibit 1.1(b)(i) to the  Purchasers as of such date or each such Purchaser's designated Affiliate (collectively, the "**Roll-Up Purchasers**") in an amount equal to twenty percent (20%) of the amount of the Aggregate New Money Note Commitment of each such Roll-Up Purchaser in exchange for, with respect to each such Roll-Up Purchaser, an aggregate principal amount of such Roll-Up Purchaser's Shareholder Notes (which amount may include the Shareholder Notes of such Roll-Up Purchaser's Affiliates) (in each case, as elected in such Roll-Up Purchaser's Roll-Up Election Notice) totaling an aggregate principal amount of $2,900,000 and all such Shareholder Notes so exchanged shall be deemed repaid in full and cease to be outstanding (such facility described in this clause (b), the "**Roll-Up Facility**" and the Notes issued thereunder, the "**Roll-Up Notes**").  In order to participate in the Roll-Up Facility, no later than January 22, 2014 at 12:00 p.m. New York Time, each Purchaser shall submit in writing to Agent a written notice identifying its Aggregate New Money Note Commitment and shall identify it or its Affiliates' holdings of Shareholder Notes subject to the exchange.

(c)    Issuances Generally. The Note Parties and the Purchasers agree that the values ascribed to the Notes (which values shall be used by the Note Parties and the Purchasers, as well as any subsequent holder of any of the Securities, for all purposes, including the preparation of tax returns) shall be the face amount of such Notes (whether evidenced on actual Notes or as set forth on the Register as evidence of the Obligations). Other than as set forth in the Interim Order or Final Order, as applicable, each of the Initial New Money Notes, Subsequent New Money Notes and Roll-Up Notes shall be *pari passu* in right of payment and shall have identical terms and the same treatment hereunder (other than having a different date of issuance); provided, however, the New Money Notes shall be repaid in full prior to any payment of the Roll-Up Notes with the proceeds of the Milestone Sale and/or any sale deposit except to the extent required to be disbursed hereunder.

(d)    Agent's Disbursement Account.  All proceeds from the New Money Notes shall be funded directly into the Agent's Disbursement Account, shall be deemed payments made

3

by the Purchasers on account of the New Money Notes for all purposes hereunder and under all other Note Documents (including, without limitation, with respect to the accrual of interest at the interest rate set forth in Section 1.3 herein) and shall be disbursed to the Issuers in accordance with, subject to and to the extent provided in, Section 1.2. Agent shall be entitled to pay interest, fees, expenses and indemnification amounts as set forth herein which are due and payable to Agent or Purchasers from amounts on deposit in the Agent's Disbursement Account. It is agreed and understood that the Note Parties shall have no right, title or interest in amounts on deposit in Agent's Disbursement Account.

(e)     Issuance of Subsequent New Money Notes and Roll-Up Notes.

(i)     The Issuers will deliver to each Purchaser requesting actual Notes (rather than relying on the Register as evidence of the Obligation), the Subsequent New Money Notes and, if applicable, Roll-Up Notes to be purchased or purchased by such Purchaser promptly upon request of the applicable Purchaser; and

(ii)     if on the Final Order Note Purchase Date, the Issuers shall fail to tender the Subsequent New Money Notes to be delivered to any Purchaser so requesting as provided herein, or if any of the conditions specified in Section 2 shall not have been fulfilled (unless waived by the Required Purchasers), each Purchaser shall, at its election, be relieved of all further obligations under this Agreement to purchase any Subsequent New Money Notes, without thereby waiving any other rights such Purchaser may have by reason of such failure or such non-fulfillment.

1.2     Procedure for Disbursements from Agent's Disbursement Account; Proceeds in Agent's Disbursement Account.

(a)     Issuers' Direction.

(i)     From and after the Interim Order Issuance Date, the Issuers may request proceeds from the New Money Notes on deposit in the Agent's Disbursement Account to be disbursed from the Agent's Disbursement Account to the Issuers on a weekly basis in accordance with the Approved Budget until the Maturity Date (or more frequently as determined by the Required Purchasers in their sole discretion or to effectuate a Cure; provided, that Issuer shall satisfy the requirements of this Section 1.2(a)), by providing the Agent and the Purchasers with the Issuer Representative's irrevocable written notice delivered to Agent and the Purchasers substantially in the form of a Notice of Disbursement Request or in a writing in any other form acceptable to Agent and the Required Purchasers, which notice must be received by Agent prior to 12:00 p.m. (New York time) on the date of the requested disbursement. Such Notice of Disbursement Request shall specify:

(A)     the amount of the disbursement to be made (which shall be an amount not to exceed the lesser of (w) if such disbursement is requested to effectuate a Cure (as defined below), the amount needed to effectuate such Cure, (x) an amount, such that after making such disbursement, the cumulative amount of disbursements so made since the

4

date of the first disbursement (plus any variances permitted under Section 6.1) would not exceed the amount set forth in the Approved Budget for such period, (y) the amount permitted in the Order and (z) the amount available in the Agent's Disbursement Account as of the Disbursement Date);

(B)   the requested Disbursement Date, which shall be a Business Day; and

(C)   whether the disbursement is requested to effectuate a Cure.

(ii)   Upon receipt of a Notice of Disbursement Request, Agent will promptly notify each Purchaser of such Notice and of the aggregate amount of disbursements to be made from the Agent's Disbursement Account to the Issuers on such Disbursement Date.

(iii)   Such disbursements will be made available to the Issuer Representative by the Agent by wire transfer of such amount to the Issuer Representative's account specified on the signature pages hereto (which such account the Issuers hereby represent and warrant is an existing operating account within the Issuers' existing cash management system) pursuant to the wire transfer instructions specified on the signature page hereto and the Issuers shall promptly direct and apply such amounts for the purposes set forth in the Approved Budget (subject to permitted variances); provided, however, any disbursement to effectuate a Cure shall be made by the Agent directly to the DIP Credit Facility Agent (pursuant to wire transfer instructions specified by such DIP Credit Facility Agent) to be applied towards the repayment of the DIP Credit Facility and/or the Pre-Petition Revolving Loan Obligations, as applicable.

(iv)   Notwithstanding anything herein to the contrary, (i) there shall be not more than one (1) Disbursement Date pursuant to this Section 1.2(a) in any calendar week unless otherwise agreed to by the Required Purchasers in their sole discretion or unless made to effectuate a Cure and (ii) no disbursement from the Agent's Disbursement Account shall be issued during any week when the Approved Budget does not provide for such a disbursement unless consented to by the Required Purchasers.

(v)   All conditions precedent set forth in Section 2.2 shall have been fulfilled or waived by the Required Purchasers; and

(vi)   If on any Disbursement Date, any of the conditions specified in Section 2.2 shall not have been fulfilled (unless waived by the Required Purchasers), the Agent shall be relieved of all obligations under this Agreement to disburse to any Issuer any amount in the Agent's Disbursement Account (and the Purchasers shall be relieved of any obligation to direct the Agent to make any such disbursement), without thereby waiving any other rights the Agent or such Purchaser may have by reason of such failure or such non-fulfillment.

(b)   Required Purchasers' Direction.   At the sole initiative of Required Purchasers (without any consent required from any Issuer), the Required Purchasers may direct the Agent to disburse proceeds in the Agent's Disbursement Account to the DIP Credit Facility

5

Agent (pursuant to wire transfer instructions specified by such DIP Credit Facility Agent) to be applied towards the repayment of the DIP Credit Facility and/or the Pre-Petition Revolving Loan Obligations, in each case, in order to cure (including, without limitation, by providing cash collateral to cure) any failure to satisfy the covenant set forth in Section 5.9(a) of the DIP Credit Ratification Agreement or any Material Budget Deviations (as such term is defined in Exhibit I of the DIP Credit Facility Agreement, "**Material Budget Deviations**") (in each case, a "**Cure**"). Notwithstanding the foregoing, in accordance with Section 1.2(a) above, the Issuers may also direct the Agent to disburse proceeds in the Agent's Disbursement Account in order to effectuate a Cure.

(c)     Authorized Disbursements.  Notwithstanding anything to the contrary set forth herein or in any other Note Document, the parties hereto hereby agree that the Agent shall be authorized, and is hereby directed, without any further instructions from any party hereto, to make disbursements to the Purchasers and Agent on account of interest, fees, expenses and indemnification amounts that are due and payable pursuant to the terms hereof or any other Note Document from amounts on deposit in the Agent's Disbursement Account without complying with the disbursement conditions set forth in this Section 1.2.

(d)     Proceeds in Agent's Disbursement Account. Notwithstanding anything to the contrary set forth herein or in any other Note Document, all amounts funded to the Agent's Disbursement Account (prior to giving effect to any upfront fees netted therefrom) shall be deemed payments for Notes issued by Issuers and purchased by Purchasers and shall accrue interest at the applicable rate set forth pursuant to Section 1.3.

1.3     Interest.

(a)     Subject to subsection 1.3(d), each Note shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to 0.00%. All computations of fees and interest payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed. Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(b)     Interest on each Note shall be paid in arrears on each Interest Payment Date.  Interest shall also be paid on the date of any payment or prepayment of Notes in full.

(c)     [Intentionally Reserved].

(d)     Anything herein to the contrary notwithstanding, the obligations of the Issuers hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Purchaser would be contrary to the provisions of any law applicable to such Purchaser limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Purchaser, and in such event the Issuers shall pay such Purchaser interest at the highest rate permitted by applicable law ("**Maximum Lawful Rate**"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Issuers shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by

Agent, on behalf of Purchasers, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the initial issuance date as otherwise provided in this Agreement.

1.4    Note Accounts.

(a)    Agent, on behalf of the Purchasers, shall record on its books and records the amount of each Note issued, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding. Agent shall deliver to the Issuer Representative on a weekly basis a statement setting forth such record for the immediately preceding calendar week. Such record shall, absent manifest error, be conclusive evidence of the amount of the Notes issued to the Purchasers and the interest and payments thereon including any disbursements authorized to be made under Section 1.2(c). Any failure to so record or any error in doing so, or any failure to deliver such note statement shall not, however, limit or otherwise affect the obligation of the Issuers hereunder (and under any Note) to pay any amount owing with respect to the Notes or provide the basis for any claim against Agent.

(b)    Agent, acting as a non-fiduciary agent of the Issuers solely for tax purposes and solely with respect to the actions described in this subsection 1.4(b), shall establish and maintain at its address referred to in Section 9.2 (or at such other address as Agent may notify the Issuer Representative) (A) a record of ownership (the "**Register**") in which Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of Agent and each Purchaser, each of their obligations under this Agreement, and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the Purchasers, (2) the Commitment of each Purchaser, (3) the amount of each Note, (4) the amount of any principal or interest due and payable or paid and (5) any other payment received by Agent from the Issuers and its application to the Obligations.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the Notes are registered obligations, the right, title and interest of the Purchasers in and to such Notes shall be transferable only upon notation of such transfer in the Register and no assignment thereof shall be effective until recorded therein. This Section 1.4 and Section 9.9 shall be construed so that the Notes are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)    The Note Parties, Agent and the Purchasers shall treat each Person whose name is recorded in the Register as a Purchaser for all purposes of this Agreement. Information contained in the Register with respect to any Purchaser shall be available for access by the Issuer Representative, Agent or such Purchaser during normal business hours and from time to time upon at least one Business Day's prior notice. No Purchaser shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Purchaser unless otherwise agreed by Agent.

(e)    Whenever any Note shall be surrendered for transfer or exchange, if so requested by the relevant Purchaser, within three (3) Business Days after the receipt of written

notice of such transfer, the Issuers, at their expense will execute and deliver in exchange therefor a new Note or Notes (in such denominations and registered in such name or names as may be requested by the holder of the surrendered Note or Notes), in the same aggregate unpaid principal amount and same series or tranche in the case of the Notes, as that of the Note or Notes so surrendered. In connection with the foregoing, the Note Parties shall take such other actions reasonably requested by a holder of such Note in order to effect such any applicable transfer, registration or exchange.

1.5     Extension. At the written request of the Issuer Representative, the Required Purchasers may, in their sole discretion, agree in writing to provide an extension of the Scheduled Maturity Date to any such date agreed upon in writing by the Required Purchasers and the Issuer Representative (the "Extension Date"), provided, that any such extension shall be conditioned upon (a) the payment of an extension fee to the Purchasers equal to 2.0% of the then outstanding principal amount of the New Money Facility, (b) an extension of the DIP Credit Facility on terms and conditions acceptable to the Required Purchasers and (c) such modifications to the Approved Budget and certain other terms and conditions hereunder as required by the Required Purchasers to reflect such extension and such other terms as determined by the Required Purchasers (which may, without limitation, include changes to the rate of interest and other fees charged hereunder); provided, further, that the Required Purchasers shall promptly notify the Agent of such Extension Date; provided, further, that upon satisfaction of the conditions set forth in this Section 1.5, the Scheduled Maturity Date shall be deemed immediately and automatically so extended.

1.6     [Reserved].

1.7     Voluntary Prepayment of the Notes. The Issuers may at any time upon at least two (2) Business Days' (or such shorter period as is acceptable to Agent) prior written notice to Agent prepay or repay the Notes in whole or in part in increments of at least $100,000. All such prepayments and repayments shall be applied without penalty or premium, except as provided in Section 10.4.

1.8     Mandatory Prepayments of the Notes.

(a)     Maturity Date. The Issuers shall repay to the Purchasers in full on the Maturity Date the aggregate principal amount of the Notes outstanding on the Maturity Date.

(b)     Asset Sales. Subject to the Interim Order and the Final Order, as applicable, following the receipt by Parent or any of its Subsidiaries of any Net Asset Sale Proceeds, including, but not limited to, the Net Asset Sale Proceeds resulting from the Old Bay Lane Disposition, immediately on such date, the Issuers shall prepay the Notes as set forth in Section 1.8(g) in an aggregate amount equal to such Net Asset Sale Proceeds.

(c)     Insurance/Condemnation Proceeds. Subject to the Interim Order and the Final Order, as applicable, following the receipt by Parent or any of its Subsidiaries, or Agent as loss payee, of any Net Insurance/Condemnation Proceeds, Issuers shall immediately prepay the Notes as set forth in Section 1.8(g) in an aggregate amount equal to such Net Insurance/Condemnation Proceeds.

8

(d)     Extraordinary Receipts.  Subject to the Interim Order and the Final Order, as applicable, following the receipt by Parent or any of its Subsidiaries of any Extraordinary Receipts, the Issuers shall immediately prepay the Notes as set forth in Section 1.8(g) in an aggregate amount equal to such Extraordinary Receipts.

(e)     Sale Deposit Proceeds.  Subject to the Interim Order and the Final Order, as applicable, following the receipt by Parent or any of its Subsidiaries of any deposit in connection with the  termination of an agreement for the sale, transfer, lease, encumbrance or other disposition of the Issuers' assets (including the deposit under the Asset Purchase Agreement), such deposit to be applied to the DIP Credit Facility and the Facility on a pro rata basis based on the principal amounts outstanding under the DIP Credit Facility and the New Money Facility.

(f)     Prepayment Certificate.  Concurrently with any prepayment of the Notes pursuant to Section 1.8(b)-(e), the Issuer Representative shall deliver to Agent a certificate of the chief financial officer of Issuer Representative demonstrating the calculation of the amount of the applicable net proceeds, or other applicable financial tests or proceeds giving rise to the prepayment, as the case may be.  In the event that Issuer Representative shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Issuer Representative shall promptly make an additional prepayment of the Notes in an amount equal to such excess, and Issuer Representative shall concurrently therewith deliver to Agent a certificate of the chief financial officer of Issuer Representative demonstrating the derivation of such excess.

(g)     Application of Prepayments.  Subject to the Interim Order and the Final Order, as applicable:

(i)     Any voluntary prepayment of any Note pursuant to Section 1.7 shall be applied to repay outstanding Notes on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(ii)     Any mandatory prepayment of any Notes pursuant to Section 1.8 shall be applied as follows:

*first*, to the payment of all unpaid expenses, fees and any indemnity amounts owing to Agent and the Purchasers to the full extent thereof;

*second*, to the payment of any accrued interest on the amounts referred to in clause *first*, if any;

*third*, to the payment of any other accrued interest on the Notes; and

*fourth*, to prepay Notes on a pro rata basis (in accordance with the respective outstanding principal amounts thereof); provided, however, the Net Asset Cash Proceeds from the Old Bay Disposition and any sale deposit shall only reduce Notes to the extent amounts thereunder have been disbursed from the Agent's Disbursement Account; and

*fifth*, to repay any other Obligations.

9

1.9     Fees.

    (a)     [Intentionally Reserved].

    (b)     [Intentionally Reserved].

    (c)     [Intentionally Reserved].

    (d)     [Intentionally Reserved].

    (e)     [Intentionally Reserved].

    (f)     Wire Transfer Fee.   The Issuers shall pay a $25 wire transfer fee in connection with each wire transfer made by the Agent or any Purchaser to the Issuers pursuant to this Agreement.

    (g)     DIP Credit Facility Proceeds Restricted.  No proceeds from the DIP Credit Facility may be applied by the Note Parties to pay any of the fees described in this Section 1.9.

1.10    Payments by any Issuer.

    (a)     All payments (including prepayments) to be made by each Note Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein or in the Control Agreements, be made to Agent (for the ratable account of the Persons entitled thereto) at the address for payment specified in the signature page hereof in relation to Agent (or such other address as Agent may from time to time specify in accordance with Section 9.2), including payments utilizing the ACH system, and shall be made in Dollars and by wire transfer or ACH transfer in immediately available funds (which shall be the exclusive means of payment hereunder), no later than 1:00 p.m. (New York time) on the date due.  Any payment which is received by Agent later than 1:00 p.m. (New York time) may in Agent's discretion be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue.  The Issuers and each other Note Party hereby irrevocably waives the right to direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral.

    (b)     If any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

    (c)     Subject to the Interim Order and the Final Order, as applicable, during the continuance of an Event of Default, Agent shall apply any and all payments received by Agent (including proceeds from the realization of Collateral) in respect of any Obligation in accordance with clauses first through sixth below.  Notwithstanding any provision herein to the contrary (but subject to the terms of Section 1.11(b) and to the Interim Order and the Final Order, as applicable), all amounts collected or received by Agent after any or all of the Obligations have

10

been accelerated (so long as such acceleration has not been rescinded), including proceeds of Collateral, shall be applied as follows:

> *first*, to payment of costs, expenses, including Attorney Costs, and any indemnity amounts of Agent payable or reimbursable by the Note Parties under the Note Documents;

> *second*, to payment of costs and expenses, including Attorney Costs, of Purchasers payable or reimbursable by any Issuer under this Agreement;

> *third*, to payment of all accrued unpaid interest on the Obligations and fees owed to Agent and Purchasers;

> *fourth*, to payment of principal of the Obligations;

> *fifth*, to payment of any other amounts owing constituting Obligations; and

> *sixth*, any remainder shall be for the account of and paid to whoever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (ii) each of the Purchasers or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to clauses third, fourth and fifth above (which share shall take into account, and be adjusted for, any non-pro rata Notes purchased pursuant to the terms hereof while any Purchaser constitutes a Non-Funding Purchaser or as a consequence of any Purchaser being a Non-Funding Purchaser).

1.11    Accountings.

(a)    Agent shall have no obligation to advance funds on behalf of any Purchaser or to relieve any Purchaser from its obligation to fulfill its Note Commitment hereunder or to prejudice any rights that Agent, any Purchaser or the Issuers may have against any Purchaser as a result of any default by such Purchaser hereunder.

(b)    As necessary, Agent shall advise each Purchaser by telephone or fax of the amount of such Purchaser's Commitment Percentage of principal, interest and Fees paid for the benefit of Purchaser with respect to each applicable Note. Provided that each Purchaser has funded all payments required to be made by it, Agent shall pay to each Purchaser such Purchaser's Commitment Percentage of principal, interest and fees paid by the Issuers for the benefit of such Purchaser on the Notes held by it. Such payments shall be made by wire transfer to such Purchaser not later than 2:00 p.m. (New York time) on the next Business Day following the Business Day on which such payment was recorded. Agent shall be entitled to set off the funding shortfall against any Non-Funding Purchaser's Commitment Percentage of all payments received from the Issuers, and hold, in a non-interest bearing account, all remaining portions of any payments received by Agent for the benefit of any Non-Funding Purchaser pursuant to this Agreement as cash collateral for any unfunded reimbursement obligations of such Non-Funding Purchaser until the Obligations are paid in full in cash and all Note Commitments have been

terminated, and upon such unfunded obligations owing by a Non-Funding Purchaser becoming due and payable, Agent shall be authorized to use such cash collateral to make such payment on behalf of such Non-Funding Purchaser. Any amounts owing by a Non-Funding Purchaser to Agent which are not paid when due shall accrue interest at the interest rate equal to the Base Rate.

(c)    Non-Funding Purchaser Cure. To the extent that any Non-Funding Purchaser should at any time prior to the Maturity Date remit to the Agent any of the purchase price of any Notes required to be purchased by it from the Issuer, the Agent shall promptly notify the other Purchasers and shall remit to each other Purchaser the appropriate portion of such amount paid by the Non-Funding Purchaser as is allocable to the amount, if any, funded by such Purchaser on a prior Note Purchase Date to address any failure to fund by a Non-Funding Purchaser. Upon payment in full in cash by any Non-Funding Purchaser of all of the purchase price of Notes required to be purchased by it hereunder and any other payments due hereunder, to the extent not otherwise qualifying as a Non-Funding Purchaser pursuant to the definition hereof, such Purchaser shall cease to be a Non-Funding Purchaser.

(d)    Return of Payments. If Agent determines at any time that any amount received by Agent under this Agreement or any other Note Document must be returned to any Note Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Note Document, Agent will not be required to distribute any portion thereof to any Purchaser. In addition, each Purchaser will repay to Agent on demand any portion of such amount that Agent has distributed to such Purchaser, together with interest at such rate, if any, as Agent is required to pay to the Issuers or such other Person, without setoff, counterclaim or deduction of any kind, and Agent will be entitled to set-off against future distributions to such Purchaser any such amounts (with interest) that are not repaid on demand.

(e)    Non-Funding Purchasers. The failure of any Non-Funding Purchaser to pay its purchase price for any Notes or any payment required by it hereunder shall not relieve any other Purchaser (each such other Purchaser, an "**Other Purchaser**") of its obligations to pay the purchase price of any Notes, but neither Agent nor, other than as expressly set forth herein, any Other Purchaser shall be responsible for the failure of any Non-Funding Purchaser to pay the purchase price of any Notes or make any other payment required hereunder. Notwithstanding anything set forth herein to the contrary, a Non-Funding Purchaser shall not have any voting or consent rights under or with respect to any Note Document and shall not constitute a "Purchaser" or be, or have its Note Commitment or Notes, included in the determination of "Required Purchasers" for any voting or consent rights under or with respect to any Note Document (it being agreed and understood that for the purposes of determining "Required Purchasers", the Note Commitments and Notes held by Non-Funding Purchasers shall be excluded from the total Notes and Note Commitments outstanding).

(f)    Procedures. Agent is hereby authorized by each Note Party and each other Secured Party to establish procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Notes and other matters incidental thereto (to the extent not inconsistent with the express provisions hereof). Without limiting the generality of the foregoing, Agent is hereby authorized to establish procedures to make available or deliver, or

12

to accept, notices, documents and similar items on, by posting to or submitting and/or completion on, E-Systems.

1.12    Priming and Super Priority Nature of Obligations and Purchasers' Liens.

(a)    Superpriority Claims and Liens. Each Note Party hereby covenants, represents and warrants that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations of the Note Parties under the Note Documents:

(i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed superpriority administrative expense claims in the Case having priority over all administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code;

(ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected Lien on all tangible, intangible, real and personal property of the Note Parties other than the Excluded Property (defined below) that is not subject to an Existing Lien as of the Petition Date (including, but not limited to claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553, 723(a) or 724(a) of the Bankruptcy Code, the "**Avoidance Actions**") (it being understood that the Liens so granted on the Avoidance Actions shall be subject to the entry of the Final Order);

(iii)    pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected Lien upon all tangible, intangible, real and personal property of the Note Parties other than the Excluded Property (defined below) that is subject to an Existing Lien as of the Petition Date (other than Primed Liens), junior to such Existing Lien; and

(iv)    pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a perfected Lien, senior and priming to the Primed Liens, on all of the tangible, intangible, real and personal property of the Note Parties (other than the Excluded Property) that is subject to lien or security interest securing the Pre-Petition Term Loan Debt or any obligation under the Pre-Petition Revolving Credit Agreement as of the Petition Date;

provided, however, in the case of each of clauses (i) through (iv), such priority shall be subject only to the exceptions and limitations expressly set forth in the Interim Order or Final Order, as applicable (including, without limitation, the provisions regarding the Carve Out and the Carve Out Expenses set forth in the Interim Order and Final Order). For purposes of this section, "**Excluded Property**" means any assets (i) upon which security may not be lawfully granted and (i) after payment in full of the Facility, with respect to the Pre-Petition Debt held by any Purchasers, any assets with respect to avoidance actions, claims against directors, officers, insiders or lenders and commercial tort claims.

(b)    Real Property. Subject in all respects to the terms of the Orders, the priorities set forth in paragraph (a) above and to the Carve Out, each Note Party grants to the Agent on behalf of the Purchasers a security interest in, and mortgage on, all of the right, title

13

and interest of such Note Party in all real property owned by such Note Party and the proceeds of all real property leased by such Note Party, together in each case with all of the right, title and interest of such Note Party in and to all buildings, improvements, and fixtures related thereto, all general intangibles relating thereto and all proceeds thereof. Each Note Party acknowledges that, pursuant to the Orders, the Liens in favor of the Agent on behalf of the Purchasers in all of such real property shall be perfected without the recordation of any instruments of mortgage or assignment. Each Note Party agrees that upon the reasonable request of the Agent, such Note Party shall enter into separate mortgages in recordable form with respect to such owned properties on terms reasonably satisfactory to the Agent, subject to the last paragraph of Section 2.1.

     1.13    Discharge.  Each Issuer agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming any plan of reorganization (and each Note Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Purchasers pursuant to the Orders and described herein and the Liens granted to the Agent pursuant to the Orders and the Note Documents shall not be affected in any manner by the entry of an order confirming any plan of reorganization.

     1.14    Payment of Obligations.  Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or Final Order, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Agent and Purchasers shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, in accordance with provisions of the Interim Order and the Final Order, as applicable.

     1.15    Restriction on Payments.  Notwithstanding anything to the contrary contained in this Agreement, no proceeds of Notes, cash or cash equivalents or other Collateral or the Carve Out or proceeds of any of the foregoing may be used to (i) object to or contest in any manner or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under this Agreement, any other Note Document or any Pre-Petition Term Loan Document or the Liens or claims granted under the Interim Order or the Final Order, any Note Document or any Pre-Petition Term Loan Document, (ii) assert any claims, counterclaims, defenses or causes of action against the Agent, the Purchasers, any Pre-Petition Term Secured Party or any of their respective Affiliates, (iii) prevent, hinder or otherwise delay the Agent's assertion, enforcement or realization on cash, cash equivalents or other Collateral in accordance with the Note Documents or the Interim Order or the Final Order, (iv) seek to modify any of the rights granted to the Agent, the Purchasers or the Pre-Petition Term Secured Parties under any Note Document or any Pre-Petition Term Loan Document, as applicable, the Interim Order or the Final Order or (v) except as may be provided in the Orders, investigate, commence, prosecute or support any other person in commencing, prosecuting or supporting any challenge to the validity, perfection, priority or extent of the obligations, claims and Liens described in clauses (i) or (ii).

     1.16    Adequate Protection.  Notwithstanding anything to the contrary contained in this Agreement or any other Note Document, the parties hereto acknowledge and agree that the DIP Credit Facility Agent, DIP Credit Facility Lender, and Pre-Petition Term Secured Parties shall be entitled to adequate protection to the extent provided in, and in accordance with, the Interim Order and the Final Order.

1.17    Cash Collateral. The Note Parties shall be permitted to use cash collateral to the extent provided in, and in accordance with, the Approved Budget (with such variances as permitted hereunder) and the Interim Order or Final Order, as applicable; provided, however, upon the occurrence of an Event of Default, the Purchasers' authorization for the consensual use of cash collateral may terminate if so directed by the Required Purchasers.

**ARTICLE II**
**CONDITIONS PRECEDENT**

2.1    Conditions to Subsequent New Money Note Issuance.  The obligation of each Purchaser to purchase the Subsequent New Money Notes is subject to satisfaction of the following conditions in a manner satisfactory to the Purchasers:

(a)    Bankruptcy Court Orders.  The Final Order is in full force and effect and the Final Order and all other orders, motions and other documents entered or filed with the Bankruptcy Court or to be entered or filed in connection with this Agreement shall be in form and substance satisfactory to the Required Purchasers in their sole discretion.

(b)    Asset Purchase Agreement. The Asset Purchase Agreement shall not have been terminated and shall be on terms and conditions (including purchase price) in form and substance acceptable to the Purchasers (it being agreed and understood that the Asset Purchase Agreement entered into on December 17, 2013 is in form and substance acceptable to the Purchasers).

(c)    Certain Documents.  Agent shall have received on or before the Final Order Note Purchase Date each of the following (except as otherwise permitted to be delivered thereafter pursuant to the terms hereof), each in form and substance satisfactory to Purchasers in their sole discretion:

(i)    this Agreement, duly executed and delivered by the Issuers and each Note Party and, if requested, for the account of each Purchaser, a note substantially in the form of Exhibit 1.1(a) herein;

(ii)    any Collateral Documents, except as are agreed to be delivered after the Final Order Note Purchase Date pursuant to the last paragraph of this Section 2.1;

(iii)    a certificate of a Responsible Officer of the Issuer Representative to the effect that the conditions set forth in Section 2.2(a) and (b) have been satisfied;

(iv)    evidence satisfactory to the Agent that the insurance policies required by Section 4.6 and any Collateral Document are in full force and effect, together with, unless otherwise agreed by the Agent and subject to the last paragraph of this Section 2.1, endorsements naming the Agent, on behalf of the Note Parties, as an additional insured or loss payee under all insurance policies to be maintained with respect to the properties of the Note Parties; and

(v)    such other certificates, documents, agreements and information respecting any Note Party as any Purchaser through the Agent may reasonably request.

15

(d)    Approved Budget.  To the extent not identical to the Approved Budget in effect as of January 13, 2014, the Purchasers shall have received and approved in their sole discretion, the then-applicable Approved Budget.

(e)    Approvals.  Agent shall have received satisfactory evidence that the Note Parties and Subsidiaries have obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, shareholders and third parties, to the execution, delivery and performance of this Agreement and other Note Documents and the consummation of the transactions contemplated hereunder.

(f)    Payment of Fees.  The Issuers shall have paid the fees required to be paid hereunder and shall have reimbursed Agent and the Purchasers for all fees, costs and expenses incurred in connection herewith presented as of the date hereof.

(g)    Information.  There shall not have been any information disclosed after December 20, 2013  that is inconsistent in a material and adverse manner with any material information previously provided in writing to Purchasers or their Affiliates and there shall not be any binding Requirement of Law, regulation, ruling, judgment, order, injunction or other restraint that restrains, prevents, prohibits, restricts or imposes materially adverse conditions upon the Issuers, the Guarantors, the Facility (and the funding thereof) or the transactions contemplated hereby.

(h)    DIP Credit Facility.  The DIP Credit Facility Agreement and the DIP Credit Ratification Agreement shall be in full force and effect and shall be on terms and conditions in form and substance acceptable to the Purchasers (it being agreed and understood that the DIP Credit Facility Agreement and DIP Credit Ratification Agreement as in effect on December 20, 2013 are in form and substance acceptable to the Purchasers).

(i)    Notice of Note Purchase Request.  The Issuers shall have delivered a duly completed and executed Notice of Note Purchase Request.

Notwithstanding anything to the contrary contained herein, it is agreed that (x) no security documents shall be required to be delivered prior to entry of the Final Order, (y) Issuers shall use commercially reasonable efforts to obtain the original stock certificates and other collateral in the possession of any of the Note Parties' existing creditors within 15 days from the date of the Final Order and (z) Issuers shall use commercially reasonable efforts to obtain any requested insurance policy endorsements with respect to loss payee and additional insured status of Agent, as appropriate, and real property mortgages within 15 days from the entry of the Final Order.

2.2    Conditions to Subsequent New Money Note Issuance and Disbursements from Agent's Disbursement Account.  Except as otherwise expressly provided herein, no Purchaser shall be obligated to purchase any Subsequent New Money Note and neither the Agent nor any Purchaser shall be obligated to cause a disbursement from the Agent's Disbursement Account to any Issuer (other than on account of any interest, fees, expenses, indemnitees or other amounts owed to any Purchaser or Agent under any Note Document), if, as of the date thereof:

(a)    any representation or warranty by any Note Party contained herein or in any other Note Document is untrue or incorrect in any material respect as of such date (or in any respect to the extent such representation or warranty is expressly qualified by a materiality concept), except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect as of such earlier date (or in any respect to the extent such representation or warranty is expressly qualified by a materiality concept), it being understood and agreed that, without limiting the foregoing provisions of this parenthetical, the representations and warranties pertaining to the information set forth in Schedules 3.16 and 3.21 shall be deemed to have been made as of the date hereof or as the date such schedules have been last updated in accordance with Section 4.2, as applicable);

(b)    any Default or Event of Default has occurred and is continuing hereunder or would result after giving effect to any Note issuance or disbursement (and the Required Purchasers shall have determined not to purchase such Notes or authorize such disbursement as a result thereof);

(c)    any default or event of default has occurred under the Interim Order or the Final Order;

(d)    the Interim Order or the Final Order, as applicable, has ceased to be in full force and effect or has been vacated, reversed, modified, amended or stayed without the prior written consent of the Agent and the Required Purchasers;

(e)    in the case of a disbursement, the Agent and Purchasers shall not have received a Notice of Disbursement Request (unless such disbursement is applied to effect the Cure or is otherwise disbursed pursuant to Section 1.2(c));

(f)    in the case of a disbursement, the proceeds shall fail to be applied in a manner in accordance with the Approved Budget (giving effect to permitted variances) or applied to effect the Cure; or

(g)    the Roll-Up Facility has failed to be implemented at the Final Hearing to the extent the Roll-Up Facility is required hereunder.

The request by the Issuers and acceptance by the Issuers of the proceeds of any Note or any disbursement shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by the Issuers that the conditions in this Section 2.2 have been satisfied as of such date and (ii) a reaffirmation by each Note Party of the granting and continuance of Agent's Liens, on behalf of itself and the Secured Parties, pursuant to the Interim Order or Final Order, as applicable, and the Collateral Documents. Each Note issued and each disbursement made pursuant to this Agreement shall be made in reliance upon the accuracy of the representations and warranties of the Note Parties as made or as deemed to be made as of Interim Order Issuance Date, the date hereof and each other Note Purchase Date.

For purposes of determining compliance with the conditions specified in Article II, each Purchaser shall be deemed to be satisfied with each document and each other matter required to be satisfactory to such Purchaser unless, prior to the date hereof or, if applicable, the relevant

Note Purchase Date, the Agent receives notice from such Purchaser specifying such Purchaser's objections and, if applicable, such Purchaser has not made available its purchase price of any Notes scheduled to be paid on such date. Each Purchaser shall be deemed to be satisfied with each document and each other matter required to be satisfactory to such Purchaser upon the receipt of an effectiveness memo transmitted by facsimile by the Agent on the date hereof and any Note Purchase Date and the Agent agrees to transmit such memo to each of the Purchasers by facsimile on the date hereof and each Note Purchase Date.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

The Note Parties, jointly and severally, represent and warrant to Agent and each Purchaser on and as of the date hereof and after giving effect to the issuance of the Notes and the other financial accommodations on the date hereof and on and as of each date as required by Section 2.2(a) and on each Note Purchase Date, after giving effect to the issuance of the Notes, that the following are true, correct and complete:

3.1    <u>Corporate Existence and Power</u>.  Each Note Party and each of their respective Subsidiaries:

(a)    is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and, if applicable, in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b)    has the corporate or similar power and authority to own its assets, carry on its business and execute, deliver, and perform its obligations under, the Note Documents to which it is a party;

(c)    has all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under, the Note Documents to which it is a party;

(d)    is duly qualified as a foreign corporation, limited liability company or limited partnership, as applicable, and licensed and, if applicable, in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification or license; and

(e)    is in compliance with all Requirements of Law; except, in each case referred to in <u>clause (c)</u>, <u>clause (d)</u> or <u>clause (e)</u>, to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.2    <u>Corporate Authorization; No Contravention</u>.    The execution, delivery and performance by each of the Note Parties of this Agreement, and by each Note Party and each of their respective Subsidiaries of any other Note Document to which such Person is party and the consummation of the transactions contemplated thereby upon entry of the Interim Order and (when applicable) the Final Order have been duly authorized by all necessary action, including

18

the consent of shareholders, partners and members and the Bankruptcy Court where required, and do not and will not:

        (i)      contravene the terms of any of that Person's Organization Documents;

        (ii)     conflict with or result in any material breach or contravention of, or (other than pursuant to the Collateral Documents) result in the creation of any Lien under, any document evidencing any material Contractual Obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority (including the Bankruptcy Court) to which such Person or its Property is subject; or

        (iii)    violate any Requirement of Law in any material respect.

    3.3     <u>Governmental Authorization</u>. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Note Party or any Subsidiary of any Note Party of this Agreement or any other Note Document except (a) for recordings and filings in connection with the Liens granted to Agent under the Collateral Documents, (b) those filings required to be made with the Securities and Exchange Commission, (c) those obtained or made on or prior to the date hereof and (d) those of the Bankruptcy Court.

    3.4     <u>Binding Effect</u>. This Agreement and each other Note Document to which any Note Party or any Subsidiary of any Note Party is a Party constitute the legal, valid and binding obligations of each such Person which is a Party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

    3.5     <u>Litigation</u>. Other than the Cases and except as specifically disclosed in <u>Schedule 3.5(a)</u>, there are no actions, suits, proceedings, claims or disputes pending, or to the knowledge of each Note Party, threatened, at law, in equity, in arbitration or before any Governmental Authority, against any Note Party, any Subsidiary of any Note Party or any of their respective Properties which:

        (a)     purport to affect or pertain to this Agreement, any other Note Document, or any of the transactions contemplated hereby or thereby (other than objections or pleadings that may have been filed in the Chapter 11 Cases with respect to the Note Parties seeking authorization to enter into the Note Documents and incur the Obligations under this Agreement);

        (b)     would reasonably be expected to result in monetary judgment(s), individually or in the aggregate, in excess of $250,000; or

        (c)     would reasonably be expected to result in equitable relief, individually or in the aggregate, that could be reasonably be expected to result in a loss of revenue, or increase in expenses, in an aggregate amount in excess of $250,000.

No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution,

delivery or performance of this Agreement or any other Note Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided. Except as specifically disclosed in Schedule 3.5(a), as of the date hereof, no Note Party or any Subsidiary of any Note Party is the subject of any audit or any review or investigation by any Governmental Authority (excluding the IRS and other taxing authorities) concerning the violation or possible violation of any Requirement of Law which violation would reasonably be expected to result in a Material Adverse Effect.

3.6    No Default.  No Default or Event of Default exists or would result from the incurring of any Obligations by any Note Party or the grant or perfection of Agent's Liens on the Collateral or the consummation of the transactions contemplated hereunder.  No Note Party and no Subsidiary of any Note Party is in default under or with respect to any Contractual Obligation owed by it arising after the Petition Date or under executory contracts and unexpired leases that have been assumed with the consent of the Agent in the Cases pursuant to Section 365 of the Bankruptcy Code (including pursuant to the Plan) in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect.

3.7    ERISA Compliance.

(a)    Schedule 3.7(a) sets forth, as of the date hereof, a complete and correct list of, and that separately identifies, (a) all Title IV Plans, (b) all Multiemployer Plans and (c) all Foreign Plans. Each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law so qualifies. Except for those that would not reasonably be expected to result in Liabilities in excess of $250,000 in the aggregate or as set forth on Schedule 3.7(a), (x) each Benefit Plan and Foreign Plan is in compliance with applicable provisions of ERISA (to the extent applicable), the Code and other applicable Requirements of Law, (y) there are no existing or pending (or to the knowledge of any Note Party, threatened in writing) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan or Foreign Plan with respect to which any Note Party incurs or otherwise has or could have an obligation or any Liability and (z) no ERISA Event or similar event with respect to a Foreign Plan is reasonably expected to occur. On the date hereof, other than the Cases, and except as set forth on Schedule 3.7(a), no ERISA Event has occurred in connection with which obligations and liabilities (contingent or otherwise) remain outstanding. With respect to each Title IV Plan, except as set forth on Schedule 3.7(a), all ERISA Affiliates have satisfied the minimum funding standard under Section 412(a) of the Code and paid all minimum required contributions and all required installments on or before the due dates provided under Section 430 of the Code.

(b)    Schedule 3.7(b) identifies as of the date hereof a complete and accurate list of pension plans and/or arrangements operating in the United Kingdom through which any of Parent or its Subsidiaries currently contributes or could be required to contribute (the "**UK Pension Plans**"). There are no amounts which are treated under Section 75 of the United Kingdom Pensions Act 1995 as due from any of Parent or its Subsidiaries to any other pension scheme operated in the United Kingdom in which any of Parent or its Subsidiaries has been a participating employer. Schedule 3.7(b) separately identifies which of the UK Pension Plans is a defined benefit plan and which is a defined contribution plan. All of the UK Pension Plans are registered pension schemes as defined in chapter 2 of part 4 of the United Kingdom Finance Act

20

2004. There is no plan of any Note Party organized in England and Wales (or, to the knowledge of the Note Parties organized in England and Wales, of any other Person having the power to amend or terminate any UK Pension Plan) to amend or terminate any UK Pension Plan or otherwise do any act or omission so as to give rise to any claim by the trustees of that plan whether under the related trust deed or rules of that plan or under Section 75 of the United Kingdom Pensions Act 1995.  Contributions have been made to the UK Pension Plans as required under their relevant schedule of contributions and recovery plan in force from time to time as those terms are defined in Part 3 of the United Kingdom Pensions Act 2004 (as amended) in all material respects.  There are no facts or circumstances which may give rise to the Pensions Regulator threatening to issue or issuing a Financial Support Directive or a Contribution Notice with respect to any UK Pension Plans.

(c)    Schedule 3.7(c) identifies as of the date hereof a complete and accurate list of pension plans and/or arrangements operating in the Netherlands through which any of Parent or its Subsidiaries currently contributes or could be required to contribute (the "**Dutch Pension Plans**").

3.8    Use of Proceeds; Margin Regulations.  The proceeds of the New Money Notes shall be used solely for the purposes set forth in and permitted by Section 4.10 and shall not be used in any manner prohibited by Section 1.15.  No Note Party and no Subsidiary of any Note Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.

3.9    Ownership of Property; Liens.  As of the date hereof, the Real Estate listed in Schedule 3.9 constitutes all of the owned and leased Real Estate of each Note Party.  Each of the Note Parties and each of their respective Subsidiaries has good record and marketable title in fee simple to (or, in the case of Constar UK, good and marketable title to freehold property), or valid leasehold interests in, all Real Estate, and good and valid title to all owned personal property and valid leasehold interests in all leased personal property, in each instance, necessary or used in the ordinary conduct of their respective businesses, except, in any case, where the failure to hold good and valid title to Real Estate or equipment, or valid leasehold interests with respect to Real Estate or equipment, would not be reasonably expected to have a Material Adverse Effect.  As of the date hereof, none of the Real Estate of any Note Party or any Subsidiary of any Note Party is subject to any Liens other than Permitted Liens.  As of the date hereof, except as would not reasonably be expected to have a Material Adverse Effect, all permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect.

3.10    Taxes.  Except as specifically disclosed in Schedule 3.5(a), all material federal, state, local and foreign income and franchise and other material tax returns, reports and statements (collectively, the "**Tax Returns**") required to be filed by any Tax Affiliate have been filed with the appropriate Governmental Authorities, all such Tax Returns are true and correct in all material respects, and all taxes, assessments and other governmental charges and impositions required to be reflected therein or otherwise due and payable have been paid prior to the date on which any Liability may be added thereto for non-payment thereof except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are

maintained on the books of the appropriate Tax Affiliate in accordance with GAAP. Except as specifically disclosed in Schedule 3.5(a) as of the date hereof, (i) to the knowledge of each Note Party, no Tax Return is under audit or examination by any Governmental Authority, and no notice of any audit or examination or any assertion of any claim for Taxes has been given or made by any Governmental Authority. Proper and accurate amounts have been withheld by each Tax Affiliate from their respective employees for all periods in full and complete compliance with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities, in each case except as would not reasonably be expected to have a Material Adverse Effect. No Tax Affiliate has participated in a "reportable transaction" within the meaning of Treasury Regulation Section 1.601 1-4(b) or has been a member of an affiliated, combined or unitary group other than the group of which a Tax Affiliate is the common parent. Notwithstanding anything herein to the contrary, Schedule 3.5 shall be delivered to the Agent and Purchasers within 10 days after the date hereof, in form and substance reasonably acceptable to the Agent and Purchasers.

3.11    Financial Condition.

(a)    Each of (i) the Consolidated audited balance sheet of Parent dated December 31, 2012, and the related Consolidated audited statements of income or operations, shareholders' equity and cash flows for the Fiscal Year ended on that date and (ii) each unaudited interim Consolidated balance sheet of Parent dated September 30, 2013, October 31, 2013 and November 30, 2013, and the related unaudited Consolidated statements of income, shareholders' equity and cash flows for the fiscal months then ended during such Fiscal Year, in each case, copies of which have been furnished to the Agent:

(x)    were prepared in accordance with GAAP consistently applied throughout the respective periods covered thereby, except as otherwise expressly noted therein, subject to, in the case of the unaudited interim financial statements, normal year-end adjustments and the lack of footnote disclosures; and

(y)    present fairly in all material respects the consolidated financial condition of Parent and its Subsidiaries as of the dates thereof and results of operations for the periods covered thereby.

(b)    The Note Parties and their Subsidiaries have no Indebtedness other than Indebtedness permitted pursuant to Section 5.5 and have no Contingent Obligations other than Contingent Obligations permitted pursuant to Section 5.9.

(c)    The Approved Budget represents each Issuer's good faith estimate as of the date hereof of future financial performance and are based on assumptions believed by each Issuer as of the date hereof to be fair and reasonable in light of market conditions known to each Issuer as of the date hereof, it being acknowledged and agreed by Agent and Purchasers that (i) projections as to future events are subject to significant uncertainties and contingencies, many of which are beyond the control of the Note Parties and their Subsidiaries, and are not to be viewed as facts or an assurance that such projections will be realized and (ii) the actual results during the

22

period or periods covered by such projections may differ from the projected results and such differences may be material.

3.12    Environmental Matters.    (a) The operations of each Note Party and each Subsidiary of each Note Party are and have been in compliance with all applicable Environmental Laws, including obtaining, maintaining and complying with all Permits required by any applicable Environmental Law, (b) as of the date hereof, no Note Party and no Subsidiary of any Note Party is Party to, and no Note Party and no Subsidiary of any Note Party and no Real Estate currently or previously owned, leased, subleased, operated or otherwise occupied by or for any such Person is subject to or the subject of, any Contractual Obligation relating to any Environmental Liabilities or any pending (or, to the knowledge of any Note Party, threatened) order, action, investigation, suit, proceeding, audit, claim, demand, dispute or written notice of violation or of potential liability or similar written notice relating in any manner to any Environmental Laws (an "**Environmental Proceeding**"), (c) no Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities has attached to any property of any Note Party or any Subsidiary of any Note Party and, to the knowledge of any Note Party, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such property, (d) no Note Party and no Subsidiary of any Note Party has caused or suffered to occur a Release of Hazardous Materials at, to or from any Real Estate in violation of Environmental Laws or that requires any Remedial Action pursuant to Environmental Laws, (e) all Real Estate currently (or to the knowledge of any Note Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Note Party and each Subsidiary of each Note Party is free of contamination by any Hazardous Materials in violation of Environmental Laws or that requires any Remedial Action pursuant to Environmental Laws, and (f) no Note Party and no Subsidiary of any Note Party (i) is or has been engaged in, or has permitted any current or former tenant to engage in, operations or (ii) knows of any facts, circumstances or conditions relating to its operations or Real Estate, including receipt of any written information request or written notice of potential responsibility under the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601 et seq.) or similar Environmental Laws, that would reasonably be expected to result in Environmental Liabilities to any Note Party or any Subsidiary of any Note Party, in each case, except (x) as set forth in Schedule 3.12 or (y) where any such non-compliance, Environmental Proceeding, Liens, Environmental Liabilities, Release of Hazardous Materials, violation, engagement or responsibilities, as applicable, would not reasonably be expected to result in any Material Environmental Liability.  Each Note Party has made available to Agent copies of all existing, material, non-routine environmental reports, reviews and audits and all material, non-routine documents pertaining to actual or potential Environmental Liabilities, in each case to the extent such reports, reviews, audits and documents are in their possession, custody, control or otherwise available to the Note Parties as of the date hereof, except for those portions subject to attorney-client privilege.

3.13    Regulated Entities.    None of any Note Party or any Subsidiary of any Note Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other foreign, Federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its Obligations under the Note Documents.

3.14    Reorganization Matters.

(a)    Each Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (i) the motions seeking approval of the Note Documents, the Interim Order and the Final Order, (ii) the hearings for the approval of the Interim Order, and (iii) the hearings for the approval of the Final Order have or will be given. Each Note Party has given and shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    From and after the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Cases having priority over all administrative expense claims and unsecured claims against the Note Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject, as to priority only, only to the exceptions and limitations expressly set forth in the Interim Order or Final Order, as applicable.

(c)    From and after the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, subject, as to priority only, only to the exceptions and limitations expressly set forth in the Interim Order or Final Order, as applicable.

(d)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended without the Agent's and Required Purchasers' consent.

3.15    Labor Relations.  There are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Note Party, threatened) against or involving any Note Party or any Subsidiary of any Note Party, except for those that would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth in Schedule 3.15 as of the date hereof, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Note Party or any Subsidiary of any Note Party, (b) to the knowledge of each Note Party, no petition for certification or election of any such representative is existing or pending with respect to any employee of any Note Party or any Subsidiary of any Note Party and (c) to the knowledge of each Note Party, no such representative has sought certification or recognition with respect to any employee of any Note Party or any Subsidiary of any Note Party.

3.16    Intellectual Property.  Schedule 3.16 sets forth a true and complete list of (a) all Intellectual Property owned by the Note Parties that is registered with or is the subject of an application for registration filed with the relevant authorities in the United States, United Kingdom or European Union (or any applicable subdivision thereof) and (b) in the case of each

24

item referenced in the preceding clause (a), (1) the Note Party that is the owner thereof, (2) the title, (3) the registration number and registration date and (4) any material IP Licenses or other rights (including franchises) granted by such Note Party with respect thereto. Each Note Party and each Subsidiary of each Note Party owns, or is licensed to use, all Intellectual Property used or necessary to conduct its business as currently conducted except for such Intellectual Property the failure of which to own or license would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, it being understood that the foregoing representation shall not be construed as a representation or warranty with respect to non-infringement, which is the subject of the next following sentence. To the knowledge of each Note Party, (a) the conduct and operations of the businesses of each Note Party and each Subsidiary of each Note Party does not infringe, misappropriate or dilute any Intellectual Property owned by any other Person and (b) no other Person has contested any right, title or interest of any Note Party or any Subsidiary of any Note Party in, or relating to, any Intellectual Property, other than, in each case, as cannot reasonably be expected to affect the Note Documents and the transactions contemplated therein and would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.17    Broker's Fees; Transaction Fees.    Neither any Note Party nor any Person acting on any of their behalf (a) has directly or indirectly offered the Notes or any part thereof or any similar securities for issue or sale to, or solicited any offer to buy any of the same from, anyone other than the Purchasers, other Pre-Petition Roll-Over Debt Holders and other Pre-Petition Shareholder Debt Holders, (b) has dealt with any broker, finder, commission agent or other similar Person in connection with the sale of the Notes and the other transactions contemplated by the Note Documents or (c) is under any obligation to pay any broker's fee, finder's fee or commission in connection with such transactions that are permitted under the Note Documents.

3.18    Insurance.    Schedule 3.18 lists all insurance policies of any nature maintained as of the date hereof for current occurrences by each Note Party, including issuers, coverages and deductibles.    Each of the Note Parties and each of their respective Subsidiaries and their respective Properties are insured with financially sound and reputable insurance companies which are not Affiliates of the Issuers (other than to the extent that the Note Parties are self insured with respect to health insurance), in such amounts, with such deductibles and co-payments and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar Properties in localities where such Person operates.

3.19    Ventures, Subsidiaries and Affiliates; Outstanding Stock.    Except as set forth in Schedule 3.19 as of the date hereof, no Note Party and no Subsidiary of any Note Party is engaged in any joint venture or partnership with any other Person, or (other than through any Affiliate controlling Holdings) is a controlled Affiliate of any other Person. All issued and outstanding Stock and Stock Equivalents of each of the Note Parties (other than Parent) and each of their respective Subsidiaries are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than, with respect to the Stock and Stock Equivalents of the Issuers and Subsidiaries of the Issuers, those in favor of Agent, for the benefit of the Secured Parties, the Pre-Petition Debt Holder Manager for the benefit of the Pre-Petition Roll-Over Debt Holders and Pre-Petition Shareholder Debt Holders, and the DIP Credit Facility Agent for the benefit of the DIP Credit Facility Lender. All such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities. As of the date hereof, all

of the issued and outstanding Stock of each Note Party (other than Parent) and each Subsidiary of each Note Party, is owned by each of the Persons and in the amounts set forth in Schedule 3.19. Except as set forth in Schedule 3.19, there are no preemptive or other outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Note Party other than Parent may be required to issue, sell, repurchase or redeem any of its Stock or Stock Equivalents or any Stock or Stock Equivalents of its Subsidiaries. Set forth in Schedule 3.19 is a true and complete organizational chart of Parent and all of its Subsidiaries.

3.20    Jurisdiction of Organization; Chief Executive Office. Schedule 3.20 lists each Note Party's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Note Party's chief executive office or sole place of business (as the case may be), in each case as of the date hereof, and such Schedule 3.20 also lists all jurisdictions of organization and legal names of such Note Party for the five years preceding the date hereof.

3.21    Locations of Inventory, Equipment and Books and Records. Each Note Party's Inventory (other than inventory in transit), Equipment and books and records concerning the Collateral are kept at the locations listed in Schedule 3.21.

3.22    Deposit Accounts and Other Accounts. The Note Parties have provided a true and correct schedule of all bank and other financial institutions at which any Note Party maintains deposit or other accounts as of the date hereof, and such schedule correctly identifies the names, addresses and telephone numbers of each depository, the names in which the accounts are held, descriptions of the purposes of the accounts, and the complete account numbers therefor.

3.23    [Reserved].

3.24    Bonding; Licenses. Except as set forth in Schedule 3.24 as of the date hereof, no Note Party is a Party to or bound by any surety bond agreement, indemnification agreement therefor or bonding requirement with respect to products or services sold by it.

3.25    [Reserved].

3.26    Full Disclosure. None of the representations or warranties made by any Note Party or any of their Subsidiaries in the Note Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Note Party or any of their Subsidiaries in connection with the Note Documents, when made, contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

3.27    Foreign Assets Control Regulations and Anti-Money Laundering. Each Note Party and each Subsidiary of Note Party is and will remain in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it. No Note Party and no Subsidiary or

Affiliate of a Note Party (i) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "**SDN List**") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including without limitation by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Note Document would be prohibited under U.S. law.

3.28    Patriot Act.   The Note Parties, each of their Subsidiaries and each of their Affiliates are in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, the Patriot Act and (c) other federal or state laws relating to "*know your customer*" and anti-money laundering rules and regulations. No part of the proceeds of any Note will be used directly or indirectly for any payments to any government official or employee, political Party, official of a political Party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

## ARTICLE IV
## AFFIRMATIVE COVENANTS

Each Note Party covenants and agrees that, so long as any Purchaser shall have any Note Commitment hereunder, or any Note or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

4.1    Financial Statements.   Each Note Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (provided that monthly and quarterly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments). The Issuers shall deliver to Agent and to the contact identified by each Purchaser as set forth on Schedule 4.1 (as may be updated from time to time) by Electronic Transmission and in detail reasonably satisfactory to Agent and the Required Purchasers:

(a)    [reserved];

(b)    as soon as available, but not later than thirty (30) days after the end of each fiscal month of each Fiscal Year, and not later than forty-five (45) days after the end of each Fiscal Quarter, a copy of the unaudited Consolidated and condensed consolidating balance sheets of Parent as of the end of such fiscal month or Fiscal Quarter, as applicable, and the related Consolidated and condensed consolidating statements of income, shareholders' equity

and cash flows as of the end of such fiscal month or Fiscal Quarter, as applicable, and for the portion of the Fiscal Year then ended.

(c)    The Purchasers and Agent hereby acknowledge and agree that the format of the material of the type required to be delivered under this Section shall be satisfactory if it corresponds to the form currently delivered by the Issuer Representative prior to the date hereof.

4.2    Appraisals; Certificates; Other Information.    The Issuers shall furnish to Agent and to the contact identified by each Purchaser as set forth on Schedule 4.1 (as updated from time to time) by Electronic Transmission:

(a)    together with each delivery of quarterly financial statements pursuant to Section 4.1(b), (i) a management discussion and analysis report, in reasonable detail, signed by a Responsible Officer of the Issuer Representative, describing the operations and financial condition of the Note Parties and their Subsidiaries for the portion of the Fiscal Year then ended (or for the Fiscal Year then ended in the case of annual financial statements), (ii) a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and discussing the reasons for any significant variations; provided that Purchasers and Agent hereby acknowledge and agree that the format of the material of the type required to be delivered under this Section shall be satisfactory if it corresponds to the form agreed upon between Issuer Representative and the Purchasers prior to the date hereof, (iii) a certification of the chief financial officer of Parent that such financial statements fairly present, in all material respects, the financial condition of Parent and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, in each case in conformity with GAAP applied on a consistent basis, subject, in the case of interim financial statements, to changes resulting from audit and year-end adjustments and (iv) a certification of a Responsible Officer of Parent stating that, to the best of such Responsible Officer's knowledge, each Note Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition contained in the Note Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate;

(b)    [reserved];

(c)    promptly after the same are sent, copies of all financial statements and reports which Parent sends to its shareholders or other equity holders, as applicable, generally and promptly after the same are filed, copies of all financial statements and regular, periodic or special reports which Parent may publicly make to, or publicly file with, the Securities and Exchange Commission or any successor or similar Governmental Authority; provided that Issuers shall not be obligated to furnish any reports under Section 16 of the Securities Exchange Act of 1934, as amended;

(d)    at least two (2) Business Days (or such shorter period as the Required Purchasers may agree to in its sole discretion) prior to any such filing or distribution, all pleadings, motions, applications, judicial information, financial information and other documents

filed or distributed by or on behalf of the Note Parties or their Subsidiaries with the Bankruptcy Court, the United States Trustee in any Case or any official committee appointed in any Case;

(e)     no later than 3:00 PM, New York City time on Monday of each week, a report detailing for the prior week (i) Professional Fees of the Note Parties that have been invoiced but unpaid to date in any Case and (ii) the total Professional Fees of the Note Parties paid in the Cases during such week and to date;

(f)     by 5:00 PM, New York City time on Wednesday of each week, a fully and properly completed Approved Budget Compliance Certificate in the form of Exhibit 4.2(f), certified on behalf of the Issuers by a Responsible Officer of the Issuer Representative, that, if requested by the Required Purchasers, sets forth, on a cumulative, weekly roll-forward basis through the end of the immediately preceding week, a comparison of the actual results for each Line item in the Approved Budget to the projected amount for such item set forth in the Approved Budget for such period, together with a certification from a Responsible Officer of the Issuer Representative as to whether or not a Material Budget Deviation has occurred in respect of disbursements and receipts and stating that, to the best of such Responsible Officer's knowledge, each Note Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition contained in the Note Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate;

(g)     substantially comtemporaneous with the delivery to the DIP Credit Facility Agent or the DIP Credit Facility Lender, a copy of any written report, statement, document, certification, opinion, or deliverable delivered to the DIP Credit Facility Agent or DIP Credit Facility Lender;

(h)     at the time of delivery of each of the monthly financial statements delivered pursuant to Section 4.1(b), a reconciliation of the outstanding Notes as set forth in the monthly account statement provided by Agent to the Issuers' general ledger and monthly Financial Statements delivered pursuant to subsection 4.1(b), in each case accompanied by such supporting detail and documentation as shall be requested by Agent or Required Purchasers in its Permitted Discretion;

(i)     at the time of delivery of each of the Approved Budget Compliance Certificates pursuant to clause (f) above, an updated Schedule 3.16 and 3.21 to the extent necessary to make accurate and complete the representations and warranties in Sections 3.16 and 3.21, as applicable;

(j)     [reserved]; and

(k)     [reserved]; and

(l)     promptly, such additional financial, and other documents and information with respect to the business, property, condition, corporate or similar affairs or operations of any Note Party or its Subsidiaries as Agent (or any Purchaser through the Agent) may from time to time reasonably request.

4.3     Notices. The Issuers shall notify Agent of each of the following promptly after a Responsible Officer becomes aware thereof, but (subject to clauses (f)(ii), (f)(iii) and (f)(iv) below) in no event later than two (2) Business Days thereafter:

(a)     the occurrence or existence of any Default or Event of Default;

(b)     any breach or non-performance of, or any default under, any Contractual Obligation of any Note Party or any Subsidiary of any Note Party, or any violation of, or non-compliance with, any Requirement of Law, which would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, including a description of such breach, non-performance, default, violation or non-compliance and the steps, if any, such Person has taken, is taking or proposes to take in respect thereof;

(c)     any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Note Party or any Subsidiary of any Note Party and any Governmental Authority which would reasonably be expected to result, either individually or in the aggregate, in Liabilities in excess of $250,000;

(d)     the commencement of, or any Material Adverse Development in, any litigation or proceeding affecting any Note Party or any Subsidiary of any Note Party of any of the following types: (i) any litigation or proceeding in which the amount of damages claimed is $250,000 (or its equivalent in another currency or currencies) or more, (ii) any litigation or proceeding in which injunctive or similar relief is sought and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect, or (iii) any litigation or proceeding in which the relief sought is an injunction or other stay of the performance of this Agreement or any other Note Document;

(e)     (i) the receipt by any Note Party of any written notice of violation of or potential liability or similar notice under any Environmental Law, (ii)(A) unpermitted Releases, (B) the existence of any condition that could reasonably be expected to result in violations of or Liabilities under, any Environmental Law or (C) the commencement of, or any Material Adverse Development with respect to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or Liability under any Environmental Law which in the case of clauses (A), (B) or (C) would reasonably be expected to result in Material Environmental Liabilities, (iii) the receipt by any Note Party of notification that any property of any Note Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities and (iv) any proposed acquisition or lease of Real Estate, if such acquisition or lease would reasonably be expected to result in Material Environmental Liabilities;

(f)     (i) on or prior to any filing by any ERISA Affiliate of any notice of any reportable event under Section 4043 of ERISA, or intent to terminate any Title IV Plan, a copy of such notice (ii) promptly, and in any event within three (3) days, after any officer of any ERISA Affiliate knows or has reason to know that a request for a minimum funding waiver under Section 412 of the Code has been filed with respect to any Title IV Plan or Multiemployer Plan, a notice describing such waiver request and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notice filed with the PBGC or the IRS pertaining thereto, (iii) promptly, and in any event within ten (10) days, after any officer of any

ERISA Affiliate knows or has reason to know that a Title IV Plan is in "at risk" status within the meaning of Section 430(i) of the Code and (iv) promptly, and in any event within three (3) days after any officer of any ERISA Affiliate knows or has reason to know that an ERISA Event or similar events with respect to Foreign Plans will occur or has occurred, a notice describing such ERISA Event or similar events with respect to Foreign Plans, and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notices received from or filed with the PBGC, IRS, Foreign Plan, Multiemployer Plan or other Benefit Plan pertaining thereto;

(g)    any Material Adverse Effect subsequent to the Petition Date, in each case except such changes of the type that customarily occur as the result of commencement of a proceeding under Chapter 11 of the Bankruptcy Code;

(h)    any labor controversy resulting in, or reasonably expected to result in, any strike, work stoppage, boycott, shutdown or other labor disruption against or involving any Note Party or any Subsidiary of any Note Party if the same would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(i)    the creation, establishment or acquisition of any Subsidiary or the issuance by or to any Note Party of any Stock or Stock Equivalent (other than issuances by Parent of any Stock or Stock Equivalent); and

(j)    (i) the creation, or filing with the IRS or any other Governmental Authority, of any Contractual Obligation or other document extending, or having the effect of extending, the period for assessment or collection of any income or franchise or other material taxes with respect to any Tax Affiliate and (ii) the creation of any Contractual Obligation of any Tax Affiliate, or the receipt of any request directed to any Tax Affiliate, to make any material adjustment under Section 481 (a) of the Code, by reason of a change in accounting method or otherwise.

Each notice pursuant to this Section 4.3 shall be in electronic or written form accompanied by a statement by a Responsible Officer of the Issuer Representative, on behalf of the Issuers, setting forth details of the occurrence referred to therein, and stating what action the Issuers or other Person proposes to take with respect thereto and at what time.  Each notice under subsection 4.3(a) shall describe with particularity any and all clauses or provisions of this Agreement or other Note Document that have been breached or violated.

4.4    Preservation of Corporate Existence, Etc.  Each Note Party shall, and shall cause each of its Subsidiaries to:

(a)    preserve and maintain in full force and effect its organizational existence and, if applicable, good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except, with respect to Parent's Subsidiaries, in connection with transactions permitted by Section 5.2 or 5.3;

(b)    preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except in connection with transactions permitted by Section 5.2 or Section 5.3 and except as

would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(c)     use its commercially reasonable efforts, in the Ordinary Course of Business, to preserve the goodwill and business of the customers, suppliers and others having material business relations with it;

(d)     preserve or renew all of its registered trademarks, trade names and service marks, the non-preservation of which would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(e)     conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any respect which would reasonably be expected to have a Material Adverse Effect, and shall comply in all material respects with the terms of its IP Licenses.

4.5     <u>Maintenance of Property</u>.  Each Note Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which is used or is necessary in the conduct of its business in good working order and condition, ordinary wear and tear excepted and shall make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.6     <u>Insurance</u>.

(a)     Each Note Party shall, and shall cause each of its Subsidiaries to, (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the property and businesses of the Note Parties and such Subsidiaries (including policies of fire, product liability, public liability, property damage, other casualty, workers' compensation, and business interruption insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Issuers (other than to the extent that the Note Parties are self-insured with respect to health insurance)) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Note Parties and (ii) subject to the last paragraph of Section 2.1, cause all such insurance relating to any property or business of any Note Party to name Agent as additional insured and all such property and business interruption insurance relating to any Collateral to name Agent as loss payee. All such property, business interruption and extra expense (if any) policies of insurance on Collateral of the Note Parties will contain an endorsement, in form and substance acceptable to the Required Purchasers, showing loss payable to Agent and extra expense and business interruption endorsements.  Such endorsement, or an independent instrument furnished to Agent, will provide, to the extent of the Agent's and the Purchasers' interest in such policies of insurance and the property covered thereby, that (i) the insurance companies endeavor to give Agent at least thirty (30) days' prior written notice before any such policy or policies of insurance shall be altered or canceled (or in the case of cancellation for non-payment of premiums, ten (10) day's prior written notice) and  (ii) no act or default of the Note Parties or any other Person shall affect the right of Agent to recover under such policy or policies of insurance in case of loss or damage.  Subject to the Interim Order and

Final Order, as applicable, each Note Party shall direct all present and future insurers under its "All Risk" policies of property insurance on Collateral to pay all proceeds payable thereunder directly to Agent. If any insurance proceeds are paid by check, draft or other instrument payable to any Note Party and Agent jointly, Agent may endorse such Note Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. Agent reserves the right at any time, upon review of each Note Party's risk profile, to require reasonable additional forms and limits of insurance.

(b)     Unless the Note Parties provide Agent with evidence of the insurance coverage required by this Agreement, Agent may, upon at least five (5) Business Days' prior written notice to the Issuer Representative, at any time and from time to time purchase insurance required by this Agreement at the Note Parties' expense to protect Agent's and Purchasers' interests in the Note Parties' and their Subsidiaries' properties (whether or not such insurance pertains to the Collateral or other property). This insurance may, but need not, protect the Note Parties' and their Subsidiaries' interests. The coverage that Agent purchases may not pay any claim that any Note Party or any Subsidiary of any Note Party makes or any claim that is made against such Note Party or any Subsidiary in connection with said Property. The Issuers may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that there has been obtained insurance as required by this Agreement. If Agent purchases insurance, the Note Parties will be responsible for the costs of that insurance, including interest and any other reasonable charges Agent may impose in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance shall be added to the Obligations. The costs of the insurance may be more than the cost of insurance the Issuers may be able to obtain on their own.

(c)     The Note Parties appoint Agent, acting at the direction of the Required Purchasers, as their attorney-in-fact to settle or adjust all property damage claims under its property insurance policies to extent such claims relate to the Collateral; provided, that such power of attorney shall only be exercised so long as an Event of Default has occurred and is continuing or if the property insurance claim exceeds $100,000. If no Event of Default has occurred and is continuing and the Agent, at the direction of the Required Purchasers, exercises such power of attorney to settle or adjust any property damage claim in accordance with the preceding sentence, the Agent, at the direction of the Required Purchasers, shall make such settlement or adjustment in consultation with the Issuer Representative. The Agent (and the Required Purchasers) shall have no duty to exercise such power of attorney, but may do so at their Permitted Discretion.

4.7     Payment of Obligations. Except to the extent expressly permitted under the Interim Order or Final Order, as applicable, or otherwise consented to by the Required Purchasers in their sole discretion, such Note Party shall, and shall cause each of its Subsidiaries to, pay, discharge and perform as the same shall become due and payable or required to be performed, all their respective obligations and liabilities (in the case of Contractual Obligations, relating only to obligations arising after the Petition Date or under executory contracts and leases that have been assumed with the consent of the Agent ("**Designated Obligations**")), including:

(a)     all tax liabilities, assessments and governmental charges or levies upon it or its Property arising after the Petition Date or, with the consent of the Required Purchasers,

ordered to be paid by the Bankruptcy Court or required to be paid under the Interim Order or Final Order, as applicable, unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the filing or enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(b)     all lawful claims relating to Designated Obligations which, if unpaid, would by law become a Lien upon its Property unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the imposition or enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(c)     with respect to all Indebtedness relating to Designated Obligations having an aggregate outstanding principal amount in excess of $250,000, as and when due and payable, but subject to any subordination provisions contained herein, in any other Note Documents and/or in any instrument or agreement evidencing such Indebtedness; and

(d)     with respect to obligations under any Designated Obligation to such Note Party or any of its Subsidiaries is bound, or to which it or any of its Property is subject, except where the failure to perform such obligations would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.8     Compliance with Laws.  Each Note Party shall, and shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.9     Inspection of Property and Books and Records.  Each Note Party shall maintain and shall cause each of its Subsidiaries to maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.  Subject to and without duplication of Section 4.20, each Note Party shall, and shall cause each of its Subsidiaries to, with respect to each owned, leased, or controlled property, during normal business hours and upon reasonable advance notice (unless an Event of Default shall have occurred and be continuing, in which event no notice shall be required and the Agent and its Related Persons and any Purchaser with a Commitment Percentage in excess of 5% and its Related Persons shall have access at any and all times during the continuance thereof): (a) provide access to such property to the Agent and any of its Related Persons, and permit the Agent and any of its Related Persons to audit, inspect and make extracts and copies from all of such Note Party's books and records as frequently as the Agent reasonably determines to be appropriate; (b) provide access to such property to any Purchaser with a Commitment Percentage in excess of 5% and any of its Related Persons, and permit such Purchaser or Related Persons to audit, inspect and make extracts and copies from all of such Note Party's books and records upon the request of such Purchaser (provided that such Purchaser shall reasonably coordinate with the other Purchasers so that they have the reasonable opportunity to join in such visit); (c) permit the Agent and any of its Related Persons, to conduct field examinations, evaluate and make physical

verifications of the Inventory and other Collateral in any manner and through any medium that the Agent or any Purchaser reasonably considers advisable; and (d) permit any Purchaser with a Commitment Percentage in excess of 5% and any of its Related Persons, to conduct field examinations, evaluate and make physical verifications of the Inventory and other Collateral in any manner and through any medium that such Purchaser reasonably considers advisable (provided that such Purchaser shall reasonably coordinate with the other Purchasers so that they have the reasonable opportunity to join in such examination); provided, that the Note Parties and their Subsidiaries shall only be required to permit one such audit, field examination, evaluation, verification and inspection for the Agent, such Purchasers and their Related Persons absent the occurrence of an Event of Default. All such audits, field examinations, evaluations, verifications and other inspections shall be at the Note Parties' expense.

4.10    Use of Proceeds. Issuers shall use the proceeds of the New Money Notes solely as follows: (a) to pay fees and expenses (including, without limitation, fees payable under the interim DIP facility approved by the Bankruptcy Court on December 20, 2013, indemnitees of the Agent and Purchasers, and such fees, expenses indemnitees to be paid pursuant to Section 2.1, Section 9.5 and Section 9.6), (b) to pay any interest (including without limitation, interest due hereunder), (c) to fund adequate protection payments in accordance with the Interim Order or Final Order, as applicable, and (d) for post-petition working capital, section 503(b)(9) claims, critical vendor claims and other general corporate purposes not in contravention of any Requirement of Law and not in violation of this Agreement, in the case of clauses (a) through (d), in accordance with the Approved Budget. Proceeds may also be used towards the repayment of the DIP Credit Facility or the Pre-Petition Revolving Loan Agreement to effect a Cure. Any modifications to the Approved Budget in effect on the date hereof shall only require the consent of the Note Parties, Agent and Required Purchasers.

4.11    Cash Management Systems.

(a)    Perfection. Other than (i) an aggregate amount of not more than $50,000 at any one time, (ii) amounts deposited into deposit accounts specially and exclusively used for payroll, payroll taxes, fiduciary and trust purposes, and other employee wage and benefit payments to or for Parent's or any of its Subsidiaries' employees, and (iii) zero balance accounts, no Note Party shall make, acquire, or permit to exist investments consisting of cash, Cash Equivalents, or amounts credited to deposit accounts, securities accounts or commodities accounts unless the applicable Note Party and the applicable bank or securities intermediary have entered into Control Agreements with Agent and the DIP Credit Facility Agent governing such investments in order to perfect (and further establish) Agent's Liens in such investments; provided, however, notwithstanding the foregoing, no Note Party shall be required to enter into any Control Agreements unless an Event of Default has occurred and is continuing (in which case, any such Note Party shall enter into such Control Agreements promptly upon the request of the Required Purchasers). During such times as an Event of Default has occurred and is continuing, no Note Party shall establish or maintain any deposit account, securities account or commodities account unless Agent shall have received a Control Agreement in respect of such deposit account, securities account or commodities account.

(b)    Cash Management. All receipts or amounts received by the Issuers from any source (other than Agent's Disbursement Account) shall be immediately deposited into the

35

Issuer's deposit accounts subject to Control Agreements to the extent required by clause (a) above (and which form a part of the Issuers' existing cash management system).

4.13    Further Assurances.  Each Note Party shall ensure that all written information, exhibits and reports furnished by the Note Parties to Agent or the Purchasers do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, in each case taken as a whole, and will promptly disclose to Agent and the Purchasers and correct any material defect or error that may be discovered therein or in any Note Document or in the execution, acknowledgement or recordation thereof.

4.14    Environmental Matters.  Without limiting the generality of the foregoing, each Note Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its Real Estate, whether owned, leased, subleased or otherwise operated or occupied, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action necessary to achieve such compliance) or that is required by orders and directives of any Governmental Authority except where the failure to comply would not reasonably be expected to, individually or in the aggregate, result in a Material Environmental Liability.  Without limiting the foregoing, if an Event of Default is continuing or if Agent at any time has a reasonable basis to believe that there exist violations of Environmental Laws by any Note Party or any Subsidiary of any Note Party or that there exist any Environmental Liabilities, then each Note Party shall, promptly upon receipt of request from Agent, cause the performance of, and allow Agent and its Related Persons access to such Real Estate for the purpose of conducting, such environmental audits and assessments, including subsurface sampling of soil and groundwater, and cause the preparation of such reports, in each case as Agent may from time to time reasonably request.  Such audits, assessments and reports, to the extent not conducted by Agent or any of its Related Persons, shall be conducted and prepared by reputable environmental consulting firms reasonably acceptable to Agent and shall be in form and substance reasonably acceptable to Agent.

4.15    Additional Collateral and Guaranties.  To the extent not delivered to the Agent on or before the date hereof (including in respect of after-acquired property and Persons that become Subsidiaries of any Note Party after the date hereof), the Issuers agree promptly to do, or cause each of its Subsidiaries or Parent to do, each of the following, unless otherwise agreed by the Agent:

(a)    deliver to the Agent a duly-executed joinder agreement in the form of Exhibit 4.15 (or such other foreign law governed guaranty agreements or supplements) and such other duly-executed supplements and amendments to this Agreement in form and substance reasonably satisfactory to the Agent and as the Agent reasonably deems necessary or advisable in order to ensure that each Subsidiary of Parent (an "**Additional Guarantor**") guaranties, as primary obligor and not as surety, the full and punctual payment when due of the Obligations or any part thereof; provided, however, with respect to Constar Holland, the Note Parties shall only be required to use commercially reasonable efforts to satisfy the requirements of this Section 4.15(a);

36

(b)     deliver to the Agent such duly-executed joinder and amendments to the applicable Collateral Documents or such other Collateral Documents (including, without limitation, foreign law governed pledge and security documents), in form and substance reasonably satisfactory to the Agent and as the Agent reasonably deems necessary or advisable, in order to (i) effectively grant to the Agent, for the benefit of the Secured Parties, a valid, perfected and enforceable first-priority security interest in the Stock and Stock Equivalents owned directly or indirectly by any Note Party, or any Additional Guarantor and (ii) effectively grant to the Agent, for the benefit of the Secured Parties, a valid, perfected and enforceable first-priority security interest (or comparable right or interest) in all Collateral of each Note Party or each Additional Guarantor; provided, however, with respect to Constar Holland, the Note Parties shall only be required to use commercially reasonable efforts to satisfy the requirements of this Section 4.15(b)(ii);

(c)     subject to the applicable limitations set forth in the Collateral Documents, deliver to the Agent all certificates, instruments and other documents representing all pledged or charged stock, pledged debt instruments and all other Stock, Stock Equivalents and other debt securities being pledged pursuant to the joinders, amendments and foreign agreements executed pursuant to clause (b) above, together with (i) in the case of certificated pledged or charged stock and other certificated Stock and Stock Equivalents, undated stock powers or the local equivalent endorsed in blank and (ii) in the case of pledged debt instruments and other certificated debt securities, endorsed in blank, in each case executed and delivered by a Responsible Officer of the pledgor;

(d)     to take such other actions reasonably necessary or advisable to ensure the validity or continuing validity of the guaranties required to be given pursuant to clause (a) above or to create, maintain or perfect the security interest required to be granted pursuant to clause (a) above, including the filing of UCC financing statements in such jurisdictions as may be required by the Collateral Documents or by law or as may be reasonably requested by the Agent or Required Purchasers; and

(e)     if requested by the Agent or Required Purchasers, deliver to the Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Agent and Required Purchasers.

4.16     Bankruptcy Court.   The Note Parties shall use their commercially reasonable efforts to obtain the approval of the Bankruptcy Court, and to satisfy the conditions precedent provided in, this Agreement and the other Note Documents, and shall deliver to the Agent and the Agent's counsel all material pleadings, motions and other documents filed on behalf of any of the Note Parties with the Bankruptcy Court or provided by any of the Note Parties to any statutory committee appointed in the Case or the United States Trustee for the District of Delaware.

4.17     Conference Calls.   On a weekly basis, at the request of and at such time as the Required Purchasers may determine, the Issuers shall hold a conference call among the Agent, the Purchasers, their respective advisors, and the Issuers' advisors and officers at a mutually agreeable time (which such agreement shall not be unreasonably withheld or delayed) and shall

provide information in detail satisfactory to the Required Purchasers on the Issuers' compliance with this Agreement and progress on achieving the Milestones.

4.18    UK Pension Plans. Each Note Party shall ensure that, other than as set forth on Schedule 4.18 hereto, (i) Constar UK complies with its obligations under the trust deed, scheme rules and other binding terms of each UK Pension Plan and with the requirements of any and all applicable laws, statutes, rules, regulations and orders with regard to each UK Pension Plan; (ii) for each UK Pension Plan that is a funded or insured plan, each such UK Pension Plan is funded or insured on an ongoing basis to the extent required by any applicable laws including Part 3 of the Pensions Act 2004 of England and Wales; and (iii) the UK Borrower contributes to each UK Pension Plan at the contribution rates recommended from time to time by the actuary acting for the trustees to the applicable UK Pension Plan, except in the case of (i), (ii) and (iii) of this Section where any such non-compliance, failure to fund or insure the relevant UK Pension Plan(s) or failure to contribute to the UK Pension Plans at the applicable rates would not, individually or in the aggregate cause, or could reasonably be expected to cause, a Material Adverse Effect. Each Note Party shall promptly notify the Agent of any material change to the rate of contributions to any UK Pension Plan paid by Constar UK, that Constar UK is required to pay by applicable law or that Constar UK is recommended to pay to the applicable UK Pension Plan (by the actuary acting for the trustees to the applicable UK Pension Plan or otherwise). Each Note Party shall promptly notify the Agent in the event that any contribution notice, financial support notice or restoration order is served on Constar UK by the UK Pension Regulator in accordance with its powers under the Pensions Act 2004 of England and Wales. Each Note Party shall ensure that Constar UK does not act or omit to act in relation to a UK Pension Plan in a manner which would cause or could reasonably be expected to cause a Material Adverse Effect (including the termination or commencement of winding-up proceedings of any such pension scheme or Constar UK terminating the employment of any member of such a pension scheme where such actions would cause or could reasonably be expected to cause a Material Adverse Effect). Each Note Party shall deliver promptly to the Agent a copy of any reports prepared by or on behalf of Constar UK in order to comply with any statutory requirements with regard to any UK Pension Plan and shall use commercially reasonable efforts to deliver to Agent a copy of any reports prepared by or on behalf of the trustees of any UK Pension Plan in order to comply with any statutory requirements with regard to any UK Pension Plan and (ii) at any other time if the Agent or Required Purchasers reasonably believe that any relevant statutory or requirements are not being complied with, actuarial reports in relation to all UK Pension Plan. Notwithstanding anything herein to the contrary, Schedule 4.18 shall be delivered to the Agent and Purchasers within 10 days after the date hereof, in form and substance reasonably acceptable to the Agent and Purchasers.

4.19    Constar UK. To the extent the Required Purchasers and required lenders under the DIP Credit Facility both direct the Issuers to take any actions with respect to the sale or liquidation of Constar UK or its assets and properties, the Issuers shall exercise commercially reasonable efforts to implement such direction and actions, including, but not limited to, revising the Approved Budget in a manner mutually agreed.

4.20    Roll-Up Facility. The Issuers shall satisfy their obligations under Section 1.1(b) and 1.1(e)(i) in accordance with the terms therein.

## ARTICLE V
## NEGATIVE COVENANTS

Each Note Party covenants and agrees that, so long as any Purchaser shall have any Note Commitment hereunder, or any Note or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

5.1     Limitation on Liens. No Note Party shall, and no Note Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than the following ("**Permitted Liens**"):

(a)     any Lien on the Property of a Note Party or a Subsidiary of a Note Party that is permitted under Annex D Section 1.2 of each of the Pre-Petition Term Agreements and is existing as of the Petition Date;

(b)     any Lien created under any Note Document; and

(c)     Liens arising after the Petition Date with respect to the DIP Credit Facility having the priority set forth in the Interim Order or the Final Order, as applicable, and Liens permitted under Annex D Section 1.2(g) and (l) of each of the Pre-Petition Term Agreements; provided, that, the priority of such Liens permitted under Annex D Section 1.2(g) and (l) of each of the Pre-Petition Term Agreements is subject to the provisions of the Intercreditor Agreements and have the same priority as existing Liens in favor of the Pre-Petition Revolving Agent or the Pre-Petition Debt Holder Manager, as applicable, with respect to collateral of such type as of the Petition Date.

The prohibition provided for in this Section 5.1 includes, without limitation, any effort by any Note Party and any successful effort by any committee or any other party-in-interest in the Cases to prime or create *pari passu* to any claims, Liens or interests of the Agent and Purchasers any Lien (other than set forth in the Interim Order or Final Order, as applicable) irrespective of whether such claims, Liens or interests may be "adequately protected". Except as otherwise permitted herein, no Note Party shall grant a Lien on any property that does not constitute Collateral to any creditor of any Note Party.

5.2     Disposition of Assets. No Note Party shall, and no Note Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including the Stock of any Subsidiary of any Note Party, whether in a public or a private offering or otherwise, and accounts and notes receivable, with or without recourse and further including, without limitation, the assumption, rejection or assignment of any leasehold interest or entry into any agreement to return inventory to any vendor, whether pursuant to section 546 of the Bankruptcy Code or otherwise) or enter into any agreement to do any of the foregoing, except:

(a)     the sale of that certain real property known as 350 Old Bay Lane, Havre de Grace, Maryland; provided, that such sale shall be (i) on arm's length terms, (ii) for fair

market value and (iii) paid in cash on the date such sale is consummated (the "**Old Bay Lane Disposition**"); and

(b)    any other sales, assignments, leases, conveyances, transfers or other dispositions in accordance with the Approved Budget or otherwise expressly provided for in Milestones or in the Approved Budget.

To the extent the Required Purchasers waive the provisions of this Section 5.2 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 5.2, subject to the approval of the Required Purchasers, such Collateral (unless sold to a Note Party) shall be sold free and clear of the Liens created by the Collateral Documents, and the Agent shall take all actions reasonably requested by any Note Party in order to effect the foregoing.

5.3    Consolidations and Mergers.  No Note Party shall, and no Note Party shall suffer or permit any of its Subsidiaries to merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except pursuant to the Milestone Sale or with the prior written consent of the Required Purchasers. To the extent the Required Purchasers waive the provisions of this Section 5.3 with respect to the sale of any Collateral, such Collateral (unless sold to a Note Party) shall be sold free and clear of the Liens created by the Collateral Documents, and the Agent shall, at the sole expense of the Note Parties, take all actions reasonably requested by any Note Party in order to effect the release of such Collateral.

5.4    Acquisitions; Loans and Investments.  No Note Party shall and no Note Party shall suffer or permit any of its Subsidiaries to (i) purchase or acquire, or make any commitment (unless such commitment is made conditional upon the receipt of any consent otherwise required under this Agreement) to purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (ii) make or commit (unless such commitment is made conditional upon the receipt of any consent otherwise required under this Agreement) to make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including without limitation, by way of merger, consolidation or other combination or (iii) make or purchase, or commit (unless such commitment is made conditional upon the receipt of any consent otherwise required under this Agreement) to make or purchase, any advance, loan, extension of credit or capital contribution to or any other investment in, any Person including the Issuers, any Affiliate of the Issuers or any Subsidiary of Parent (the items described in clauses (i), (ii) and (iii) are referred to as "Investments", it being understood and agreed, for the avoidance of doubt, that Capital Expenditures shall not constitute Investments, but Contingent Obligations shall constitute Investments), except for:

(a)    Investments permitted under Annex D Section 1.6 of each of the Pre-Petition Term Agreements and existing as of the Petition Date;

(b)    Investments permitted under Annex D Section 1.6(b)(ii) of each of the Pre-Petition Term Agreements;

(c)    intercompany loans made to Constar Holland in an aggregate amount not to exceed $500,000; and

(d)    any such Investments specifically set forth in the Approved Budget;

5.5    Limitation on Indebtedness.  No Note Party shall, and no Note Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(a)    the Obligations;

(b)    Indebtedness permitted under Annex D Section 1.1 under each Pre-Petition Term Agreement and in existence as of the Petition Date; and

(c)    Indebtedness under the DIP Credit Facility to the extent set forth in the Interim Order or Final Order, as applicable;

provided, however, that all such Indebtedness is specifically provided for in the Approved Budget.

5.6    Employee Loans and Transactions with Affiliates.  No Note Party shall, and no Note Party shall suffer or permit any of its Subsidiaries to, enter into any transaction with any Affiliate of the Issuers or of any Subsidiary thereof, except any such transaction permitted under the Pre-Petition Term Agreements and existing as of the Petition Date; provided such transaction is expressly provided for in the Approved Budget.

5.7    Compensation.  No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, pay any management, consulting or similar fees to any Affiliate of any Note Party or to any director or officer of any Note Party or any Affiliate of any Note Party, except as permitted by Section 5.6.

5.8    Margin Stock; Use of Proceeds.  No Note Party shall, and no Note Party shall suffer or permit any of its Subsidiaries to, use any portion of the Note proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of any Note Party or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of this Agreement.

5.9    Contingent Obligations.  No Note Party shall, and no Note Party shall suffer or permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations except in respect of (a) the Obligations, (b) any Contingent Obligations with respect to Indebtedness permitted under Section 5.5(a) and existing on the Petition Date, (c) any Contingent Obligations with respect to Indebtedness permitted under Section 5.5(b) or (c) and existing on the Petition Date (or, with respect to clause (c), arising after the Petition Date) or (d) any other Contingent Obligations outstanding on the Petition Date and expressly provided for in the Approved Budget.

5.10    Compliance with ERISA.  Except as could not reasonably be expected to result in a Material Adverse Effect, no ERISA Affiliate shall cause or suffer to exist (i) any event,

including an ERISA Event or similar event with respect to a Foreign Plan, that could result in the imposition of a Lien on any asset of a Note Party or a Subsidiary of a Note Party with respect to any Benefit Plan, Foreign Plan, Title IV Plan or Multiemployer Plan (other than Liens encumbering Property having a book and fair market value of less than $250,000) or (ii) any ERISA Event or similar event with respect to a Foreign Plan, that would, in the aggregate, result in Liabilities in excess of $1,000,000.

    5.11    _Restricted Payments._  No Note Party shall, and no Note Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or Stock Equivalent, (ii) purchase, redeem or otherwise acquire for value any Stock or Stock Equivalent now or hereafter outstanding or (iii) make any payment or prepayment of principal of, premium, if any, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to, Subordinated Indebtedness, except any Restricted Payments expressly provided for in the Approved Budget or consented to by the Required Purchasers.

    5.12    _Change in Business._  No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, engage in any material respect in any line of business different from those lines of business carried on by it on the Petition Date (or which are similar, reasonably related, incidental, ancillary or complementary thereto or are reasonable extensions thereof).

    5.13    _Change in Organizational Documents._  No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, amend any of its Organization Documents in any respect.

    5.14    _Changes in Accounting, Name or Jurisdiction of Organization._  No Note Party shall, and no Note Party shall suffer or permit any of its Subsidiaries to, (i) make any significant change in accounting treatment or reporting practices, except as required by GAAP (except for changes with which the Issuers' accountants shall concur and that shall have been disclosed in the notes to the financial statements subject to _Section 11.3_), provided that the Purchasers acknowledge that the Note Parties will not be providing audited financial statements to the Purchasers, (ii) change the Fiscal Year or method for determining Fiscal Quarters of any Note Party or of any consolidated Subsidiary of any Note Party, (iii) change its name as it appears in official filings in its jurisdiction of organization or (iv) change its jurisdiction of organization.

    5.15    _Amendments to DIP Credit Facility._  No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, amend, supplement, waive or otherwise modify any provision of the DIP Credit Facility Agreement, the DIP Credit Ratification Agreement or any "Loan Document" (as such term is defined in the DIP Credit Facility Agreement), without the prior written consent of the Required Purchasers.

    5.16    _Amendment to Pre-Petition Term Loan Documents and Intercreditor Agreements._  No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, amend, supplement, waive or otherwise modify any provision of any Pre-Petition Term Loan Document or any Intercreditor Agreement, without the prior written consent of the Required Purchasers.

5.17    No Negative Pledges.

(a)    (i) No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Note Party or Subsidiary to pay dividends or make any other distribution on any of such Note Party's or Subsidiary's Stock or Stock Equivalents (other than with respect to Constar Holland, as provided in the Constar Holland Financing as in effect as of the Petition Date) or to pay fees, including management fees, or make other payments and distributions to the Issuers or any Note Party and (ii) no Note Party shall, and no Note Party shall permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any Contractual Obligation prohibiting or otherwise restricting the existence of any Lien upon any of its assets in favor of Agent, whether now owned or hereafter acquired (except, with respect to Constar Holland, as provided in the Constar Holland Financing as in effect as of the Petition Date, provided that any such restriction contained therein relates only to the asset or assets subject to Liens under the Constar Holland Financing as in effect on the Petition Date), except, in the case of clauses (i) and (ii), (1) any such provision in any agreement governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), (2) any such provision in any Note Document, the DIP Credit Facility Agreement, the Pre-Petition Revolving Credit Agreement and any Loan Documents (as defined in the DIP Credit Ratification Agreement) or any Pre-Petition Term Loan Document or (3) any prohibition or limitation that (A) exists pursuant to applicable Requirements of Law, (B) consists of customary restrictions and conditions contained in any agreement relating to the sale or other disposition of any property permitted under Section 5.2 pending the consummation of such sale or disposition, but only with respect to the property subject to such sale or disposition or (C) restricts licensing, sublicensing or assignment of a contract (but not the creation of a Lien thereon to the extent constituting Collateral), or subletting or assignment of any lease governing a leasehold interest, of any Note Party or Subsidiary thereof permitted hereunder.

(b)    No Note Party shall issue any Stock or Stock Equivalents (i) if such issuance would result in an Event of Default under subsection 7.1(k) and (ii) unless, in the case of any Note Party other than Holdings, such Stock and Stock Equivalents are, substantially concurrently with such issuance thereof, pledged to Agent, for the benefit of the Secured Parties, as security for the Obligations, on substantially the same terms and conditions as the Stock and Stock Equivalents of the Note Parties owned by the Note Parties are pledged as Agent as of the Petition Date, to the extent not excluded by Section 4.15.

5.18    OFAC; Patriot Act.  No Note Party shall, and no Note Party shall permit any of its Subsidiaries to fail to comply with the laws, regulations and executive orders referred to in Sections 3.27 and 3.28.

5.19    Sale-Leasebacks.  No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, engage in a sale and leaseback transaction involving any of its assets.

5.20    Hazardous Materials.  No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, cause or suffer to exist any Release of any Hazardous Material at, to or from

43

any Real Estate that would violate any Environmental Law, form the basis for any Environmental Liabilities or otherwise adversely affect the value or marketability of any Real Estate (whether or not owned by any Note Party or any Subsidiary of any Note Party), in each case if such Release, violation, Environmental Liabilities or affect to the value or marketability of Real Estate would reasonably be expected to result in Material Environmental Liabilities or would reasonably be expected to have a Material Adverse Effect.

5.21    Prepayments of Other Indebtedness. No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, directly or indirectly, (a) (x) purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness other than as expressly provided for in the Approved Budget, (y) set apart any property for such purpose, whether directly or indirectly and whether to a sinking fund, a similar fund or otherwise, or (z) make any payment in violation of any subordination terms of any Indebtedness.

5.22    Bankruptcy Matters. No Note Party shall (i) seek or consent to, any modification, stay, vacation or amendment to any order entered with the Bankruptcy Court (including, without limitation, any First Day Order) having a material adverse effect on the rights of the Purchasers under this Agreement; (ii) seek or consent to any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Note Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Note Documents; or (iii) seek or consent to any plan of reorganization or liquidation other than contemplated under the defined term "Milestones".

5.23    Chapter 11 Claims. Unless the Required Purchasers consent (which consent may be given or withheld in their sole discretion) and except as expressly provided in the Orders and Approved Budget, subject to the Carve Out, Parent shall not, and shall not permit any of its Subsidiaries to, agree to, incur, create, assume, suffer to exist or permit (a) any administrative expense, unsecured claim, or other Super-priority claim or lien which is *pari passu* with or senior to the claims of the Secured Parties against the Note Parties hereunder, or apply to the Bankruptcy Court for authority to do so or (b) the extension of any existing adequate protection or the grant of further adequate protection or apply to the Bankruptcy Court for authority to do so.

5.24    The Orders. Parent shall not, and shall not permit any of its Subsidiaries to, make or seek any change, amendment, vacation or modification, or any application or motion for any change, amendment, vacation or modification, to either Order without the prior written consent of the Required Purchasers which shall be given or withheld in their sole discretion.

5.25    Certain Expenses. From and after the Petition Date, no Note Party shall make cash expenditures for (i) any "key employee incentive expenses", retention payments and severance payments to key employees without the prior written approval of the Required Purchasers, which approval shall not be unreasonably withheld, (ii) "utility deposits" in excess of the greater of (x) one month per provider or (y) the amount permitted under the Approved Budget or (iii) "critical vendor payments" in excess of those approved by the Required Purchasers, unless approved by the Bankruptcy Court.

44

5.26   Payments to Constar Holland.   Unless permitted pursuant to Section 5.4 or otherwise consented to by the Required Purchasers, no payments to Constar Holland shall be permitted except to the extent specifically set forth the Approved Budget (subject to permitted variances), in an amount not in excess of the line item for such period set forth in the Approved Budget (subject to permitted variances) and on account of goods purchased from Constar Holland after the Petition Date on "cash on delivery" terms or on other terms agreed to by the Required Purchasers.

## ARTICLE VI
## FINANCIAL COVENANTS

Each Note Party covenants and agrees that, so long as any Purchaser shall have any Note Commitment hereunder, or any Note or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

6.1   Budget Compliance. Subject to the terms and conditions set forth below, the proceeds of Notes issued under this Agreement shall be used by the Issuers solely for the purposes and up to the amounts set forth in the Approved Budget, and:

(a)   as of the last day of each Test Period:

(i)   the Cumulative Operating Cash Flow of the Issuers and Parent (excluding, for the avoidance of doubt, Constar UK and Constar Holland) during such Test Period shall not be less than the amount set forth in the Approved Budget for such Test Period by more than (a) 22.5% for any of the first four Test Periods and (b) 12.5% for any of the subsequent Test Periods;

(ii)   the Cumulative Operating Cash Flow of Constar UK during such Test Period shall be not be less than the amount set forth in the Approved Budget for such Test Period by more than (a) 22.5% for any of the first four Test Periods and (b) 12.5% for any of the subsequent Test Periods;

(iii)   the Cumulative Disbursements of the Issuers and Parent (excluding, for the avoidance of doubt, Constar UK and Constar Holland) during such Test Period shall not exceed the amount set forth in the Approved Budget for such Test Period by more than (a) 22.5% for any of the first four Test Periods and (b) 12.5% for any of the subsequent Test Periods;

(iv)   the Cumulative Disbursements of Constar UK during such Test Period shall not exceed the amount set forth in the Approved Budget for such Test Period by more than (a) 22.5% for any of the first four Test Periods and (b) 12.5% for any of the subsequent Test Periods;

(v)   the maximum cumulative Capital Expenditures incurred by the Issuers and Parent (excluding, for the avoidance of doubt, Constar UK and Constar Holland) during

such Test Period shall not exceed the amount set forth in the Approved Budget for such Test Period by more than 7.5%;

(vi)    the maximum cumulative Capital Expenditures incurred by Constar UK during such Test Period shall not exceed the amount set forth in the Approved Budget for such Test Period by more than 7.5%;

(vii)   the Cumulative Payroll Expenses of the Issuers and Parent (excluding, for the avoidance of doubt, Constar UK and Constar Holland) during such Test Period shall not exceed the amount set forth in the Approved Budget for such Test Period by more than 7.5%;

(viii)  the Cumulative Payroll Expenses of Constar UK during such Test Period shall not exceed the amount set forth in the Approved Budget for such Test Period by more than 7.5%;

(ix)    the Constar Holland Disbursements shall not exceed the amount set forth in the Approved Budget for such Test Period or for the final week of such Test Period (which such week, for purposes of testing under this clause (ix), shall be a period beginning on a Monday at 12:01 a.m. New York City time and ending on the immediately following Monday at 12:00 a.m. New York City time) by more than 7.5%; and

(x)     Availability (as defined in the DIP Credit Facility Agreement) shall not be less than (a) $1,025,000 less than the amount set forth in the Approved Budget for any of the first four Test Periods or (b) $512,500 less than the amount set forth in the Approved Budget for any of the subsequent Test Periods.

(b)     to the extent any additional line item constituting an operating receipt or an operating disbursement is added to the Approved Budget in accordance with the provisions of the Interim Order or the Final Order, such line items shall be included in the Cumulative Operating Cash Flows or Cumulative Disbursements, as applicable, and shall be subject to the same variance provisions as set forth in Section 6.5(a);

(c)     except as would not violate the cumulative variance tests set forth above, no unused portion of any line item in the Approved Budget may be carried forward to the same or any other line item for any prior or subsequent period in the Approved Budget; and

(d)     the Agent and Purchasers (A) may assume that the Issuers will comply with each Approved Budget to the extent required by this Section 6.5, (B) shall have no duty to monitor such compliance and (C) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in each Approved Budget for payment of interest, expenses and other amounts to Agent and Purchasers are estimates only, and each Issuer remains obligated to pay any and all Obligations in accordance with the terms of the Note Documents, the Interim Order and the Final Order. Nothing in any Approved Budget (including any estimates of the outstanding principal amount of Notes) shall constitute an amendment or other modification of

this Agreement, any Note Document or any of such restrictions or other lending limits set forth herein or therein.

## ARTICLE VII
## EVENTS OF DEFAULT

7.1     Events of Default.  Any of the following shall constitute an "**Event of Default**":

(a)     Non-Payment.  Any Note Party fails (i) to pay within three (3) Business Day after the same shall become due herein or under any other Note Document, any amount of principal of, or interest on, any Note, including after maturity of the Notes, or (ii) to pay within four (4) Business Days after the same shall become due, any fee or any other amount payable hereunder or pursuant to any other Note Document;

(b)     Representation or Warranty.  Any representation, warranty or certification by or on behalf of any Note Party or any of its Subsidiaries made or deemed made herein, in any other Note Document, or which is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Note Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made and such default shall continue unremedied for a period of three (3) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Note Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer Representative by Agent or Required Purchasers;

(c)     Specific Defaults.  Any Note Party fails to perform or observe any term, covenant or agreement contained in any of Section 4.1, 4.2, 4.3, 4.6, 4.9, 4.10, 4.11, 4.19, 4.20 or 9.10(d) or Article V or VI, and such default shall continue unremedied for a period of three (3) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Note Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer Representative by Agent or Required Purchasers;

(d)     Other Defaults.  Any Note Party or Subsidiary of any Note Party fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other Note Document (other than as provided in clauses (a), (b) or (c) hereof), and such default shall continue unremedied for a period of eight (8) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Note Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer Representative by Agent or Required Purchasers;

(e)     Cross-Default.  Any Note Party or any Subsidiary of any Note Party (i) fails to make any payment in respect of any Indebtedness (other than the Obligations and the DIP Credit Facility) assumed or incurred after the Petition Date (including, without limitation, any Indebtedness that is reinstated, required to be paid, or is otherwise not discharged under the Interim Order or Final Order, regardless of when such Indebtedness was incurred) or Contingent

47

Obligation having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $1,000,000 when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure continues after the applicable grace or notice period, if any, specified in the document relating thereto on the date of such failure; (ii) fails to perform or observe any other condition or covenant, or any other event shall occur or condition exist, under any agreement or instrument relating to any such Indebtedness or Contingent Obligation, if the effect of such failure, event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause such Indebtedness to be declared to be due and payable (other than by a regularly scheduled required prepayment) prior to its stated maturity (without regard to any subordination terms with respect thereto), or such Contingent Obligation to become payable or cash collateral in respect thereof to be demanded or (iii) any "Event of Default" (or equivalent term) shall occur under the Constar Holland Financing which has not been cured or waived; and in each case such default shall continue unremedied for a period of three (3) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Note Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer Representative by Agent or Required Purchasers;

(f)    DIP Credit Facility.  The occurrence of one or more "Events of Default" (as such term is defined in the DIP Credit Facility Agreement) (other than any such Event of Default which is the subject of a Cure or is the result of a Material Budget Deviation (as such term is defined in the DIP Credit Agreement) unless such Material Budget Deviation would also result in a default hereunder) which has not been cured or waived; and such default shall continue unremedied for a period of three (3) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Note Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer Representative by Agent or Required Purchasers;

(g)    Monetary Judgments.  One or more judgments, non-interlocutory orders, decrees or arbitration awards shall be entered against any one or more of the Note Parties or any of their respective Subsidiaries involving in the aggregate a liability of $500,000 or more (excluding amounts covered by insurance to the extent the relevant independent third Party insurer has not denied coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of eight (8) days after the entry thereof;

(h)    Non-Monetary Judgments.  One or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Note Parties or any of their respective Subsidiaries which has or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of eighteen (18) days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(i)    Collateral. Except pursuant to a valid, binding and enforceable termination or release permitted under the Note Documents and executed by the Agent or as otherwise expressly permitted under any Note Document, (i) any provision of any Note Document shall, at

48

any time after the delivery of such Note Document, fail to be valid and binding on, or enforceable against, any Note Party, (ii) any Note Document purporting to grant a Lien to secure any Obligation shall, at any time after the delivery of such Note Document, fail to create a valid and enforceable Lien on any Collateral or such Lien shall fail or cease to be a perfected Lien with the priority required in the relevant Note Document (subject to the Interim Order and the Final Order, as applicable) or (iii) any Note Party shall state in writing that any of the events described in clause (i), or (ii) shall have occurred; and in each case such default shall continue unremedied for a period of three (3) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Note Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer Representative by Agent or Required Purchasers;

(j)    Change of Control.  There shall occur any Change of Control; and such default shall continue unremedied for a period of three (3) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Note Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer Representative by Agent or Required Purchasers;

(k)    ERISA.  One or more ERISA Events or similar events with respect to Foreign Plans shall have occurred that, in the opinion of the Required Purchasers, when taken together with all other such ERISA Events and similar events with respect to Foreign Plans that have occurred, could reasonably be expected to result in liability of any Note Party or Subsidiary in an aggregate amount exceeding $500,000 or in the imposition of a Lien on any properties of a Note Party or its Subsidiary.  Notwithstanding the foregoing, neither the Issuers' failure to make the required quarterly contribution to the Constar, Inc. Pension Plan due October 15, 2013 or any subsequent payments nor the underfunding of the Constar, Inc. Pension Plan, each as described in Schedule 3.7(a), shall constitute an Event of Default;

(l)    Milestones.  Any of the Milestones are not satisfied as and when required pursuant to the definition of "Milestones" unless (i) the Bankruptcy Court has provided an extension of such dates or (ii) the Required Purchasers or Agent (at the direction of the Required Purchasers) has provided prior written consent for an extension of such dates (it being agreed and understood that any such later dates approved by the Bankruptcy Court or agreed to in lieu thereof shall be of the same force and effect as the dates provided in the definition of "Milestones"); and such default shall continue unremedied for a period of three (3) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Note Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer Representative by Agent or Required Purchasers;

(m)    [Reserved];

(n)    Bankruptcy Matters.  The occurrence of any of the following in any Case:

(i)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any Note Party in any Case, or the entry of an order (a) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code from any entity other than the Purchasers not otherwise

49

permitted by this Agreement or (b) to grant any Lien other than Permitted Liens upon or affecting any Collateral;

(ii)     without the prior written consent of the Required Purchasers, the dismissal of any Case or the conversion of one or more of the Cases to a case under chapter 7 of the Bankruptcy Code;

(iii)     the entry of an order which has not been withdrawn, dismissed or reversed (a) appointing a trustee, receiver or examiner with expanded powers in any Case, (b) granting relief from or modifying the automatic stay (x) to any creditor or creditors holding a Lien on any Collateral or on any other property or assets of any Note Party with a fair market value in excess of $100,000 in the aggregate or (y) with respect to any Lien of, or the granting of any Lien on any Collateral or any other property or assets of any Note Party to, any state or local environmental or regulatory agency or authority, in each case with a respect to Collateral or any other property or assets with a fair market value in excess of $100,000 in the aggregate, or (c) amending, supplementing, staying, reversing, vacating or otherwise modifying any of the (i) Interim Order or the Final Order in any manner adverse to the Purchasers without the prior written consent of the Required Purchasers or (ii) any order providing for adequate protection Liens on the Collateral in favor of the Pre-Petition Term Secured Parties, any Pre-Petition Term Loan Document, this Agreement or any other Note Document, or Agent's, any Purchaser's, or any Pre-Petition Term Secured Party's, benefits, privileges or remedies under the Interim Order, the Final Order, this Agreement, any other Note Document or any Pre-Petition Term Loan Document;

(iv)     a plan of reorganization or liquidation is filed with the Bankruptcy Court by or on behalf of any Note Party that does not provide for termination of the Facility and payment in full of the Obligations on the effective date thereof;

(v)     except for the limitations expressly provided herein, the occurrence of any event or circumstance (including the entry of any order by the Bankruptcy Court) which results in the Note Parties not being able or permitted to use cash collateral as provided for herein and the Interim Order or Final Order, as applicable;

(vi)     the filing or commencement of a contested matter, adversary proceeding or other legal proceeding by any Note Party seeking to challenge (or the support by any Note Party of such challenge by any other Person) to the Agent's, any Purchaser's or any Pre-Petition Term Secured Party's motion seeking confirmation of the amount of such Person's claim or the validity, extent, perfection, priority or characterization of any obligations incurred or Liens granted under or in connection with any Note Document or Pre-Petition Term Loan Document;

(vii)     the filing or commencement of a contested matter, adversary proceeding or other legal proceeding by any Note Party seeking to challenge (or the support by any Note Party of such challenge by any other Person) to (a) disallow in whole or in part the claim of any Pre-Petition Term Secured Party in respect of the obligations under any Pre-Petition Term Loan Document or the Agent or any Purchaser in respect of Obligations or

50

to challenge the validity, perfection and enforceability of any of the Liens in favor of any of them, or (b) equitably subordinate or re-characterize in whole or in part the claim of any Pre-Petition Term Secured Party in respect of the obligations under any Pre-Petition Term Loan Document or the Agent or any Purchaser in respect of the Obligations, or in each case the entry of an order by the Bankruptcy Court granting the relief described above;

(viii)   the filing of a lawsuit, adversary proceeding, claim or counterclaim related to any Note Party or Collateral or pre-petition collateral against the Agent, any Purchaser, or any Pre-Petition Term Secured Party;

(ix)   the application by any Note Party for authority to make any Pre-Petition Payment without the Agent's and Required Purchasers' prior written consent, other than a Permitted Prepetition Claim Payment;

(x)   the entry of an order in any Case avoiding any portion of the Pre-Petition Term Loan Documents and the obligations thereunder;

(xi)   the filing of a motion by any Note Party (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Agent or any of the Purchasers directly) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise);

(xii)   subject to any applicable cure periods contained in such Order, the failure of any Note Party to perform its obligations under the Interim Order or the Final Order, or any unenforceability or other failure of (whether resulting from a reversal, stay, vacation or modification of any such order or otherwise) any adequate protection provided to any Purchaser, Agent or Pre-Petition Term Secured Party in the First Day Orders or Interim Order or as otherwise ordered by the Bankruptcy Court;

(xiii)   the use, remittance or the application of proceeds of Collateral in contravention of the terms of the Note Documents or the Orders or First Day Orders;

(xiv)   [reserved];

(xv)   without the prior written consent of the Required Purchasers, any Note Party incurs, creates, assumes, suffers to exist or permits any Lien or superpriority claim in any Case that is *pari passu* with or senior to the Liens or claims of the Purchasers and Agent, other than as expressly provided in the Interim Order or the Final Order;

(xvi)   the marshaling of any Collateral;

(xvii)   unless the Required Purchasers have agreed to such amendment or modification pursuant to the terms hereof, any pleading or application seeking to amend or modify this Agreement or the Facility shall have been filed in the Bankruptcy Court by

51

any Note Party or any of its Affiliates which has not been withdrawn, dismissed or denied within two (2) days of filing;

(xviii) if any Note Party or any of its Subsidiaries suspends or discontinues or is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of the Note Parties and their Subsidiaries, taken as a whole, or a trustee, receiver or custodian is appointed for any Note Party, or any of their respective properties, except to the extent such suspension or discontinuance of business occurs in accordance with the Approved Budget and the terms herein;

(xix)    any Note Party requesting or seeking authority for or any motion or order that approves or provides authority to take any other action or actions adverse to the Agent or any Purchaser or its rights and remedies under the Note Documents or its interest in the Collateral;

(xx)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment thereto, by any Note Party to which the Required Purchasers do not consent or otherwise agree to the treatment of their claims; or

(xxi)    the Note Parties or any of their Subsidiaries take any action in support of any of the foregoing, including failing to contest any application or request by another party in support of any of the foregoing;

and in each case such default shall continue unremedied for a period of three (3) Business Days after the earlier to occur of (i) the date upon which a Responsible Officer of any Note Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Issuer Representative by Agent or Required Purchasers.

7.2    Remedies.  Upon the occurrence and during the continuance of any Event of Default, Agent may, and shall at the request of the Required Purchasers:

(a)    declare all or any portion of the Note Commitment of each Purchaser to purchase Notes to be suspended or terminated, whereupon such Note Commitment shall forthwith be suspended or terminated;

(b)    declare all or any portion of the unpaid principal amount of all outstanding Notes, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Note Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Note Party; and/or

(c)    exercise on behalf of itself and the Purchasers all rights and remedies available to it and the Purchasers under the Note Documents or applicable law; and/or

(d)    terminate consent to the use of cash collateral by the Note Parties.

In addition, subject solely to any requirement of the giving of notice, if any, by the terms of the Interim Order or the Final Order, the automatic stay provided in section 362 of the Bankruptcy

Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Agent and the Note Parties shall be entitled to exercise all of their respective rights and remedies under the Note Documents, including, without limitation, all rights and remedies with respect to the Collateral. Besides the remedies set forth above, and subject, solely to any requirement of the giving of notice by the terms of the Interim Order or the Final Order, the Agent may exercise any remedies provided for by this Agreement, the Collateral Documents, the Interim Order or the Final Order or any other remedies provided by law or equity.

7.3    Rights Not Exclusive.  The rights provided for in this Agreement and the other Note Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

## ARTICLE VIII
## THE AGENT

8.1    Appointment and Duties.

(a)    Appointment of Agent.  Each Purchaser hereby appoints BDCF (together with any successor Agent pursuant to Section 8.9) as Agent hereunder and authorizes Agent to (i) execute and deliver the Note Documents and accept delivery thereof on its behalf from any Note Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent under such Note Documents and (iii) exercise such powers as are incidental thereto.

(b)    Duties as Collateral and Disbursing Agent.  Without limiting the generality of clause (a) above, Agent shall have the sole and exclusive right and authority (to the exclusion of the Purchasers), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Purchasers with respect to all payments and collections arising in connection with the Note Documents (including in any proceeding described in subsection 7.1(g) or any other bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with any Note Document to any Secured Party is hereby authorized to make such payment to Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any proceeding described in subsection 7.1(f) or (g) or any other bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Note Documents, (vi) except as may be otherwise specified in any Note Document, exercise all remedies given to Agent and the other Secured Parties with respect to the Collateral, whether under the Note Documents, applicable Requirements of Law or otherwise and (vii) execute any amendment, consent or waiver under the Note Documents on behalf of any Purchaser that has consented in writing to such amendment, consent or waiver; provided, however, that Agent hereby appoints, authorizes and directs each Purchaser to act as collateral sub-agent for Agent and the Purchasers for purposes of the perfection of Liens with respect to any deposit account maintained by a Note Party with, and cash and Cash Equivalents

held by, such Purchaser, and may further authorize and direct the Purchasers to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to Agent, and each Purchaser hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)    Limited Duties.  Under the Note Documents, Agent (i) is acting solely on behalf of the Secured Parties (except to the limited extent provided in subsection 1.4(b) with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Note Document to refer to Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Note Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Purchaser or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Note Document, and each Secured Party, by accepting the benefits of the Note Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above; provided, however, the Agent shall take such action with respect to this Agreement as it shall be directed by the Required Purchasers, and the Agent shall not be liable except for the performance of such duties and obligations.

(d)    No Other Duties.  Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. Agent shall not be trustee for or have any fiduciary obligation to any party hereto and Agent shall take such action with respect to this Agreement as it shall be directed by the Required Purchasers (or Purchasers with respect to such actions expressly requiring Purchaser consent, waiver or action or all Purchasers with respect to such actions expressly requiring all Purchaser consent, waiver or action), and Agent shall not be liable except for the performance of such duties and obligations, and no implied covenants and obligations shall be read into this Agreement against Agent.

8.2    Binding Effect.    Each Secured Party, by accepting the benefits of the Note Documents, agrees that (i) any action taken, or not taken, by Agent or the Required Purchasers (or Purchasers with respect to such actions expressly requiring Purchaser consent, waiver or action or all Purchasers with respect to such actions expressly requiring all Purchaser consent, waiver or action)  in accordance with the provisions of the Note Documents, (ii) any action taken, or not taken, by Agent in reliance upon the instructions of the Required Purchasers (or Purchasers with respect to such actions expressly requiring Purchaser consent, waiver or action or all Purchasers with respect to such actions expressly requiring all Purchaser consent, waiver or action)  and (iii) the exercise by Agent or the Required Purchasers (or Purchasers with respect to such actions expressly requiring Purchaser consent, waiver or action or all Purchasers with respect to such actions expressly requiring all Purchaser consent, waiver or action)  of the powers set forth herein or therein, together with such other powers as are incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3    Use of Discretion.

(a)    Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby

or by the other Note Documents that Agent is required to exercise as directed in writing by the Required Purchasers (or such other number or percentage of the Purchasers as shall be expressly provided for herein or in the other Note Documents); provided, that Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Agent to liability or that is contrary to any Note Document or applicable Requirement of Law; and

(b)    Agent shall not, except as expressly set forth herein and in the other Note Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Note Party or its Affiliates that is communicated to or obtained by Agent or any of its Affiliates in any capacity.

8.4    <u>Delegation of Rights and Duties</u>. Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Note Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party) appointed with due care and shall not be responsible for any misconduct or negligence on the part of any trustee, co-agent. employee, attorney-in-fact or any other Person.  Any such Person shall benefit from this <u>Article VIII</u> to the extent provided by Agent.

8.5    <u>Reliance and Liability</u>. Agent may, without incurring any liability hereunder, (i) treat the payee of any Note as its holder until such Note has been assigned in accordance with <u>Section 9.9</u>, (ii) rely on the Register to the extent set forth in <u>Section 1.4</u>, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Note Party) and (iv) conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval or other paper or document (including those transmitted by Electronic Transmission) believed by it to be genuine and to have been signed, transmitted, presented or otherwise authenticated by the Purchasers, the Required Purchasers, all the Purchasers, or any other proper party or parties.

(b)    None of Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Note Document or for any error of judgment made in good faith by an officer or officers of the Agent, and each Secured Party, Parent, each Issuer and each other Note Party hereby waive and shall not assert (and each of Parent and each Issuer shall cause each other Note Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person (each as conclusively determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein.  Without limiting the foregoing, Agent:

(i)    shall not be responsible or otherwise incur liability for any action or omission taken by it in good faith and in accordance with any instruction or direction of the Required Purchasers (or all Purchasers with respect to such actions expressly requiring all Purchaser consent, waiver or action) or such other proper party or parties as the context requires under this Agreement or any other Note Document or for the actions

or omissions of any of the applicable Related Persons selected with reasonable care (other than employees, officers and directors of Agent, when acting on behalf of Agent);

      (ii)     shall not be responsible to any Purchaser or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Note Document;

      (iii)    makes no warranty or representation, and shall not be responsible, to any Purchaser or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Note Party or any Related Person of any Note Party in connection with any Note Document or any transaction contemplated therein or any other document or information with respect to any Note Party, whether or not transmitted or (except for documents expressly required under any Note Document to be transmitted to the Purchasers) omitted to be transmitted by Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by Agent in connection with the Note Documents;

      (iv)    shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Note Document, whether any condition set forth in any Note Document is satisfied or waived, as to the financial condition of any Note Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Issuer Representative or any Purchaser describing such Default or Event of Default clearly labeled "notice of default" (in which case Agent shall promptly give notice of such receipt to all Purchasers); and

      (v)     shall not have any duty to exercise any of its rights or powers hereunder if it shall have reasonable grounds for believing that repayment of any such funds expended in connection or execution thereof or any indemnity satisfactory to Agent with respect to such risk or liability is not assured to it;

and, for each of the items set forth in clauses (i) through (v) above, each Purchaser, Parent and the Issuers hereby waive and agree not to assert (and each of Parent and the Issuers shall cause each other Note Party to waive and agree not to assert) any right, claim or cause of action it might have against Agent based thereon.

      (c)     Each Purchaser (i) acknowledges that it has performed and will continue to perform its own diligence and has made and will continue to make its own independent investigation of the operations, financial conditions and affairs of the Note Parties and (ii) agrees that it shall not rely on any audit or other report provided by Agent or its Related Persons (an "**Agent Report**"). Each Purchaser further acknowledges that any Agent Report (i) is provided to the Purchasers solely as a courtesy, without consideration, and based upon the understanding that such Purchaser will not rely on such Agent Report, (ii) was prepared by Agent or its Related Persons based upon information provided by the Note Parties solely for Agent's own internal use, (iii) may not be complete and may not reflect all information and findings obtained by

Agent or its Related Persons regarding the operations and condition of the Note Parties. Neither Agent nor any of its Related Persons makes any representations or warranties of any kind with respect to (i) any existing or proposed financing, (ii) the accuracy or completeness of the information contained in any Agent Report or in any related documentation, (iii) the scope or adequacy of Agent's and its Related Persons' due diligence, or the presence or absence of any errors or omissions contained in any Agent Report or in any related documentation, and (iv) any work performed by Agent or Agent's Related Persons in connection with or using any Agent Report or any related documentation.

(d)     Neither Agent nor any of its Related Persons shall have any duties or obligations in connection with or as a result of any Purchaser receiving a copy of any Agent Report. Without limiting the generality of the forgoing, neither Agent nor any of its Related Persons shall have any responsibility for the accuracy or completeness of any Agent Report, or the appropriateness of any Agent Report for any Purchaser's purposes, and shall have no duty or responsibility to correct or update any Agent Report or disclose to any Purchaser any other information not embodied in any Agent Report, including any supplemental information obtained after the date of any Agent Report. Each Purchaser releases, and agrees that it will not assert, any claim against Agent or its Related Persons that in any way relates to any Agent Report or arises out of any Purchaser having access to any Agent Report or any discussion of its contents, and agrees to indemnify and hold harmless Agent and its Related Persons from all claims, liabilities and expenses relating to a breach by any Purchaser arising out of such Purchaser's access to any Agent Report or any discussion of its contents.

(e)     Whenever in the administration of the provisions of this Agreement the Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action to be taken hereunder, such matter (unless otherwise provided herein) may, in the absence of gross negligence or bad faith on the part of the Agent, be deemed to be conclusively proved and established by a certificate signed by the Required Purchasers (or all Purchasers with respect to such actions expressly requiring all Purchaser consent, waiver or action) delivered to the Agent and such certificate, in the absence of gross negligence or bad faith on the part of the Agent, shall be full warrant to the Agent for any action taken, suffered or omitted by it under the provisions of this Agreement upon the faith thereof.

(f)     Agent may consult with counsel and the advice or any opinion of counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in accordance with such advice and opinion of counsel.

(g)     Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, entitlement order, approval or other paper or document.

8.6     <u>Agent Individually</u>. Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock and Stock Equivalents of, engage in any kind of business with, any Note Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor. To the extent Agent or any of its Affiliates purchases any Notes or otherwise becomes a Purchaser hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any

other Purchaser and the terms "Purchaser", "Required Purchaser", and any similar terms shall, except where otherwise expressly provided in any Note Document, include, without limitation, Agent or such Affiliate, as the case may be, in its individual capacity as Purchaser or as one of the Required Purchasers, respectively.

8.7    Purchaser Credit Decision.

(a)    Each Purchaser acknowledges that it shall, independently and without reliance upon Agent, any Purchaser or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the issuance of the Notes) solely or in part because such document was transmitted by Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Note Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Note Document or with respect to any transaction contemplated in any Note Document, in each case based on such documents and information as it shall deem appropriate. Except for documents expressly required by any Note Document to be transmitted by Agent to the Purchasers, Agent shall not have any duty or responsibility to provide any Purchaser with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Note Party or any Affiliate of any Note Party that may come in to the possession of Agent or any of its Related Persons.

(b)    If any Purchaser has elected to abstain from receiving MNPI concerning the Note Parties or their Affiliates, such Purchaser acknowledges that, notwithstanding such election, Agent and/or the Note Parties will, from time to time, make available syndicate-information (which may contain MNPI) as required by the terms of, or in the course of administering the Notes to the credit contact(s) identified for receipt of such information on the Purchaser's administrative questionnaire who are able to receive and use all syndicate-level information (which may contain MNPI) in accordance with such Purchaser's compliance policies and contractual obligations and applicable law, including federal and state securities laws; provided, that if such contact is not so identified in such questionnaire, the relevant Purchaser hereby agrees to promptly (and in any event within one (1) Business Day) provide such a contact to Agent and the Note Parties upon request therefor by Agent or the Note Parties. Notwithstanding such Purchaser's election to abstain from receiving MNPI, such Purchaser acknowledges that if such Purchaser chooses to communicate with Agent, it assumes the risk of receiving MNPI concerning the Note Parties or their Affiliates.

8.8    Expenses; Indemnities; Withholding.

(a)    Each Purchaser agrees to reimburse Agent and each of its Related Persons (to the extent not reimbursed by any Note Party) promptly upon demand, jointly and severally, for any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Note Party) that may be incurred by Agent or any of its Related Persons in connection with the preparation, execution, delivery, administration, modification, consent, waiver or enforcement (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding

or otherwise) of, or legal advice in respect of its rights or responsibilities under, any Note Document.

(b)    Each Purchaser further agrees to indemnify, defend and hold harmless Agent and each of its Related Persons (to the extent not reimbursed by any Note Party), jointly and severally, from and against, and reimburse the Agent for, any and all expenses, injuries (to person, property or natural resources), attorney's and agent's fees, expenses and Liabilities (including, to the extent not indemnified pursuant to subsection 8.8(c), taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to or for the account of any Purchaser) of whatever kind or nature regardless of their merit that may be imposed on, incurred by or asserted against Agent or any of its Related Persons in any matter directly or indirectly relating to or arising out of, in connection with or as a result of any Note Document, any Related Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by Agent or any of its Related Persons under or with respect to any of the foregoing, including, without limitation, all reasonable costs related or associated with claims for damages to persons or property, reasonable attorney and consultant fees, expenses and court costs; provided, however, that no Purchaser shall be liable to Agent or any of its Related Persons to the extent such liability has resulted from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. The provisions of this Section shall survive the termination of this Agreement or the earlier resignation or removal of the Agent.

(c)    To the extent required by any applicable law, Agent may withhold from any payment to any Purchaser under a Note Document an amount equal to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Purchaser (because the appropriate certification form was not delivered, was not properly executed, or fails to establish an exemption from, or reduction of, withholding tax with respect to a particular type of payment, or because such Purchaser failed to notify Agent or any other Person of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), or Agent reasonably determines that it was required to withhold taxes from a prior payment but failed to do so, such Purchaser shall promptly indemnify Agent fully for all amounts paid, directly or indirectly, by such Agent as tax or otherwise, including penalties and interest, and together with all expenses incurred by Agent, including legal expenses, allocated internal costs and out-of-pocket expenses. Agent may offset against any payment to any Purchaser under a Note Document, any applicable withholding tax that was required to be withheld from any prior payment to such Purchaser but which was not so withheld, as well as any other amounts for which Agent is entitled to indemnification from such Purchaser under this subsection 8.8(c).

(d)    None of the provisions of this Agreement shall require Agent to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

59

8.9    Resignation of Agent.

(a)    Agent may resign at any time by delivering notice of such resignation to the Purchasers and the Issuer Representative, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective in accordance with the terms of this Section 8.9. If Agent delivers any such notice, the Required Purchasers shall have the right to appoint a successor Agent. If, within forty-five (45) days after the retiring Agent having given notice of resignation, no successor Agent has been appointed by the Required Purchasers that has accepted such appointment, then the retiring Agent may petition any court of competent jurisdiction for the appointment of a successor. Each appointment under this clause (a) shall be subject to the prior consent of the Issuer Representative, which may not be unreasonably withheld but shall not be required during the continuance of an Event of Default.

(b)    Effective immediately upon the earlier of thirty (30) days after its resignation and appointment of a successive agent, (i) the retiring Agent shall be discharged from its duties and obligations under the Note Documents, (ii) unless a successor agent has been appointed, the Purchasers shall assume and perform all of the duties of Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Persons shall no longer have the benefit of any provision of any Note Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as Agent under the Note Documents and (iv) subject to its rights under Section 8.3, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Note Documents. Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Note Documents. Upon the acceptance by the successor Agent of such appointment, the Required Purchasers shall release the retiring Agent from its obligations hereunder by written instrument, a copy of which shall be delivered to the successor Agent.

(c)    Any corporation into which any Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which Agent shall be a party, or any corporation succeeding to the business of Agent shall be the successor of Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

8.10    Release of Collateral or Guarantors. Each Purchaser hereby consents to the release and hereby directs Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following:

(a)    any Subsidiary of Holdings from its guaranty of any Obligation if all of the Stock and Stock Equivalents of such Subsidiary owned by any Note Party are sold or transferred in a transaction permitted under the Note Documents (including pursuant to a waiver or consent); and

(b)    any Lien held by Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Note Party in a transaction permitted by the Note Documents (including pursuant to a waiver or consent) to the extent also released under the DIP Credit Facility, (ii) [reserved], and (iii) all of the Collateral and all Note Parties, upon (A) termination of the Note Commitments, (B) payment and satisfaction in full of all Notes and all other Obligations (excluding contingent Obligations as to which no claim has been asserted) under the Note Documents, (C) deposit of cash collateral with respect to all contingent Obligations, in amounts and on terms and conditions and with parties satisfactory to Agent and each Indemnitee that is, or may be, owed such Obligations and (D) to the extent requested by Agent, receipt by Agent and the Secured Parties of liability releases from the Note Parties each in form and substance reasonably acceptable to Agent.

Each Purchaser hereby directs Agent, and Agent hereby agrees, upon receipt of at least five (5) Business Days' advance notice from the Issuer Representative, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guaranties and Liens when and as directed in this Section 8.10.

8.11    Limitation on Liability. Neither Agent nor any of its officers, directors, employees or agents shall be liable for any action taken or omitted under this Agreement or in connection therewith except to the extent caused by Agent's gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, no longer subject to appeal or review. The parties each (for itself and any person or entity claiming through it) hereby releases, waives, discharges, exculpates and covenants not to sue Agent for any action taken or omitted under this Agreement except to the extent caused by Agent's gross negligence or willful misconduct. Anything in this Agreement to the contrary notwithstanding, in no event shall Agent be liable for special, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

## ARTICLE IX
## MISCELLANEOUS

9.1    Amendments and Waivers. Except as otherwise provided herein or in such other Note Document, no amendment or waiver of any provision of this Agreement or any other Note Document, and no consent with respect to any departure by any Note Party therefrom, shall be effective unless the same shall be in writing and signed by Agent, the Required Purchasers (or by Agent with the consent of the Required Purchasers), and the Issuers, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given.

9.2    Notices.

(a)    Addresses. All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly specified herein, and (i) addressed to the address set forth on the applicable signature page hereto, (ii) posted to any E-System approved by or set up by or at the direction of Agent (including the Securities and Exchange Commission's EDGAR system provided that notice thereof is otherwise delivered pursuant to this Section 9.2(a)) or (iii) addressed to such other

address as shall be notified in writing (A) in the case of the Issuers and Agent, to the other parties hereto and (B) in the case of all other parties, to the Issuers and Agent. Transmissions made by electronic mail or E-Fax to Agent shall be effective only (x) for notices where such transmission is specifically authorized by this Agreement, (y) if such transmission is delivered in compliance with procedures of Agent applicable at the time and previously communicated to Issuers, and (z) if receipt of such transmission is acknowledged by Agent.

(b)     Effectiveness.

(i)     All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (A) if delivered by hand, upon personal delivery, (B) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (C) if delivered by mail, three (3) Business Days after deposit in the mail, (D) if delivered by facsimile (other than to post to an E-System pursuant to clause (a)(ii) or (a)(iii) above), upon sender's receipt of confirmation of proper transmission, and (E) if delivered by posting to any E-System, on the later of the Business Day of such posting and the Business Day access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System; provided, however, that no communications to Agent pursuant to Article I shall be effective until received by Agent.

(ii)     The posting, completion and/or submission by any Note Party of any communication pursuant to an E-System shall constitute a representation and warranty by the Note Parties that any representation, warranty, certification or other similar statement required by the Note Documents to be provided, given or made by a Note Party in connection with any such communication is true, correct and complete except as expressly noted in such communication or E-System.

(c)     Each Purchaser shall notify Agent in writing of any changes in the address to which notices to such Purchaser should be directed, of addresses of its Lending Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as Agent shall reasonably request.

9.3     Electronic Transmissions.

(a)     Authorization. Subject to the provisions of subsection 9.2(a), each of Agent, Purchasers, each Note Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Note Document and the transactions contemplated therein. Each Note Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)     Signatures. Subject to the provisions of subsection 9.2(a), (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically,

each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to any Note Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which Agent, each Secured Party and each Note Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(c)     Separate Agreements. All uses of an E-System shall be governed by and subject to, in addition to Section 9.2 and this Section 9.3, the separate terms, conditions and privacy policy posted or referenced in such E-System (or such terms, conditions and privacy policy as may be updated from time to time, including on such E-System) and related Contractual Obligations executed by Agent and Note Parties in connection with the use of such E-System.

(d)     LIMITATION OF LIABILITY. ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE". NONE OF AGENT, ANY PURCHASER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN. NO WARRANTY OF ANY KIND IS MADE BY AGENT, ANY PURCHASER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E-SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS. Each of the Issuers, each other Note Party executing this Agreement and each Secured Party agrees that Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

9.4     No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of Agent or any Purchaser, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. No course of dealing between any Note Party, any Affiliate of any Note Party, Agent or any Purchaser shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Note Documents.

9.5     Costs and Expenses. Any action taken by any Note Party under or with respect to any Note Document, even if required under any Note Document or at the request of Agent or any Purchaser, shall be at the expense of such Note Party, and neither Agent nor any other Secured Party shall be required under any Note Document to reimburse any Note Party or any Subsidiary of any Note Party therefor. In addition, the Issuers agree to pay or reimburse upon demand (a) Agent and each Purchaser for all reasonable and documented out-of-pocket costs and expenses incurred by it or any of its Related Persons, in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, the Interim Order, the Final Order, any Note Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including but not limited to separate Attorney Costs for each of the Agent, on the one hand, and the Purchasers, on the other hand, costs and expenses for consultant services, travel, valuations, audits, due diligence, appraisals, background checks and similar expenses, and costs incurred in connection with monitoring the Cases, reviewing the Budgets and otherwise monitoring performance with this Agreement, in each case, incurred by Agent or any Purchaser and which shall include, without limitation, all costs, expenses and fees of Winston & Strawn, LLP, as counsel for the Purchasers, (b) Agent and any Purchaser for all reasonable and documented costs and expenses incurred by it or any of its Related Persons in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by Agent and each such Purchaser for its examiners), and (c) each of Agent, each of the Purchasers and each of its Related Persons for all documented out-of-pocket costs and expenses incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out", (ii) the enforcement or preservation of any right or remedy under any Note Document, any Obligation, with respect to the Collateral or any other related right or remedy or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Note Party, any Subsidiary of any Note Party, Note Document or Obligation (or the response to and preparation for any subpoena or request for document production relating thereto), including separate Attorney Costs for each of Agent, on the one hand, and the Purchasers, on the other hand and all fees, costs and expenses of the Consultant.

9.6     Indemnity.

(a)     Each Note Party agrees to indemnify, hold harmless and defend Agent, each Purchaser, and each of their respective Related Persons (each such Person being an "**Indemnitee**") from and against, and to reimburse each Indemnitee for any and all expenses, injuries (to person, property or natural resources), attorney's and agent's fees and expenses and all Liabilities (including brokerage commissions, fees and other compensation) of whatever kind or nature regardless of their merit that may be imposed on, incurred by or asserted against any such Indemnitee in any matter directly or indirectly relating to, arising out of, in connection with or as a result of (i) any of the Cases, the Interim Order, the Final Order, any Note Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Note or any securities filing of, or with respect to, any Note Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with

64

any broker, finder or consultant, in each case entered into by or on behalf of any Note Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding relating to the foregoing, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including reasonable attorneys' fees in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing, including, without limitation, all reasonable costs related or associated with claims for damages to person, property or natural resources, reasonable attorney's and consultant's fees and expenses and court costs (collectively, the "**Indemnified Matters**"); provided, however, that no Note Party shall have any liability under this Section 9.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted from the gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Furthermore, each of the Issuers and each other Note Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Note Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person or any Indemnitee (subject to the proviso above in the immediately preceding sentence). The provisions of this Section 9.6 shall survive the termination of this Agreement and, with respect to the Agent, the earlier resignation or removal of the Agent or, with respect to any Purchaser, the earlier date on which Purchaser ceases to be a Purchaser hereunder.

(b)      Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities, including those arising from, or otherwise involving, any property of any Note Party or any Related Person of any Note Party or any actual, alleged or prospective damage to property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property or natural resource or any property on or contiguous to any Real Estate of any Note Party or any Related Person or any Note Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Note Party or any Related Person of any Note Party or the owner, lessee or operator of any property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by Agent or following Agent or any Purchaser having become the successor-in-interest to any Note Party or any Related Person of any Note Party and (ii) are attributable solely to acts of such Indemnitee.

9.7      Marshaling; Payments Set Aside. No Secured Party shall be under any obligation to marshal any property in favor of any Note Party or any other Person or against or in payment of any Obligation. To the extent that any Secured Party receives a payment from the Issuers, from any other Note Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in

part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8    Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that any assignment by any Purchaser shall be subject to the provisions of Section 9.9, and provided further that the Issuers may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Purchaser.

9.9    Assignments and Participations; Binding Effect.

(a)    Binding Effect.  This Agreement shall become effective when it shall have been executed by Parent, the Issuers, the other Note Parties signatory hereto and Agent and when Agent shall have been notified by each Purchaser that such Purchaser has executed it. Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, Parent, the Issuers, the other Note Parties hereto (in each case except for Article VIII), Agent and each Purchaser receiving the benefits of the Note Documents and, to the extent provided in Section 8.11, each other Secured Party and, in each case, their respective successors and permitted assigns.  Except as expressly provided in any Note Document (including in Section 8.9), none of Parent, the Issuers, any other Note Party or Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b)    Right to Assign.  Each Purchaser may sell, transfer, or assign (a "**Sale**") all or a portion of its rights and obligations hereunder (including all or a portion of its Note Commitment and its rights and obligations with respect to the Notes) to (i) any existing Purchaser, (ii) any Affiliate or Approved Fund of any existing Purchaser or (iii) any other Person; provided, however, it shall be a condition precedent to any assignment hereunder that the assignee consent to the Asset Purchase Agreement prior to or contemporaneously with its assignment hereunder; provided further, however, that the aggregate outstanding principal amount (determined as of the effective date of the applicable Sale) of the Notes subject to any such Sale shall be in a minimum amount of $1,000,000, unless such Sale is made to an existing Purchaser or Affiliate or Approved Fund of any existing Purchaser, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such facility, is made with the prior consent of the Issuer Representative and the Agent or is made to a Pre-Petition Roll-Over Debt Holder or a Pre-Petition Shareholder Debt Holder, (w) such Sales shall be effective only upon the acknowledgement in writing by such assignee that the representations and warranties set forth in Section 9.26 shall be true and correct with respect to such assignee, (x) such Sales shall be effective only upon delivery of notice of such Sale to the Agent and the acknowledgment in writing of such Sale by the Agent (which such acknowledgement shall not be withheld, delayed or conditioned) and (y) interest accrued prior to and through the date of any such Sale shall be assigned.  Any assignment to an assignee that fails to consent to the Asset Purchase Agreement shall be void *ab initio*.

(c)    Procedure.  The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to Agent an

Assignment via a manual execution and delivery of the Assignment evidencing such Sale, together with any existing Note subject to such Sale (or any affidavit of loss therefor acceptable to Agent), any tax forms required to be delivered pursuant to Section 10.1 and payment of an assignment fee in the amount of $3,500 to Agent, unless waived or reduced by Agent; provided, that if a Sale by a Purchaser is made to an assignee that is not an Affiliate or Approved Fund of such assignor Purchaser, and concurrently to one or more Affiliates or Approved Funds of such Assignee, then only one assignment fee of $3,500 shall be due in connection with such Sale (unless waived or reduced by Agent). Upon receipt of all the foregoing, and conditioned upon such receipt, from and after the effective date specified in such Assignment, Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d)    Effectiveness.  Subject to the recording of an Assignment by Agent in the Register pursuant to subsection 1.4(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Note Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Purchaser, (ii) any applicable Note shall be transferred to such assignee through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the payment in full of the Obligations) and be released from its obligations under the Note Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Purchaser's rights and obligations under the Note Documents, such Purchaser shall cease to be a party hereto).

(e)    Grant of Security Interests.  In addition to the other rights provided in this Section 9.9, each Purchaser may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Notes), to (i) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to Agent or (ii) any holder of, or trustee for the benefit of the holders of, such Purchaser's Indebtedness or equity securities, by notice to Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Purchaser hereunder and no such Purchaser shall be relieved of any of its obligations hereunder.

(f)    Participants and SPVs.  In addition to the other rights provided in this Section 9.9, each Purchaser may, (i) with notice to Agent, grant to an SPV the option to make all or any part of any Note that such Purchaser would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Notes pursuant thereto shall satisfy the obligation of such Purchaser to make such Notes hereunder) and such SPV may assign to such Purchaser the right to receive payment with respect to any Obligation and (ii) with notice to the Agent (but without notice to the Issuers or consent from Agent or the Issuers) sell participations to one or more Persons in or to all or a portion of its rights and obligations under the Note Documents; provided, however, that, whether as a result of any term of any Note Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to purchase Notes hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of

such Purchaser hereunder, (ii) such Purchaser's rights and obligations, and the rights and obligations of the Note Parties and the Secured Parties towards such Purchaser, under any Note Document shall remain unchanged and each other party hereto shall continue to deal solely with such Purchaser, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article X, but, with respect to Section 10.1, only to the extent such participant or SPV delivers the tax forms such Purchaser is required to collect pursuant to subsection 10.1(f) and then only to the extent of any amount to which such Purchaser would be entitled in the absence of any such grant or participation and (B) each such SPV may receive other payments that would otherwise be made to such Purchaser with respect to Notes funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to Agent by such SPV and such Purchaser, provided, however, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any Note Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Purchaser's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Note Document or to exercise or refrain from exercising any powers or rights such Purchaser may have under or in respect of the Note Documents (including the right to enforce or direct enforcement of the Obligations). No party hereto shall institute (and the Issuers and Parent shall cause each other Note Party not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one (1) year and one (1) day after the payment in full of all outstanding commercial paper of such SPV; provided, however, that each Purchaser having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to get reimbursed by such SPV for any such Liability). The agreement in the preceding sentence shall survive the termination of the Note Commitments and the payment in full of the Obligations.

(g) Each holder of a Note, by its acceptance of such Note, will be deemed to have made the representations and warranties in Section 9.26 in connection with its receipt of such Note.

### 9.10   Non-Public Information; Confidentiality.

(a) Non-Public Information. Agent and each Purchaser acknowledges and agrees that it may receive material non-public information ("**MNPI**") hereunder concerning the Note Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable Requirements of Laws (including United States federal and state security laws and regulations).

(b) Confidential Information. Each Purchaser, Agent and Note Party agrees to use all reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Note Document, except that such information may be disclosed (i) (A) by the Purchasers and Agent, with the Issuer Representative's consent and (B) by the Note Parties, with the Purchasers' consent, (ii) (A) with respect to the Purchasers and Agent, to Related Persons of such Purchaser, or Agent, as the case may be, that are advised of the confidential nature of such information and are instructed to keep

68

such information confidential in accordance with the terms hereof and (B) with respect to any Note Party, to Related Persons of such Note Party on a "need to know" basis, that are advised of the confidential nature of such information and are instructed to keep such information confidential in accordance with the terms hereof, (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this Section 9.10 or (B) with respect to the Purchasers and Agent, available to such Purchaser or Agent or any of their Related Persons, as the case may be, from a source (other than any Note Party) not known by them to be subject to disclosure restrictions, (iv) (A) with respect to the Purchasers and Agent, to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority (in which case such Purchaser or Agent shall promptly notify the Issuer Representative to the extent lawfully permitted to do so) and (B) with respect to each Note Party, to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority in the opinion of such Note Party's counsel (in which case such Note Party shall promptly notify the Issuers and Agent to the extent lawfully permitted to do so), (v) with respect to the Purchasers and Agent, to the extent necessary or customary for inclusion in league table measurements, (vi) with respect to the Purchasers and Agent, (A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Note Parties, (vii) with respect to the Purchasers and Agent, to current or prospective assignees, SPVs (including the investors or prospective investors therein) or participants and to their respective Related Persons, in each case to the extent such assignees, investors, participants, counterparties or Related Persons agree to be bound by provisions substantially similar to the provisions of this Section 9.10 (and such Person may disclose information to their respective Related Persons in accordance with clause (ii) above), (viii) to any other party hereto, (ix) with respect to the Purchasers and Agent, in connection with the exercise or enforcement of any right or remedy under any Note Document, in connection with any litigation or other proceeding to which such Purchaser or Agent or any of their Related Persons is a party or bound, or to the extent necessary to respond to public statements or disclosures by Note Parties or their Related Persons referring to a Purchaser or Agent or any of their Related Persons or (x) if such information becomes public as a result of its inclusion in any filing with the Bankruptcy Court for the Cases. In the event of any conflict between the terms of this Section 9.10 and those of any other Contractual Obligation entered into with any Note Party (whether or not a Note Document), the terms of this Section 9.10 shall govern. The Note Parties' obligations under this Section 9.10(b) shall survive the termination of this Agreement.

(c)     Tombstones. Each Note Party consents to the publication by Agent or any Purchaser of advertising material relating to the financing transactions contemplated by this Agreement using any Note Party's name, logo or trademark. Agent or such Purchaser shall provide a draft of any advertising material to Issuer Representative for review and comment prior to the publication thereof.

(d)     Press Release and Related Matters. No Note Party shall, and no Note Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority or securities exchange relating to a public offering of securities of any Note Party or the reports filed by any Note Party in accordance with the Securities Exchange Act of 1934, as amended) using the name, logo or

69

otherwise referring to the Purchasers or of any of their Affiliates, the Note Documents or any transaction contemplated therein to which Agent is party without the prior consent of such Purchaser except to the extent required to do so under applicable Requirements of Law and then, only after consulting with the applicable Purchaser to the extent lawfully permitted to do so.

(e)    Distribution of Materials to Purchasers.  The Note Parties acknowledge and agree that the Note Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Note Parties hereunder (collectively, the "Issuer Materials") may be disseminated by, or on behalf of, Agent, and made available, to the Purchasers by posting such Issuer Materials on an E-System.  The Note Parties authorize Agent to download copies of their logos from its website and post copies thereof on an E-System.

(f)    Material Non-Public Information.  The Note Parties hereby agree that if either they, any parent company or any Subsidiary of the Note Parties has publicly traded equity or debt securities in the U.S., they shall (and shall cause such parent company or Subsidiary, as the case may be, to) (i) identify in writing, and (ii) to the extent reasonably practicable, clearly and conspicuously mark such Issuer Materials that contain only information that is publicly available or that is not material for purposes of U.S. federal and state securities laws as "PUBLIC".  The Note Parties agree that by identifying such Issuer Materials as "PUBLIC" or publicly filing such Issuer Materials with the Securities and Exchange Commission, then Agent and the Purchasers shall be entitled to treat such Issuer Materials as not containing any MNPI for purposes of U.S. federal and state securities laws.  The Note Parties further represent, warrant, acknowledge and agree that the following documents and materials shall be deemed to be PUBLIC, whether or not so marked, and do not contain any MNPI: (A) this Agreement, other than the schedules and exhibits attached hereto, and (B) administrative materials of a customary nature prepared by the Note Parties or Agent.  Before distribution of the Issuer Materials, the Note Parties agree to execute and deliver to Agent a letter authorizing distribution of the Issuer Materials to prospective Purchasers and their employees willing to receive MNPI, and a separate letter authorizing distribution of Issuer Materials that do not contain MNPI and represent that no MNPI is contained therein.

### 9.11    Set-off; Sharing of Payments.

(a)    Right of Setoff.  Subject to any requirement of notice provided in the Orders, each of Agent, each Purchaser, and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by each Note Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final) at any time held and other Indebtedness, claims or other obligations at any time owing by Agent, such Purchaser or any of their respective Affiliates to or for the credit or the account of the Issuers or any other Note Party against any Obligation of any Note Party now or hereafter existing, whether or not any demand was made under any Note Document with respect to such Obligation and even though such Obligation may be unmatured.  No Purchaser shall exercise any such right of setoff without the prior consent of Agent or Required Purchasers.  Each of Agent and each Purchaser agrees promptly to notify the Issuer Representative and Agent after any such

setoff and application made by such Purchaser or its Affiliates; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application. The rights under this Section 9.11 are in addition to any other rights and remedies (including other rights of setoff) that Agent, the Purchasers, their Affiliates and the other Secured Parties, may have.

(b)     Sharing of Payments, Etc.  If any Purchaser, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Note Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of Collateral) other than pursuant to Article X and such payment exceeds the amount such Purchaser would have been entitled to receive if all payments had gone to, and been distributed by, Agent in accordance with the provisions of the Note Documents, such Purchaser shall purchase for cash from other Purchasers such participations in their Obligations as necessary for such Purchaser to share such excess payment with such Purchasers to ensure such payment is applied as though it had been received by Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of the Issuers, applied to repay the Obligations in accordance herewith); provided, however, that (a) if such payment is rescinded or otherwise recovered from such Purchaser in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Purchaser without interest and (b) such Purchaser shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Purchaser were the direct creditor of the applicable Note Party in the amount of such participation.  If a Non-Funding Purchaser receives any such payment as described in the previous sentence, such Purchaser shall turn over such payments to Agent in an amount that would satisfy the cash collateral requirements set forth in subsection 1.11(b).

9.12     Counterparts; Facsimile Signature.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13     Severability.     The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.14     Captions.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.15     Independence of Provisions.  The parties hereto acknowledge that this Agreement and the other Note Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.16    Interpretation. This Agreement is the result of negotiations among and has been reviewed by counsel to Note Parties, Agent, each Purchaser and other parties hereto, and is the product of all parties hereto. Accordingly, this Agreement and the other Note Documents shall not be construed against the Purchasers or Agent merely because of Agent's or Purchasers' involvement in the preparation of such documents and agreements. Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to Sections 9.18 and 9.19.

9.17    No Third Parties Benefited. This Agreement is made and entered into for the sole protection and legal benefit of the Issuers, the Purchasers and Agent and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Note Documents. Neither Agent nor any Purchaser shall have any obligation to any Person not a Party to this Agreement or the other Note Documents.

9.18    Governing Law and Jurisdiction.

(a)    Governing Law. The laws of the State of New York and the Bankruptcy Code shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement.

(b)    Submission to Jurisdiction.    EACH NOTE PARTY HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE OR ABSTAINS FROM JURISDICTION, TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK COUNTY, NEW YORK. EACH NOTE PARTY IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER NOTE DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS. EACH NOTE PARTY EXPRESSLY SUBMITS AND CONSENT TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; provided that nothing in this Agreement shall limit the right of Agent to commence any proceeding in the federal or state courts of any other jurisdiction to the extent Agent determines that such action is necessary or appropriate to exercise its rights or remedies under the Note Documents. The parties hereto (and, to the extent set forth in any other Note Document, each other Note Party) hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    Service of Process. Each Note Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Note Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of the Issuers specified herein (and shall be effective when such mailing shall be effective, as provided

therein). Each Note Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)     Non-Exclusive Jurisdiction.  Nothing contained in this Section 9.18 shall affect the right of Agent or any Purchaser to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Note Party in any other jurisdiction.

9.19     Waiver of Jury Trial.    THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER NOTE DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY, THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20     Entire Agreement; Release; Survival.

(a)     THE NOTE DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY NOTE PARTY AND ANY PURCHASER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT.    IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER NOTE DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS SUCH TERMS OF SUCH OTHER NOTE DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH). IN THE EVENT THIS AGREEMENT OR ANY NOTE DOCUMENT CONFLICT WITH THE TERMS OF THE FINAL ORDER, THE PARTIES ACKNOWLEDGE AND AGREE THAT THE FINAL ORDER SHALL GOVERN.

(b)     Execution of this Agreement by the Note Parties constitutes a full, complete and irrevocable release of any and all claims which each Note Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Note Documents.  In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings). Each of the Issuers and each other Note Party signatory hereto hereby waives, releases and agrees (and shall cause each other Note Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)     (i) Any indemnification or other protection provided to any Indemnitee pursuant to this Agreement or any other Note Document (including pursuant to this Section 9.20, Sections 9.5 (Costs and Expenses) and 9.6 (Indemnity) and Articles VIII (Agent) and X (Taxes, Yield Protection and Illegality) herein), in each case, shall (x) survive the termination of the Note Commitments and the payment in full of all other Obligations and (y) inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.21    Patriot Act.  Each Purchaser that is subject to the Patriot Act hereby notifies the Note Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Note Party, which information includes the name and address of each Note Party and other information that will allow such Purchaser to identify each Note Party in accordance with the Patriot Act.

9.22    Replacement of Purchaser.    Within three (3) days after: (i) any Purchaser becoming a Non-Funding Purchaser and failing to cure such status or (ii) any failure by any Purchaser (other than Agent) to consent to a requested amendment, waiver or modification to any Note Document in which all Purchasers have consented to such amendment, waiver or modification but the consent of each Purchaser (or Required Purchasers, as applicable) is required with respect thereto, the Agent may, at the direction of the Purchasers, notify such Affected Purchaser (or such defaulting or non-consenting Purchaser, as the case may be) of the intention to obtain a replacement Purchaser ("**Replacement Purchaser**") for such Affected Purchaser (or such defaulting or non-consenting Purchaser, as the case may be), which Replacement Purchaser shall be reasonably satisfactory to the Purchasers.   In the event a Replacement Purchaser is obtained, the Affected Purchaser (or defaulting or non-consenting Purchaser, as the case may be) shall sell and assign its Notes and Note Commitment to such Replacement Purchaser, at par, provided that the Issuers have reimbursed such Affected Purchaser for its increased costs and any costs, expenses or other amounts or indemnitees for which it is entitled to reimbursement or other payment under this Agreement or any other Note Document through the date of such sale and assignment.  In the event that a replaced Purchaser does not execute an Assignment pursuant to Section 9.9 within three (3) days after receipt by such replaced Purchaser of notice of replacement pursuant to this Section 9.22 and presentation to such replaced Purchaser of an Assignment evidencing an assignment pursuant to this Section 9.22, the Agent shall be entitled (and, if directed by the Purchasers, obligated) to execute such an Assignment on behalf of such replaced Purchaser, and any such Assignment so executed by the Agent and the Replacement Purchaser, shall be effective for all purposes hereunder (including Section 9.22 and Section 9.9).  Upon any such assignment and payment and compliance with the other provisions of Section 9.9, such replaced Purchaser shall no longer constitute a "Purchaser" for purposes hereof; provided, any rights of such replaced Purchaser to indemnification hereunder shall survive.

9.23    Joint and Several.  The obligations of the Note Parties hereunder and under the other Note Documents are joint and several. Each Issuer acknowledges that it is jointly and severally liable for all of the Obligations and as a result hereby unconditionally guaranties the full and prompt payment when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, of all Obligations of every kind and nature of each Issuer to the Purchasers howsoever created, arising or evidenced, whether direct or indirect, absolute or

74

contingent, joint or several, now or hereafter existing, or due or to become due, and howsoever owned, held or acquired by the Purchasers. Each Issuer agrees that if this guaranty would, but for the application of this sentence, be unenforceable under applicable law, this guaranty shall be valid and enforceable to the maximum extent that would not cause this guaranty to be unenforceable under applicable law, and this guaranty shall automatically be deemed to have been amended accordingly at all relevant times. Each Issuer hereby agrees that its obligations under this guaranty shall be unconditional, irrespective of (a) the validity or enforceability of the Obligations or any part thereof, or of any promissory note or other document evidencing all or any part of the Obligations, (b) the absence of any attempt to collect the Obligations from any other Issuer or any guarantor or other action to enforce the same, (c) the waiver or consent by any Purchaser or any other Person with respect to any provision of any agreement, instrument or document evidencing or securing all or any part of the Obligations, or any other agreement, instrument or document now or hereafter executed by any other Issuer and delivered to any Purchaser or any other Person (other than a waiver, forgiveness or consent by a Purchaser or other Person, as applicable, that reduces the amount of any of the Obligations to such Person), (d) intentionally omitted, (e) any Purchaser's election, in any proceeding instituted under the Bankruptcy Code or any other similar bankruptcy or insolvency legislation, of the application of Section 1111(b)(2) of the United States Bankruptcy Code or any other similar bankruptcy or insolvency legislation, (f) any borrowing by any Issuer as debtor-in-possession, under Section 364 of the United States Bankruptcy Code or any other similar bankruptcy or insolvency legislation, (g) the disallowance, under Section 502 of the United States Bankruptcy Code or any other similar bankruptcy or insolvency legislation, of all or any portion of any Purchaser's claim(s) for repayment of the Obligations or (h) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of an Issuer or a guarantor (other than payment in full of the Obligations). Notwithstanding anything to the contrary set forth in this Section 9.23, it is the intent of the parties hereto that the liability incurred by each Issuer in respect of the Obligations of the other Issuers (and any Lien granted by each Issuer to secure such Obligations), not constitute a fraudulent conveyance under Section 548 of the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the provisions of any applicable law of any state or other governmental unit ("**Fraudulent Conveyance**"). Consequently, each Issuer and each Purchaser hereby agree that if a court of competent jurisdiction determines that the incurrence of liability by any Issuer in respect of the Obligations of any other Issuer (or any Liens granted by such Issuer to secure such Obligations) would, but for the application of this sentence, constitute a Fraudulent Conveyance, such liability (and such Liens) shall be valid and enforceable only to the maximum extent that would not cause the same to constitute a Fraudulent Conveyance, and this Agreement and the other Note Documents shall automatically be deemed to have been amended accordingly.

      9.24   Creditor-Debtor Relationship.   The relationship between Agent and each Purchaser, on the one hand, and the Note Parties, on the other hand, is solely that of creditor and debtor. No Secured Party has any fiduciary relationship or duty to any Note Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Note Parties by virtue of, any Note Document or any transaction contemplated therein.

      9.25   Actions in Concert.  Notwithstanding anything contained herein to the contrary, each Purchaser hereby agrees with each other Purchaser that no Purchaser shall take any action

to protect or enforce its rights against any Note Party arising out of this Agreement or any other Note Document (including exercising any rights of setoff) without first obtaining the prior written consent of Agent or Required Purchasers, it being the intent of Purchasers that any such action to protect or enforce rights under this Agreement and the other Note Documents shall be taken in concert and at the direction or with the consent of Agent or Required Purchasers.

9.26    Representations and Warranties of Purchasers. Each Purchaser represents and warrants (i) that it has been furnished with all information that it has requested for the purpose of evaluating such Purchaser's proposed acquisition of the Notes to be issued to such Purchaser pursuant hereto, (ii) that (a) it is either (a) a qualified institutional buyer as defined in Rule 144A of the Securities Act of 1933, as amended (the "Securities Act"), (b) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act (the "**Rules**")) or (c) it is an entity in which all of the equity owners are institutional accredited investors as defined in the Rules; and (iii) that any securities purchased or received in connection herewith cannot be resold absent an exemption to the Securities Act or registration of such securities under the Securities Act. The acquisition of such Notes by each Purchaser at the Interim Order Issuance Date or on each Note Purchase Date shall constitute such Purchaser's confirmation of the foregoing representations and warranties.  Each Purchaser, and each assignee by its acceptance of a Note, understands that such Notes are being sold to such Purchaser in a transaction which is exempt from the registration requirements of the Securities Act, and that, in making the representations and warranties contained in this Section 9.26, the Note Parties are relying, to the extent applicable, upon such Purchaser's representations and warranties contained herein.

9.27    Reduction in Payments on Shareholder Notes.  The Purchasers agree that in the event of payment of the Shareholder Notes resulting in a recovery for the unsecured creditors of the Issuers, payments to Purchasers in their capacity as Pre-Petition Shareholder Debt Holders shall be reduced by the amount of fees and expenses paid by the Issuers in connection with the interim debtor-in possession facility provisionally approved by the Bankruptcy Court at the hearing on December 20, 2013.

9.28    Payments.  Notwithstanding anything to the contrary herein, the payment of fees and expenses paid by the Issuers in connection with the interim debtor-in possession facility provisionally approved by the Bankruptcy Court at the hearing on December 20, 2013 are hereby approved, irrespective of the Approved Budget, and shall be excluded from the calculation of the financial covenants set forth therein.

# ARTICLE X
## TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    Taxes.

(a)    Except as otherwise provided in this Section 10.1, each payment by any Note Party under any Note Document shall be made free and clear of all present or future taxes, levies, imposts, deductions, charges or withholdings imposed by any Governmental Authority

and all liabilities with respect thereto (and without deduction for any of them) (collectively, but excluding the taxes set forth in clauses (i) and (ii) below, the "**Taxes**") other than for (i) taxes measured by overall net income (however denominated, including branch profits taxes) and franchise taxes imposed in lieu of net income taxes, in each case imposed on any Secured Party by the jurisdiction (or any political subdivision thereof) in which such Secured Party is organized, maintains its principal office or applicable Lending Office, or (ii) taxes that are directly attributable to the failure (other than as a result of a change in any Requirement of Law) by Agent or any Purchaser to deliver the documentation required to be delivered pursuant to clause (f) below.

(b)     If any Taxes shall be required by law to be deducted from or in respect of any amount payable under any Note Document to any Secured Party (i) such amount shall be increased as necessary to ensure that, after all required deductions for Taxes are made (including deductions applicable to any increases to any amount under this Section 10.1), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant Note Party shall make such deductions, (iii) the relevant Note Party shall timely pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable Requirements of Law and (iv) within thirty (30) days after such payment is made, the relevant Note Party shall deliver to Agent an original or certified copy of a receipt evidencing such payment or other evidence of payment reasonably satisfactory to Agent; provided, however, that no such increase shall be made with respect to, and no Note Party shall be required to indemnify any Secured Party pursuant to clause (d) below for, (x) withholding taxes to the extent that the obligation to withhold amounts existed on the date that such Person became a "Secured Party" under this Agreement in the capacity under which such Person makes a claim under this clause (b), designates a new Lending Office or experiences a change in circumstances (other than a change in a Requirement of Law), except in each case to the extent such Person is a direct or indirect assignee (other than pursuant to Section 9.22) of any other Secured Party that was entitled, at the time the assignment to such Person became effective, or such Secured Party was entitled at the time of designation of a new Lending Office or change in circumstances, to receive additional amounts under this clause (b), or (y) any United States backup withholding tax required by the Code to be withheld from amounts payable to a Secured Party that is subject to backup withholding due to (A) notified payee underreporting of reportable interest or dividend payments or other reportable payments or (B) the IRS notifying Agent or Issuers that the furnished taxpayer identification number is incorrect.

(c)     In addition, the Issuers agree to pay, and authorize Agent to pay in their name, any stamp, documentary, excise or property tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all Liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery or registration of, or otherwise with respect to, any Note Document or any transaction contemplated therein (collectively, "**Other Taxes**"). Within thirty (30) days after the date of any payment of Other Taxes by any Note Party, the Issuers shall furnish to Agent, at its address referred to in Section 9.2, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to Agent.

(d)     The Issuers shall reimburse and indemnify, within five (5) days after receipt of demand therefor (with copy to Agent), each Secured Party for all Taxes and Other

77

Taxes (including any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this Section 10.1) paid by such Secured Party and any Liabilities arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. A certificate of the Secured Party (or of Agent on behalf of such Secured Party) claiming any compensation under this clause (d), setting forth the amounts to be paid thereunder and delivered to the Issuer Representative with copy to Agent, shall be conclusive, binding and final for all purposes, absent manifest error. In determining such amount, Agent and such Secured Party may use any reasonable averaging and attribution methods.

    (e)    Any Purchaser claiming any additional amounts payable pursuant to this Section 10.1 shall use its commercially reasonable efforts (consistent with its internal policies and Requirements of Law) to change the jurisdiction of its Lending Office if such a change would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Purchaser, be otherwise disadvantageous to such Purchaser. Additionally, no Purchaser shall be entitled to any payment under this Section 10.1 more than 120 days after such Purchaser received notice of its entitlement to such payment; provided, that the foregoing shall in no way operate in derogation of the undertaking contained in the last sentence of this subsection 10.1(e). In the event that any Purchaser determines that any event or circumstance that will lead to a claim for payment under this Section 10.1 has occurred or will occur, such Purchaser will use commercially reasonable efforts to so notify the Issuer Representative; provided, that any failure to provide such notice shall in no way impair the rights of such Purchaser to demand and receive payment under this Section 10.1.

    (f)    (i) Each Non-U.S. Purchaser Party that, at any of the following times, is entitled to an exemption from United States withholding tax or is subject to such withholding tax at a reduced rate under an applicable tax treaty, shall (w) on or prior to the date such Non-U.S. Purchaser Party becomes a "Non-U.S. Purchaser Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (i) and (z) from time to time if requested by the Issuers or Agent (or, in the case of a participant or SPV, the relevant Purchaser), provide Agent and the Issuer Representative (or, in the case of a participant or SPV, the relevant Purchaser) with two completed originals of each of the following, as applicable: (A) Forms W-8EC1 (claiming exemption from U.S. withholding tax because the income is effectively connected with a U.S. trade or business), W-8BEN (claiming exemption from, or a reduction of, U.S. withholding tax under an income tax treaty) and/or W-8IMY (together with appropriate forms, certifications and supporting statements) or any successor forms, (B) in the case of a Non-U.S. Purchaser Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN (claiming exemption from U.S. withholding tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to Agent that such Non-U.S. Purchaser Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Issuer Representative within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Purchaser Party to such exemption from United States withholding tax or reduced rate with respect to all payments to be made to such Non-U.S. Purchaser Party under the Note Documents. Unless the Issuer Representative and Agent have received forms or other

documents satisfactory to them indicating that payments under any Note Document to or for a Non-U.S. Purchaser Party are not subject to United States withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Note Parties and Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate.

(i)     Each U.S. Purchaser Party shall (A) on or prior to the date such U.S. Purchaser Party becomes a "U.S. Purchaser Party" hereunder, (B) on or prior to the date on which any such form or certification expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (f) and (D) from time to time if requested by the Issuers or Agent (or, in the case of a participant or SPV, the relevant Purchaser), provide Agent and the Issuer Representative (or, in the case of a participant or SPV, the relevant Purchaser) with two completed originals of Form W-9 (certifying that such U.S. Purchaser Party is entitled to an exemption from U.S. backup withholding tax) or any successor form.

(ii)     Each Purchaser having sold a participation in any of its Obligations or identified an SPV as such to Agent shall collect from such participant or SPV the documents described in this clause (f) and provide them to Agent.

(g)     If the Agent or any Purchaser shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of any amounts payable pursuant to this Section 10.1 as to which it has been indemnified by the Issuers or with respect to which issuers has paid additional amounts, the applicable Agent or Purchaser shall use commercially reasonable efforts to notify the Issuer Representative of the availability of such refund claim and, if the applicable Agent or Purchaser determines in its sole discretion that making a claim for refund will not have an adverse effect on its Taxes or business operations, shall, within sixty (60) days after receipt of a request by the Issuer Representative, make a claim to such Governmental Authority for such refund. If the Agent or a Purchaser determines, in its sole discretion, that it has received a refund of any amounts payable pursuant to this Section 10.1 as to which it has been indemnified by the Issuers or with respect to which Issuers has paid additional amounts, it shall pay over such refund to the Issuers (but only to the extent of indemnity payments made, or additional amounts paid, by the Issuers under this Section 10.1 with respect to amounts giving rise to such refund), net of all out-of-pocket expenses of the Agent and/or the Purchaser and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Issuers, upon the request of the Agent or such Purchaser, agrees to repay the amount paid over to the Issuers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent or such Purchaser in the event the Agent or such Purchaser is required to repay such refund to such Governmental Authority. This subsection 10.1(g) shall not be construed to require the Agent or any Purchaser to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Issuers or any other Person.

10.2     [Reserved].

10.3     [Reserved].

10.4    Funding Losses.  The Issuers agrees to reimburse each Purchaser and to hold each Purchaser harmless from any loss or expense which such Purchaser may sustain or incur as a consequence of:

(a)    the failure of the Issuers to make any payment or mandatory prepayment of principal of any Notes (including payments made after any acceleration thereof);

(b)    the failure of the Issuer to issue Notes after the Issuer has given (or is deemed to have given) a Notice of Note Purchase Request; or

(c)    the failure of any Issuer to make any prepayment after the Issuer has given a notice in accordance with Section 1.7;

including any such loss or expense arising from the liquidation or reemployment of funds obtained by it to have purchased the Notes hereunder or from fees payable to terminate the deposits from which such funds were obtained.

10.5    [Reserved].

10.6    [Reserved].

10.7    Certificates of Purchasers.    Any Purchaser claiming reimbursement or compensation pursuant to this Article X shall deliver to the Issuer Representative (with a copy to Agent) a certificate setting forth in reasonable detail the amount payable to such Purchaser hereunder and the calculation thereof and such certificate shall be conclusive and binding on the Issuers in the absence of manifest error.

## ARTICLE XI
## DEFINITIONS

11.1    Defined Terms.  The following terms are defined in the Sections or subsections referenced opposite such terms:

| | |
|---|---|
| "**Additional Guarantor**" | 4.15(a) |
| "**Agent Report**" | 8.5(c) |
| "**Agreement**" | Preamble |
| "**Assignment Amount**" | 1.1(a)(iii) |
| "**Bankruptcy Court**" | Recitals |
| "**Buyer**" | "Bidding Procedures Order" |
| "**Cases**" | Recitals |
| "**Constar Holland**" | Recitals |
| "**Constar UK**" | Recitals |
| "**Consultant**" | 4.20 |
| "**Cure**" | 1.2(b) |
| "**Designated Obligations**" | 4.7 |
| "**DIP Credit Facility Agent**" | "DIP Credit Facility Agreement" |
| "**DIP Credit Facility Lender**" | "DIP Credit Facility Agreement" |
| "**DIP Credit Ratification Agreement**" | "DIP Credit Facility Agreement" |

| | |
|---|---|
| "Event of Default" | 7.1 |
| "Extension Date" | 1.5 |
| "Holdings" | Recitals |
| "Indemnified Matters" | 9.6 |
| "Indemnitee" | 9.6(a) |
| "Initial New Money Notes" | 1.1(a)(i) |
| "Investments" | 5.4 |
| "Issuers" | Preamble |
| "Issuer Materials" | 9.10(e) |
| "Material Budget Deviations" | 1.2(b) |
| "Maximum Lawful Rate" | 1.3(d) |
| "Milestone Sale" | "Bidding Procedures Order" |
| "Milestone Sale Order" | "Milestones" |
| "MNPI" | 9.10(a) |
| "OFAC" | 3.29 |
| "Old Bay Lane Disposition" | 5.2 |
| "Other Purchaser" | 1.1(e) |
| "Other Taxes" | 10.1(c) |
| "Parent" | Recitals |
| "Permitted Liens" | 5.1 |
| "Pre-Petition Revolving Agent" | "Pre-Petition Revolving Credit Agreement" |
| "Pre-Petition Roll-Over Debt Holder Manager" | "Roll-Over Intercreditor Agreement" |
| "Pre-Petition Shareholder Debt Holder Manager" | "Shareholder Intercreditor Agreement" |
| "Purchasers" | Preamble |
| "Register" | 1.4(b) |
| "Replacement Purchaser" | 9.22 |
| "Required Sale" | 1.1(a)(iii) |
| "Restricted Payments" | 5.11 |
| "Roll-Up Facility" | 1.1(b) |
| "Roll-Over Lenders" | "Pre-Petition Roll-Over Credit Agreement" |
| "Roll-Over Purchasers" | "Pre-Petition Roll-Over Note Purchase Agreement" |
| "Roll-Up Notes" | 1.1(b) |
| "Roll-Up Purchasers" | 1.1(b) |
| "Sale" | 9.9(b) |
| "Scheduling Order" | "Milestones" |
| "SDN List" | 3.27 |
| "Settlement Date" | 1.11(b) |
| "Shareholder Lenders" | "Pre-Petition Shareholder Credit Agreement" |
| "Shareholder Purchasers" | "Pre-Petition Shareholder Note Purchase Agreement" |
| "Solicitation" | "Milestones" |
| "Subsequent New Money Notes" | 1.1(a)(ii) |
| "Taxes" | 10.1(a) |
| "Tax Returns" | 3.10 |
| "UK Pension Plans" | 3.7(b) |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"**Account**" means, as at any date of determination, all "accounts" (as such term is defined in the UCC) of the Note Parties, including, without limitation, the unpaid portion of the obligation of a customer of an Operating Company in respect of Inventory purchased by and shipped to such customer and/or the rendition of services by an Operating Company, as stated on the respective invoice of a Note Party, net of any credits, rebates or offsets owed to such customer.

"**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of fifty percent (50%) of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Subsidiary of Parent, or (c) a merger or consolidation or any other combination with another Person.

"**Affiliate**" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract or otherwise. Without limitation, any director, executive officer or beneficial owner of ten percent (10%) or more of the Stock (either directly or through ownership of Stock Equivalents) of a Person shall for the purposes of this Agreement, be deemed to be an Affiliate of the other Person. Further without limitation, with respect to any investment funds, managed accounts or any other investment vehicles ("**Funds**"), (a) such Fund's general partner, manager and/or investment manager and Affiliates thereof; (b) any entity with the same general partner, manager and/or investment manager as such Fund or a general partner, manager or investment manager affiliated with such general partner, manager and/or investment manager of such Fund; and (c) any other Person under the direct or indirect control of such Fund or its general partner, manager and/or investment manager, shall be deemed an Affiliate of such Fund. Notwithstanding the foregoing, neither Agent nor any Purchaser shall be deemed an "Affiliate" of any Note Party or of any Subsidiary of any Note Party solely by reason of the provisions of the Note Documents.

"**Agent**" means BDCF in its capacity as administrative agent for the Secured Parties hereunder, and any successor administrative agent.

"**Agent's Disbursement Account**" shall mean a bank deposit account maintained by Agent in the name of the Agent on behalf of the Purchasers.

"**Aggregate New Money Note Commitment**" means the Initial New Money Note Commitment and the Subsequent New Money Note Commitment, collectively, which shall be an aggregate amount not to exceed $14,500,000.

"**Aggregate Note Commitment**" means the combined Note Commitments of the Purchasers, which shall be an aggregate amount not to exceed $17,400,000.

"**Amcor**" means Amcor Rigid Plastics USA, Inc.

"**Approved Budget**" means the Budget approved by the Issuers and the Purchasers as of January 13, 2014, a copy of which is attached as Exhibit 11.1(a), as such Approved Budget may be amended, modified, replaced or supplemented from time to time after such date upon the prior written consent of the Issuers and the Required Purchasers.

"**Approved Fund**" means, with respect to any Purchaser, any Person (other than a natural Person) that (I)(a) is or will be engaged in making, purchasing, holding or otherwise investing in notes, commercial loans and similar extensions of credit in the Ordinary Course of Business and (b) is advised or managed by (i) such Purchaser, (ii) any Affiliate of such Purchaser or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Purchaser or (II) any Person described in clause (I)(a) above for whom loans are temporarily warehoused by a Purchaser.

"**Asset Purchase Agreement**" means that certain Asset Purchase Agreement dated as of December 17, 2013 by and among Amcor, Constar International Holdings LLC, and the sellers named therein as in effect on the date hereof or as amended with the consent of the Required Purchasers.

"**Asset Sale**" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, license, transfer or other disposition to, or any exchange of property with, any Person, in one transaction or a series of transactions, of all or any part of Parent's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the equity interests of any of Parent's Subsidiaries, other than inventory sold or leased in the ordinary course of business.

"**Assignment**" means an assignment agreement entered into by a Purchaser, as assignor, and any Person, as assignee, pursuant to the terms and provisions of Section 9.9, accepted by Agent, in substantially in the form of Exhibit 9.9 or any other form approved by Agent and the Required Purchasers.

"**Attorney Costs**" means and includes all reasonable fees and disbursements of any law firm or other external counsel.

"**Bankruptcy Code**" means 11 U.S.C. 101 et seq.

"**Base Rate**" means, for any day, a rate per annum equal to the highest of:

(a)    the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted

therein, any similar rate quoted therein (as determined by Agent) or any similar release by the Federal Reserve Board (as determined by Agent); and

> (b)    the sum of three percent (3.00%) per annum and the Federal Funds Rate.

Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "bank prime loan" rate or Federal Funds Rate.

"**Benefit Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Note Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court approving (i) bidding procedures relating to the sale of all or substantially all of the Note Parties' and their Subsidiaries' assets and other rights (the "**Milestone Sale**"), (ii) appointing Amcor as the stalking horse bidder with respect to the Milestone Sale (the "**Buyer**") and (iii) approving bid protections for Buyer, in each case, in form and substance and otherwise on terms and for a price acceptable to Required Purchasers.

"**Budget**" means a cash flow forecast for the Note Parties and their Subsidiaries for the period from the Petition Date through the Scheduled Maturity Date, as updated from time to time with the consent of the Required Purchasers.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which federal reserve banks are authorized or required by law to close.

"**Capital Expenditures**" means for any period (a) the additions to property, plant and equipment of Parent and its Subsidiaries that are (or should be) capitalized under GAAP on a consolidated statement of cash flows of Parent for such period and (b) Capital Lease Obligations.

"**Capital Lease**" means any leasing or similar arrangement which, in accordance with GAAP, is classified as a capital lease.

"**Capital Lease Obligations**" means all monetary obligations of any Note Party or any Subsidiary of any Note Party under any Capital Leases.

"**Carve Out**" shall include (i) the meaning ascribed to such term in the Final Order or if the Final Order has not been entered, the Interim Order and (ii) carve out from the proceeds of the Milestone Sale proceeds of $375,000,000 for an official committee of unsecured creditors appointed in the Cases.

"**Cash Equivalents**" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or the government of the United Kingdom or (ii) issued by any agency of the United States federal government or the government of the United Kingdom the obligations of which are fully backed by the full faith and credit of the United States federal government or the government of the United Kingdom, as the case may be, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government or government of the United Kingdom,

any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any Dollar-denominated or Euro-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Purchaser or (ii) any commercial bank that is (A) organized under the laws of, and located in, the United States, any state thereof or the District of Columbia or England and Wales, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (d) shares of any United States or English money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clauses (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States or England; provided, however, that the maturities of all obligations specified in any of clauses (a), (b) or (c) above shall not exceed 365 days.

"**Change of Control**" means the occurrence of any of the following: (a) any person or group of persons (within the meaning of the Securities Exchange Act of 1934, as amended) shall have acquired beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended) of thirty-five percent (35%) or more of the issued and outstanding Voting Stock of Parent, (b) during any period of twelve (12) consecutive calendar months, individuals who, at the beginning of such period, constituted the board of directors of Parent (together with any new directors whose election by the board of directors of Parent or whose nomination for election by the stockholders of Parent was approved by a vote of at least fifty percent (50%) of the directors then still in office who either were directors at the beginning of such period or whose elections or nomination for election were previously so approved) cease for any reason other than death or disability to constitute a majority of the directors then in office, (c) Parent shall cease to own and control directly or through one or more Subsidiaries all of the economic and voting rights associated with all of the outstanding Stock of any Operating Company or (d) any "Change of Control" (or equivalent term) shall occur under the DIP Credit Facility or any Pre-Petition Term Agreement.

"**Claim**" has the meaning given to such term in Section 101(5) of the Bankruptcy Code.

"**Code**" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

"**Collateral**" means all Property and interests in Property and proceeds thereof now owned or hereafter acquired by any Note Party in or upon which a Lien is granted under this Agreement or under any Collateral Document; provided, that after payment in full of the Facility, avoidance actions, claims against directors, officers, insiders or lenders and commercial tort claims, shall not constitute Collateral for the Pre-Petition Indebtedness held by any Purchasers.

"**Collateral Documents**" means, collectively, the Guaranty and Security Agreement, the UK Collateral Documents, each Control Agreement, and all other security agreements, pledge agreements, patent and trademark security agreements, lease assignments, guarantees and other similar agreements, and all amendments, restatements, modifications or supplements thereof or

thereto, by or between any one or more of any Note Party, any of their respective Subsidiaries or any other Person pledging or granting a lien on collateral or guaranteeing the payment and performance of the Obligations, and any Purchaser or Agent for the benefit of Agent, the Purchasers and other Secured Parties now or hereafter delivered to the Purchasers or Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor in favor of any Purchaser or Agent for the benefit of Agent, the Purchasers and the other Secured Parties, as secured Party, as any of the foregoing may be amended, restated and/or modified from time to time.

"**Commitment Percentage**" means, as to any Purchaser, the percentage equivalent of such Purchaser's used and unused Note Commitment, divided by the Aggregate Note Commitment (including both used and unused portions thereof); provided, that for the purpose of calculating payments to be made to any Other Purchaser, Commitment Percentage shall be the greater of the foregoing formula and the aggregate principal amount of Notes purchased by such Purchaser divided by the aggregate principal amount of all Notes issued; provided, further, that for purposes of calculating payments to be made to any Purchaser with respect to any outstanding Notes, the Commitment Percentage shall be calculated as the aggregate principal amount of Notes purchased by such Purchaser and outstanding as of such date of determination divided by the aggregate principal amount of all Notes issued by the Issuers and outstanding as of such date of determination.

"**Consolidated**" means, with respect to any Person, the consolidation of accounts of such Person and its Subsidiaries in accordance with GAAP.

"**Constar Holland Disbursements**" means, for any Test Period, disbursements to Constar Holland from any Note Party for any matter, including, but not limited to, payments for goods, services and investments.

"**Constar Holland Financing**" shall mean receivables and inventory financing provided to Constar Holland by ING existing as of the Petition Date.

"**Constar UK Deed of Charge and Assignment**" means that certain Deed of Charge and Assignment, dated on or about the date hereof, made by Constar UK in favor of the Agent, as the same may be amended, restated and/or modified from time to time.

"**Constar UK Share Mortgage**" means that certain Share Mortgage, dated on or about the date hereof, made by Constar UK in favor of the Agent, as the same may be amended, restated and/or modified from time to time.

"**Constar UK Guarantee and Indemnity**" means that certain guaranty and indemnity, dated on or about the date hereof, made by Constar UK in favor of Agent and the Secured Parties, as the same may be amended, restated and/or modified from time to time.

"**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person: (a) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that

such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (c) under any Rate Contracts; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed or supported.

"**Contractual Obligations**" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its Property is bound.

"**Contribution Notice**" means a notice issued by the Pensions Regulator in accordance with section 38 of the United Kingdom Pensions Act 2004 (as amended).

"**Control Agreement**" means a four-party deposit account, securities account or commodities account control agreement by and among the applicable Note Party, Agent, the DIP Credit Facility Agent and the depository, securities intermediary or commodities intermediary, and each in form and substance satisfactory to Agent and the Required Purchasers and in any event providing, to Agent "control" of such deposit account, securities account or commodities account within the meaning of Articles 8 and 9 of the UCC or any equivalent or similar agreement or arrangement pursuant to applicable foreign law.

"**Copyrights**" means all rights, title and interests (and all related IP Ancillary Rights) in or relating to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"**Cumulative Disbursements**" means, for any Test Period, the total cumulative operating disbursements (other than to the extent constituting expenses of Agent or any Purchaser (including any legal fees and disbursements thereof), legal fees incurred by any Note Party as a debtor under the Case, and Capital Expenditures) of the Note Parties (other than Constar UK) or Constar UK, as applicable.

"**Cumulative Operating Cash Flows**" means, for any Test Period, the total cumulative operating receipts (to the extent not constituting Net Asset Sale Proceeds, Net Insurance/Condemnation Proceeds or the proceeds from any other non-ordinary course sales, including, without limitation, the Old Bay Lane Disposition) of the Note Parties (other than Constar UK) or Constar UK, as applicable.

"**Cumulative Payroll Expenses**" means, for any Test Period, the cumulative payroll expenses of the Note Parties (other than Constar UK) or Constar UK, as applicable.

"**Default**" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"**DIP Credit Facility**" means that certain revolving credit facility extended pursuant to the DIP Credit Facility Agreement and the Order.

"**DIP Credit Facility Agreement**" means that certain Pre-Petition Revolving Credit Agreement as amended by that certain Ratification and Amendment Agreement dated as of the Petition Date by and among the Note Parties, Wells Fargo Capital Finance, LLC as agent for the lenders thereunder (the "**DIP Credit Facility Agent**") and Wells Fargo Bank, National Association, as lender thereunder (the "**DIP Credit Facility Lender**") (as in effect on December 20, 2013 and as amended from time to time in accordance with the terms hereof, the "**DIP Credit Ratification Agreement**"), as in effect on December 20, 2013 and as amended from time to time in accordance with the terms hereof.

"**DIP Credit Facility Obligations**" has the meaning assigned to the term "Obligations" in the DIP Credit Facility Agreement.

"**Disbursement Date**" means, each date after the Interim Order Issuance Date with respect to which Issuer Representative has delivered a Notice of Disbursement Request requesting a disbursement from the Agent's Disbursement Account to the Issuer Representative in accordance with Section 1.2(a) on such date.

"**Dollar Equivalent**" of any amount means, at the time of determination thereof, (a) if such amount is expressed in Dollars, such amount and (b) if such amount is denominated in any other currency, the equivalent of such amount in Dollars as determined by the Agent (notice of which Agent shall promptly provide to Issuer Representative following Issuer Representative's request therefor) using any method of determination it reasonably deems appropriate.

"**Dollars**", "**dollars**" and "**$**" each mean lawful money of the United States of America.

"**E-Fax**" means any system used to receive or transmit faxes electronically.

"**Electronic Transmission**" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, by the Securities and Exchange Commission's EDGAR system (provided written notice thereof has separately been delivered to the intended recipient of such communication or posting) or otherwise to or from an E-System or other equivalent service acceptable to Agent.

"**Environmental Laws**" means all present and future Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the workplace, the environment and natural resources, and including public

notification requirements and environmental transfer of ownership, notification or approval statutes.

"**Environmental Liabilities**" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the cost of environmental consultants and the cost of attorney's fees) that may be imposed on, incurred by or asserted against any Note Party or any Subsidiary of any Note Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any environmental, health or safety condition or with any Release and resulting from the ownership, lease, sublease or other operation or occupation of property by any Note Party or any Subsidiary of any Note Party, whether on, prior or after the date hereof.

"**Equipment**" means all "equipment," as such term is defined in the UCC, now owned or hereafter acquired by any Note Party, wherever located.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means, collectively, any Note Party and any Person under common control or treated as a single employer with, any Note Party, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"**ERISA Event**" means any of the following: (a) a reportable event described in Section 4043(b) of ERISA (or, unless the 30-day notice requirement has been duly waived under the applicable regulations, Section 4043(c) of ERISA) with respect to a Benefit Plan or a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Benefit Plan or a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Benefit Plan or a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Benefit Plan, Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Benefit Plan subject to Section 401(a) of the Code, Title IV Plan or Multiemployer Plan when due; (h) the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) the failure of a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code or other Requirements of Law to qualify thereunder; (j) a Multiemployer Plan is in "endangered status" or "critical status" within the meaning of Section 432(b) of the Code; and (k) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Benefit Plan, Title IV Plan or Multiemployer Plan.

"**E-Signature**" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including

89

the name or an abbreviation of the name of the Party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"**E-System**" means any electronic system approved by Agent, including Intralinks® and ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"**Euros**", "**euros**" and "**€**" each mean the currency constituted by the Treaty on the European Union and as referred to in the legislative measures of the European Union for the introduction of, changeover to or operation of the Euro in one or more member states.

"**Existing Liens**" means valid and perfected Liens in existence at the time of the commencement of the Cases and valid Liens in existence at the time of such commencement of the Cases that are perfected after such commencement as permitted by Section 546(b) of the Bankruptcy Code, in each case as permitted by Section 5.1 or as listed on Schedule 1.12 attached hereto.

"**Extraordinary Receipts**" means any payments received by any Note Party or Subsidiary not in the ordinary course of business (and not consisting of proceeds of the Facility or the DIP Credit Facility) consisting of (a) proceeds of judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (b) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of a Note Party, or (ii) received by any Note Party as reimbursement for any payment previously made to such Person), and (c) any purchase price adjustment (other than earn outs, a working capital adjustment or other similar purchase price adjustments) received in connection with any purchase agreement, in each case, less (i) reasonable expenses related thereto incurred by such Note Party or such Subsidiary in connection therewith, (ii) transfer taxes paid by such Note Party or such Subsidiary in connection therewith, (iii) net income taxes to be paid in connection therewith and (iv) any amounts required to be applied to the DIP Credit Facility pursuant to the applicable Order.

"**Facility**" means, collectively, the New Money Facility and the Roll-Up Facility.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent in a commercially reasonable manner.

"**Federal Reserve Board**" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"**Final Hearing**" has the meaning assigned to such term in the Interim Order.

"**Final Order**" shall mean the order of the Bankruptcy Court approving this Agreement, the Collateral Documents and the other Note Documents and authorizing the granting of post-petition secured credit by Purchasers to the Issuers on a permanent basis pursuant to section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court on the docket in the Cases, and as to which no stay on its execution or enforcement in effect, and no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, and which has not been reversed, modified, vacated or overturned, and which is substantially in the form of the Interim Order (with such modifications that are satisfactory to the Required Purchasers in their sole discretion).

"**Final Order Note Purchase Date**" means the date of entry of the Final Order (or the immediately following Business Day as determined in the sole discretion of each such Purchaser purchasing a Note on such date).

"**Financial Support Direction**" means a direction issued by the Pensions Regulator in accordance with section 43 of the United Kingdom Pensions Act 2004 (as amended).

"**First Day Orders**" means all orders entered by the Bankruptcy Court on the Petition Date or within five Business Days of the Petition Date or based on motions filed on the Petition Date, in each case, in form and substance reasonably satisfactory to the Agent.

"**Fiscal Quarter**" means any of the quarterly accounting periods of the Note Parties, ending on March 31, June 30, September 30 and December 31 of each year.

"**Fiscal Year**" means any of the annual accounting periods of the Note Parties ending on December 31 of each year.

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Note Party or any Subsidiary with respect to employees employed outside the United States (including for greater certainty any employee benefit plan, program policy or arrangement maintained or contributed to by any Note Party or any Subsidiary with respect to employees employed outside of the United States).

"**Foreign Subsidiary**" means, with respect to any Person, a Subsidiary of such Person that is organized under the laws of a jurisdiction other than the United States of America or a state or possession of the United States of America.

"**Fraudulent Conveyance**" has the meaning designated in Section 9.23.

"**GAAP**" means (a) in respect of Constar UK, generally accepted accounting principles in the United Kingdom; (b) in respect of any other Foreign Subsidiary of Parent, generally accepted accounting principles in the jurisdiction of such Foreign Subsidiary's incorporation and (c) in all other cases, generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), which are applicable to the circumstances as of the date of determination, in each case subject to Section 11.3 hereof.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"**Guaranty and Security Agreement**" means that certain Debtor in Possession U.S. Guaranty and Security Agreement, dated on or about the date hereof, made by the applicable Note Parties that are not Foreign Subsidiaries in favor of Agent, for the benefit of the Secured Parties, as the same may be amended, restated and/or modified from time to time.

"**Guaranty Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person with respect to any Indebtedness of another Person, if the purpose or intent of such Person in incurring the Guaranty Obligation is to provide assurance to the obligee of such Indebtedness that such Indebtedness will be paid or discharged, that any agreement relating thereto will be complied with, or that any holder of such Indebtedness will be protected (in whole or in part) against loss in respect thereof, including (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of Indebtedness of another Person and (b) any liability of such Person for Indebtedness of another Person through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such Indebtedness or any security therefor or to provide funds for the payment or discharge of such Indebtedness (whether in the form of a loan, advance, stock purchase, capital contribution or otherwise), (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another Person, (iii) to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement, (iv) to purchase, sell or lease (as lessor or lessee) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss or (v) to supply funds to, or in any other manner invest in, such other Person (including to pay for property or services irrespective of whether such property is received or such services are rendered), if in the case of any agreement described under clause (b)(i), (ii), (iii), (iv) or (v) above the primary purpose or intent thereof is to provide assurance that Indebtedness of another Person will be paid or discharged, that any agreement relating thereto will be complied with or that any holder of such Indebtedness will be protected (in whole or in part) against loss in respect thereof. The amount of any Guaranty Obligation shall be equal to the amount of the Indebtedness so guaranteed or otherwise supported.

"**Hazardous Materials**" means any substance, material or waste that is regulated or otherwise gives rise to liability under any Environmental Law, including but not limited to any "Hazardous Waste" as defined by the Resource Conservation and Recovery Act (RCRA) (42 U.S.C. § 6901 et seq. (1976)), any "Hazardous Substance" as defined under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. §9601 et seq. (1980)), any contaminant, pollutant, petroleum or any fraction thereof, asbestos, asbestos containing material, polychlorinated biphenyls, mold, and radioactive substances or any other substance that is toxic, ignitable, reactive, corrosive, caustic, or dangerous.

"**Indebtedness**" of any Person means, without duplication: (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services (other than trade payables and expenses entered into or incurred in the Ordinary Course of Business); (c) the face amount of all letters of credit issued for the account of such Person and without duplication, all drafts drawn thereunder and all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by the Person (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations; (g) the principal balance outstanding under any factoring, synthetic lease, off-balance sheet loan, off-balance sheet securitization or similar off balance sheet financing product; (h) all obligations, whether or not contingent, to purchase, redeem, retire, defease or otherwise acquire for value any of its own Stock or Stock Equivalents (or any Stock or Stock Equivalent of a direct or indirect parent entity thereof), valued at, in the case of redeemable preferred Stock, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such Stock plus accrued and unpaid dividends; (i) all indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; and (j) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above. For the avoidance of doubt, the following shall not constitute Indebtedness: (i) obligations arising from honoring by a bank or other financial institution of a check draft of similar instrument against insufficient funds, provided that such obligations are outstanding no more than two (2) Business Days; (ii) obligations incurred in the Ordinary Course of Business owed to any Person (including obligations in respect of letters of credit for the benefit of any such Person) providing worker's compensation, health, disability or other employee benefits or property, casualty or liability insurance to the Parent or any Subsidiary of Parent, pursuant to reimbursement or indemnification obligations to such Person; (iii) unsecured obligations arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred in connection with the disposition of any business, assets or a Subsidiary, other than Guaranty Obligations incurred by any Person acquiring all or any portion of such business, assets or such Subsidiary for the purpose of financing such acquisition and (iv) Contingent Obligations with respect to surety bonds permitted under Section 5.9.

"**Initial New Money Note Commitment**" means each Purchaser's aggregate commitment to purchase New Money Notes hereunder as specified on Schedule I attached hereto, which collectively totals $7,000,000.

"**Intellectual Property**" means, collectively, all rights, title, interests, priorities and privileges of any Note Party in or relating to intellectual property and industrial property arising under any Requirement of Law, whether under United States, multinational or foreign laws or

otherwise, and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Trademarks, Internet Domain Names, Trade Secrets and IP Licenses.

"**Intercreditor Agreements**" means the Revolving/Term Intercreditor Agreement, the Term Intercreditor Agreement, the Roll-Over Intercreditor Agreement and the Shareholder Intercreditor Agreement.

"**Interest Payment Date**" means Monday of each week (beginning with December 30, 2013).

"**Interim Facility Maturity Date**" means the day that is thirty-five (35) days from the date of entry of the Interim Order unless a Final Order has been entered by the Bankruptcy Court on or before such date.

"**Interim Order**" means that certain order issued by the Bankruptcy Court in substantially the form of Exhibit 11.1(b).

"**Interim Order Issuance Date**" means, with respect to each Purchaser, the date such Purchaser funded the proceeds of its respective Initial New Money Notes into the Agent's Disbursement Account.

"**Internet Domain Name**" means all right, title and interest (and all related IP Ancillary Rights) in or relating to internet domain names.

"**Inventory**" means all of the "inventory" (as such term is defined in the UCC) of the Note Parties, including, but not limited to, all merchandise, raw materials, parts, supplies, work-in-process and finished goods intended for sale, together with all the containers, packing, packaging, shipping and similar materials related thereto, and including such inventory as is temporarily out of a Note Party's custody or possession, including inventory on the premises of others and items in transit.

"**IP Ancillary Rights**" means, with respect to any Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"**IP License**" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in or relating to any Intellectual Property.

"**IRS**" means the Internal Revenue Service of the United States and any successor thereto.

"**Lending Office**" means, with respect to any Purchaser, the office or offices of such Purchaser specified as its "Lending Office" beneath its name on the applicable signature page hereto, or such other office or offices of such Purchaser as it may from time to time notify the Issuers and Agent.

"**Liabilities**" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or otherwise) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of any financing statement naming the owner of the asset to which such lien relates as debtor, under the UCC or any comparable law) and any contingent or other agreement to provide any of the foregoing, but not including the interest of a lessor under a lease which is not a Capital Lease.

"**Margin Stock**" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"**Material Adverse Development**" means as a development that would reasonably be expected to result in (a) an increase of $250,000 or more in the amount of damages or Environmental Liabilities that a Note Party or any Subsidiary thereof would suffer, or (b) an increase of $250,000 of other adverse effects upon a Note Party or Subsidiary thereof, had such development not occurred.

"**Material Adverse Effect**" means: (a) a material adverse change in, or a material adverse effect upon, the operations, business, Properties, condition (financial or otherwise) or prospects of the Note Parties and their Subsidiaries taken as a whole; (b) a material impairment of the ability of any Note Party, any Subsidiary of a Note Party or any other Person (other than Agent or Purchasers) to perform in any material respect its obligations under any Note Document; or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability of any Note Document, or (ii) the perfection or priority of the Liens granted to the Purchasers or to Agent for the benefit of the Secured Parties under any of the Collateral Documents.

"**Material Environmental Liabilities**" means Environmental Liabilities exceeding $250,000 in the aggregate.

"**Maturity Date**" means the earliest of (a) the Scheduled Maturity Date, (b) the Interim Facility Maturity Date if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (c) the substantial confirmation (as defined in 11 U.S.C. Section 1101(2)) of a

plan of reorganization of the Note Parties, which has been confirmed by a confirmation order of the Bankruptcy Court, (d) the date of the conversion of any Case into a liquidation proceeding pursuant to Chapter 7 of the Bankruptcy Code, (e) the date of the sale of all or substantially all of the assets of the Note Parties and (f) the acceleration of the Obligations by Required Purchasers (or Agent at the direction of the Required Purchasers) pursuant to Section 7.2 herein.

"**Milestones**" means the following, except as otherwise provided by the Bankruptcy Court:

(i)     the Petition Date shall be no later than December 20, 2013 (it being agreed and acknowledged that this clause (i) of "Milestones" has been satisfied as of the date hereof);

(ii)     on the Petition Date, the Debtors shall file, all in form and substance acceptable to the Purchasers, among other things: (A) a motion to approve the Interim Order and a Final Order, which motion shall be in form and substance acceptable to the Purchasers in their sole discretion and which will incorporate the Approved Budget and authorize this Facility and the DIP Credit Facility, (B) a motion seeking entry of the Bidding Procedures Order and a hearing on entry of the Bidding Procedures Order as promptly as permitted under the applicable local bankruptcy rules and to be held after the appointment of a committee, if any, and (C) a motion requesting the entry of an order approving the Milestone Sale (the "**Milestone Sale Order**") (it being agreed and acknowledged that this clause (ii) of "Milestones" has been satisfied as of the date hereof);

(iii)     all such other milestones as described in the Asset Purchase Agreement as such milestones were modified at the hearing on January 9, 2014 and by the First Amendment to Asset Purchase Agreement dated January 13, 2014; and

(iv)     the Milestone Sale shall be consummated within sixty seven (67) days after execution of the Asset Purchase Agreement.

"**Moody's**" means Moody's Investors Service, Inc., and its successors.

"**Multiemployer Plan**" means any multiemployer plan, as defined in Section 3(37) or 4001 (a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) the sum of cash payments and Cash Equivalents received by Parent or any of its Subsidiaries from such Asset Sale (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), minus (ii) any reasonable bona fide direct costs and expenses incurred in connection with such Asset Sale, including (a) income or gains taxes paid or reasonably estimated to be payable by the seller as a result of any gain recognized in connection with such Asset Sale during the tax period in which the sale occurs (after taking into account any available tax credits or deductions and any tax-sharing arrangements), (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the

Notes) that is secured by a Lien on the stock or assets in question and that is required to be repaid under both the terms thereof and the applicable Order as a result of such Asset Sale and (c) a reasonable reserve agreed to by the Required Purchasers for any indemnification payments (fixed or contingent) attributable to the seller's indemnities and representations and warranties to the purchaser in respect of such Asset Sale undertaken by Parent or any of its Subsidiaries in connection with such Asset Sale; provided that upon release of any such reserve, the amount released shall be considered Net Asset Sale Proceeds).

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any cash payments or proceeds received by Parent or any of its Subsidiaries (a) under any casualty, business interruption or "key man" insurance policies in respect of any covered loss thereunder, or (b) as a result of the taking of any assets of Parent or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any reasonable bona fide direct costs and expenses incurred by Parent or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Parent or such Subsidiary in respect thereof, (b) any reasonable bona fide direct costs and expenses incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes paid or payable as a result of any gain recognized in connection therewith (after taking into account any available tax credits or deductions and any tax-sharing arrangements) and (c) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Notes) that is secured by a Lien on the stock or assets in question and that is required to be repaid under both the terms thereof and the applicable Order as a result of such Asset Sale .

"**New Money Facility**" means the $14,500,000 delayed draw note purchase facility which is to be funded by the Purchasers in cash pursuant to Section 1.1(a) of this Agreement, subject to the conditions contained herein.

"**New Money Notes**" means the notes issued by the Issuers to the Purchasers pursuant to Section 1.1(a) hereunder.

"**Non-Funding Purchaser**" means any Purchaser (a) that has failed to fund any payments required to be made by it under the Note Documents when such payment is due, (b) that has given verbal or written notice to the Issuer Representative, Agent or any Purchaser or has otherwise publicly announced that such Purchaser believes it will fail to fund all payments required to be made by it or fund all purchases of participations required to be funded by it under this Agreement and the other Note Documents, (c) as to which Agent has a good faith belief that such Purchaser or an Affiliate of such Purchaser has defaulted in fulfilling its obligations (as a purchaser, agent or letter of credit issuer) under one or more other syndicated credit facilities or (d) with respect to which one or more Purchaser-Related Distress Events has occurred with respect to such Person or any Person that directly or indirectly controls such Purchaser and Agent has determined that such Purchaser may become a Non-Funding Purchaser. For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition of Affiliate.

"**Non-U.S. Purchaser Party**" means each of Agent, each Purchaser, each SPV and each participant, in each case that is not a United States person as defined in Section 7701(a)(30) of the Code.

"**Note**" means, collectively, New Money Notes and Roll-Up Notes.

"**Note Commitment**" means each Purchaser's aggregate commitment to purchase New Money Notes hereunder as specified on Schedule I attached hereto and Roll-Up Notes as set forth in the applicable Roll-Up Election Notice.

"**Note Documents**" means this Agreement, the Notes, the Collateral Documents, any subordination agreement and all documents delivered to Agent and/or any Purchaser in connection with any of the foregoing.

"**Note Parties**" means Parent, the Issuers, each other signatory hereto as a "Note Party" and each other Person (i) which executes a guaranty of the Obligations and (ii) which grants a Lien on all or substantially all of its assets to secure payment of the Obligations.

"**Note Purchase Date**" means, each date after the Interim Order Issuance Date with respect to which (a) the applicable conditions precedent set forth in Section 2 have been satisfied and (b) Issuer Representative has delivered a Notice of Note Purchase Request.

"**Notice of Disbursement Request**" means a notice given by the Issuers to Agent and the Purchasers pursuant to Section 1.2, in substantially the form of Exhibit 1.2 hereto.

"**Notice of Note Purchase Request**" means a notice given by the Issuers to Agent pursuant to Section 2.1, in substantially the form of Exhibit 2.1 hereto.

"**Obligations**" means all obligations of the Issuers under the Notes, and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Note Party to any Purchaser, Agent, or any other Person required to be indemnified, that arises under any Note Document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"**Operating Company**" means each of Constar, Inc., Holdings, Constar UK and Constar Holland.

"**Orders**" means the Interim Order or the Final Order, as applicable.

"**Ordinary Course of Business**" means, in respect of any transaction involving any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice, or the ordinary course of business for similarly situated persons and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Note Document.

98

"**Organization Documents**" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"**Patents**" means all rights, title and interests (and all related IP Ancillary Rights) in or relating to letters patent and applications therefor.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

"**PBGC**" means the United States Pension Benefit Guaranty Corporation any successor thereto.

"**Pensions Regulator**" means the UK pensions regulator established pursuant to the United Kingdom Pensions Act 2004 (as amended).

"**Permits**" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, that is applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured purchaser or lender) business judgment.

"**Permitted Prepetition Claim Payment**" means a payment (as adequate protection or otherwise) that is made by a Note Party that is a debtor in one of the Cases on account of any claim arising or deemed to have arisen prior to the commencement of the Cases, which is made (i) pursuant to authority granted by any Order or First Day Order and (ii) is in accordance with the Approved Budget.

"**Person**" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture or Governmental Authority.

"**Petition Date**" has the meaning specified in the recitals to this Agreement.

"**Pre-Petition Debt Holder Manager**" means Black Diamond Commercial Finance, L.L.C. in its capacity as Pre-Petition Roll-Over Debt Holder Manager and Pre-Petition Shareholder Debt Holder Manager.

"**Pre-Petition Indebtedness**" means any or all Indebtedness and Claims of any Note Party incurred prior to the Petition Date and outstanding on the Petition Date.

99

"**Pre-Petition Payments**" means any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition Indebtedness or other obligations or claims (including trade payables and payments in respect of reclamation claims) of any Note Party.

"**Pre-Petition Revolving Credit Agreement**" means that certain Credit Agreement dated as of May 31, 2011 by and among Constar, Inc., Constar International LLC, and Constar UK, each as borrowers, Wells Fargo Capital Finance, LLC as administrative agent and collateral agent for the lenders party thereto (the "**Pre-Petition Revolving Agent**") and the lenders party thereto, as in effect on the Petition Date and as amended from time to time in accordance with the terms hereof.

"**Pre-Petition Roll-Over Credit Agreement**" means that certain Credit Agreement dated as of May 31, 2011, by and among the Note Parties, the lenders party thereto (the "**Roll-Over Lenders**") and Black Diamond Commercial Finance, L.L.C. as administrative agent and collateral agent for the Roll-Over Lenders, as in effect on the Petition Date and as amended from time to time in accordance with the terms hereof.

"**Pre-Petition Roll-Over Debt Holders**" means the Roll-Over Lenders and the Roll-Over Purchasers, collectively.

"**Pre-Petition Roll-Over Note Purchase Agreement**" means that certain Note Purchase Agreement dated as of May 31, 2011, by and among the Note Parties, the purchasers party thereto (the "**Roll-Over Purchasers**") and Black Diamond Commercial Finance, L.L.C. as administrative agent and collateral agent for the Roll-Over Purchasers, as in effect on the Petition Date and as amended from time to time in accordance with the terms hereof.

"**Pre-Petition Shareholder Credit Agreement**" means that certain Credit Agreement dated as of May 31, 2011, by and among the Note Parties, the lenders party thereto (the "Shareholder Lenders") and Black Diamond Commercial Finance, L.L.C. as administrative agent and collateral agent for the Shareholder Lenders, as in effect on the Petition Date and as amended from time to time in accordance with the terms hereof.

"**Pre-Petition Shareholder Debt Holders**" means the Shareholder Lenders and the Shareholder Purchasers, collectively.

"**Pre-Petition Shareholder Note Purchase Agreement**" means that certain Note Purchase Agreement dated as of May 31, 2011, by and among the Note Parties, the purchasers party thereto (the "**Shareholder Purchasers**") and Black Diamond Commercial Finance, L.L.C. as administrative agent and collateral agent for the Shareholder Purchasers, as in effect on the Petition Date and as amended from time to time in accordance with the terms hereof.

"**Pre-Petition Shareholder Term Loan Debt**" means (a) the "Obligations" (as such term is defined in Pre-Petition Shareholder Credit Agreement) outstanding under the Pre-Petition Shareholder Credit Agreement as of the applicable date of measurement and (b) the "Obligations" (as such term is defined in Pre-Petition Shareholder Note Purchase Agreement) outstanding under the Pre-Petition Shareholder Note Purchase Agreement as of the applicable date of measurement.

"**Pre-Petition Term Agreement**" means, collectively, the Pre-Petition Roll-Over Credit Agreement, the Pre-Petition Roll-Over Note Purchase Agreement, the Pre-Petition Shareholder Credit Agreement and the Pre-Petition Shareholder Note Purchase Agreement.

"**Pre-Petition Term Loan Debt**" means the sum of (a) the "Obligations" (as such term is defined in Pre-Petition Roll-Over Credit Agreement) outstanding under the Pre-Petition Roll-Over Credit Agreement as of the applicable date of measurement, (b) the "Obligations" (as such term is defined in Pre-Petition Roll-Over Note Purchase Agreement) outstanding under the Pre-Petition Roll-Over Note Purchase Agreement as of the applicable date of measurement, (c) the "Obligations" (as such term is defined in Pre-Petition Shareholder Credit Agreement) outstanding under the Pre-Petition Shareholder Credit Agreement as of the applicable date of measurement and (d) the "Obligations" (as such term is defined in Pre-Petition Shareholder Note Purchase Agreement) outstanding under the Pre-Petition Shareholder Note Purchase Agreement as of the applicable date of measurement.

"**Pre-Petition Term Loan Document**" means, collectively, each "Applicable Debt Document" as such term is defined in each of the Pre-Petition Roll-Over Credit Agreement, Pre-Petition Roll-Over Note Purchase Agreement, Pre-Petition Shareholder Credit Agreement and Pre-Petition Shareholder Note Purchase Agreement, each as in effect on the Petition Date and as amended from time to time in accordance with the terms hereof.

"**Pre-Petition Term Secured Parties**" means, collectively, the Pre-Petition Debt Holder Manager, the Pre-Petition Roll-Over Debt Holders and the Pre-Petition Shareholder Debt Holders.

"**Primed Liens**" shall mean any Liens that are permitted under Section 5.1 herein and which are senior to the Liens securing the Obligations (to the extent such senior priority is permitted hereunder).

"**Professional Fees**" shall mean (a) any legal, financial advisory or investment banking fees incurred by any Note Party that is a debtor in one of the Cases, (b) any costs and expenses incurred by the United States Trustee in any Case and (c) any legal, financial advisory or investment banking fees incurred by the unsecured creditors' committee.

"**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Rate Contracts**" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) and any other agreements or arrangements designed to provide protection against fluctuations in interest or currency exchange rates or commodities prices.

"**Real Estate**" means any real estate owned, leased, subleased or otherwise operated or occupied by any Note Party or any Subsidiary of any Note Party.

"**Related Persons**" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor (including those retained in

connection with the satisfaction or attempted satisfaction of any condition set forth in Article II) and other consultants and agents of or to such Person or any of its Affiliates.

"**Releases**" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"**Remedial Action**" means all actions required to (a) clean up, remove, treat or in any other way address any Hazardous Material in the indoor or outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"**Required Purchasers**" means at any time Purchasers then holding at least fifty percent (50%) of the sum of (a) the unused Aggregate Note Commitments then in effect and (b) the aggregate unpaid principal amount of Notes then outstanding.

"**Requirement of Law**" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case legally binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Responsible Officer**" means, with respect to any Note Party, the chief executive officer or the president of such Note Party or any other executive officer of such Note Party or, with respect to compliance with financial covenants or delivery of financial information, the chief financial officer, the treasurer, controller or vice president of finance of such Note Party or any other officer of such Note Party having substantially the same authority and responsibility.

"**Revolving/Term Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of May 31, 2011 by and among the Pre-Petition Revolving Agent, the Pre-Petition Debt Holder Manager and each of the Note Parties, as in effect on the Petition Date and as amended from time to time in accordance with the terms hereof.

"**Roll-Over Intercreditor Agreement**" means that certain Roll-Over Facility Intercreditor and Collateral Agency Agreement dated as of May 31, 2011 by and among Black Diamond Commercial Finance, L.L.C, as debt holder manager for each of the Roll-Over Lenders and each of the Roll-Over Purchasers (in each such capacity, the "**Pre-Petition Roll-Over Debt Holder Manager**") and each of the Note Parties, as in effect on the Petition Date and as amended from time to time in accordance with the terms hereof.

"**Roll-Over Notes**" means, collectively, loans extended pursuant to the Pre-Petition Roll-Over Credit Agreement and notes issued pursuant to the Pre-Petition Roll-Over Note Purchase Agreement.

"**Roll-Up Election Notice**" means a notice substantially in the form of Exhibit 1.1(b)(ii) delivered to the Agent and each Purchaser hereunder.

"**S&P**" means Standard & Poor's, a Division of The McGraw-Hill Companies, Inc., and its successors.

"**Scheduled Maturity Date**" means February 23, 2014 or, if applicable, the Extension Date.

"**Secured Party**" means Agent, each Purchaser, each other Indemnitee and each other holder of any Obligation of a Note Party.

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, all as the same shall be in effect from time to time.

"**Shareholder Intercreditor Agreement**" means that certain Shareholder Facility Intercreditor and Collateral Agency Agreement dated as of May 31, 2011 by and among Black Diamond Commercial Finance, L.L.C, as debt holder manager for each of the Shareholder Lenders and each of the Shareholder Purchasers (in such capacities, the "**Pre-Petition Shareholder Debt Holder Manager**") and each of the Note Parties, as in effect on the Petition Date and as amended from time to time in accordance with the terms hereof.

"**Shareholder Notes**" means, collectively, loans extended pursuant to the Pre-Petition Shareholder Credit Agreement and notes issued pursuant to the Pre-Petition Shareholder Note Purchase Agreement.

"**Software**" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

"**SPV**" means any special purpose funding vehicle identified as such in a writing by any Purchaser to Agent.

"**Stock**" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"**Stock Equivalents**" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"**Subordinated Indebtedness**" means Indebtedness of any Note Party or any Subsidiary of any Note Party which is subordinated to the Obligations as to right and time of payment and as to other rights and remedies thereunder and having such other terms as are, in each case, reasonably satisfactory to the Required Purchasers.

"**Subsequent New Money Note Commitment**" means each Purchaser's aggregate commitment to purchase New Money Notes hereunder on the Final Order Note Purchase Date, as specified on Schedule I attached hereto, with commitments totaling $7,500,000.

"**Subsidiary**" of a Person means any corporation, association, limited liability company, partnership, joint venture or other business entity of which more than fifty percent (50%) of the voting Stock, is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof.

"**Superpriority Claim**" means a claim against any Note Party in any Case which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"**Tax Affiliate**" means, (a) Parent and its Subsidiaries and (b) any Affiliate of the Issuers with which the Issuers file or is required to file tax returns on a consolidated, combined, unitary or similar group basis.

"**Term Intercreditor Agreement**" means that certain Term Intercreditor Agreement dated as of May 31, 2011 by and among the Pre-Petition Debt Holder Manager and each of the Note Parties, as in effect on the Petition Date and as amended from time to time in accordance with the terms hereof.

"**Test Period**" means, the period beginning on Monday, January 13, 2014 at 12:01 a.m. New York City time and ending on each successive Monday at 12:00 a.m. New York City time then elapsed and covered by the Approved Budget (as such Approved Budget may be updated pursuant to the terms hereof) and, by way of example, the first Test Period begins on Monday, January 13, 2014 at 12:01 a.m. New York City time and ends on Monday, January 20th, 2014 at 12:00 a.m. New York City time and the second Test Period begins on Monday, January 20, 2014 at 12:01 a.m. New York City time and ends on Monday, January 27, 2014 at 12:00 a.m. New York City time.

"**Title IV Plan**" means a pension plan subject to Title IV of ERISA, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Trade Secrets**" means all right, title and interest (and all related IP Ancillary Rights) in or relating to trade secrets.

"**Trademark**" means all rights, title and interests (and all related IP Ancillary Rights) in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"**UK Charge Over Shares**" means that certain Charge Over Shares, dated on or about the date hereof, made by Constar Foreign Holdings, Inc. in respect of its shares in Constar UK, in favor of Agent, for the benefit of the Secured Parties, as the same may be amended, restated or modified from time to time.

"**UK Collateral Documents**" means the Constar UK Guarantee and Indemnity, the Constar UK Deed of Charge and Assignment, Constar UK Share Mortgage and the UK Charge Over Shares.

"**United States**" and "**U.S.**" each means the United States of America.

"**U.S. Purchaser Party**" means each of Agent, each Purchaser, each SPV and each participant, in each case that is a United States person as defined in <u>Section 7701(a)(30)</u> of the Code.

"**Voting Stock**" means Stock of any Person having ordinary power to vote in the election of members of the board of directors, managers, trustees or other controlling Persons, of such Person (irrespective of whether, at the time, Stock of any other class or classes of such entity shall have or might have voting power by reason of the happening of any contingency).

"**Weekly Average Unused Amount**" means, as of any date of determination, (i) the Aggregate New Money Note Commitment during the preceding calendar week beginning on December 20, 2013 <u>less</u> (ii) the sum of the average daily principal balance of all New Money Notes, in each case, during the preceding calendar week that have been funded by the Purchasers into the Agent's Disbursement Account.

11.2    <u>Other Interpretive Provisions</u>.

(a)    <u>Defined Terms</u>.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Note Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms. Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)    <u>The Agreement</u>.  The words "hereof, "herein", "hereunder" and words of similar import when used in this Agreement or any other Note Document shall refer to this Agreement or such other Note Document as a whole and not to any particular provision of this Agreement or such other Note Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Note Documents unless otherwise specified.

(c)    <u>Certain Common Terms</u>.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "including" is not limiting and means "including without limitation."

(d)    <u>Time</u>.  Whenever any performance obligation hereunder or under any other Note Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on

105

the next succeeding Business Day. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."

(e)     Contracts. Unless otherwise expressly provided herein or in any other Note Document, references to agreements and other contractual instruments, including this Agreement and the other Note Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Note Document.

(f)     Laws. References to any statute or regulation are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

(g)     [Reserved].

11.3    Accounting Terms and Principles. All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP. No change in the accounting principles used in the preparation of any financial statement hereafter adopted by Parent shall be given effect for purposes of measuring compliance with any provision of Article V or VI unless the Issuer Representative, Agent and the Required Purchasers agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in Article VI shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Note Party or any Subsidiary of any Note Party at "fair value" (except in the case of the First Mortgage Notes prior to any refinancing thereof). A breach of a financial covenant contained in Article VI shall be deemed to have occurred as of any date of determination or as of the last day of any specified measurement period, regardless of when the reports, certificates or notices reflecting such breach are delivered to Agent or Purchasers.

11.4    Payments. Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Note Party. Any such determination or redetermination by Agent shall be conclusive and binding for purposes, absent manifest error. No determination or redetermination by any Secured Party or any Note Party and no other currency conversion shall change or release any obligation of any Note Party or of any Secured Party (other than Agent and its Related Persons) under any Note Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted. Agent may round up or down,

106

and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable de minimis payment thresholds.

11.5    Dollar Equivalent.  Unless specifically stated to the contrary, each reference to any amount in this Agreement shall be deemed to mean a reference to the Dollar Equivalent of such amount.  For purposes of determining Issuers' compliance with any provision of Articles V or VI hereof, the Dollar Equivalent amount of any transaction or incurrence of a Liability shall be determined solely at the time of the consummation of a transaction or incurrence of any Liability which requires compliance with such provision and shall be re- determined solely at the time of the consummation of any subsequent transaction or incurrence of a Liability requiring compliance with the same provision.

11.6    Electronic Transmission.  If any materials required to be delivered pursuant subsections 4.1(a), 4.1(b), 4.2(c) are delivered by Electronic Transmission by posting any materials with the Securities and Exchange Commission's EDGAR system, the Issuers shall provide prompt written notice thereof to the Agent.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized signatories as of the day and year first above written.

ISSUERS:

CONSTAR, INC., as an Issuer

By:_____

Name:_____

Title:_____

FEIN: 58-0680950

Address for notices:

Constar, Inc.
1100 Northbrook Drive, 2nd Floor
Trevose, PA 19053
Attn:  _____
Facsimile:_____

Address for wire transfers:

_____
_____
_____

CONSTAR INTERNATIONAL INC., as an Issuer

By:_____
Name:_____
Title:_____
FEIN:13-1889304

Address for notices:

Constar International Inc.
1100 Northbrook Drive, 2nd Floor
Trevose, PA 19053
Attn:_____
Facsimile:_____

BFF INC., as an Issuer

By:_____
Name:_____
Title:_____
FEIN:  04-2521229

Address for notices:

BFF Inc.
1100 Northbrook Drive, 2nd Floor
Trevose, PA 19053
Attn:_____
Facsimile:_____

DT, INC., as an Issuer

By:_____
Name:_____
Title:_____
FEIN: 63-0247693

Address for notices:

DT, Inc.
1100 Northbrook Drive, 2nd Floor
Trevose, PA 19053
Attn:_____
Facsimile:_____

CONSTAR FOREIGN HOLDINGS, INC., as an Issuer

By:_____
Name:_____
Title:_____
FEIN: 14-1838591

Address for notices:

Constar Foreign Holdings, Inc.
1100 Northbrook Drive, 2nd Floor
Trevose, PA 19053
Attn:_____
Facsimile:_____

[Signature Page to Note Purchase Agreement]

<u>OTHER NOTE PARTIES</u>:

CONSTAR GROUP, INC., as a Note Party

By:_____
Name:_____
Title:_____
FEIN: 14-1838591

Address for notices:

Constar Group, Inc.
1100 Northbrook Drive, 2nd Floor
Trevose, PA 19053
Attn:_____
Facsimile:_____

CONSTAR INTERNATIONAL U.K. LIMITED, as
a Note Party

By:_____
Name:_____
Title:_____
FEIN: N/A

Address for notices:

Constar International U.K. Limited
Moor Lane Trading Estate
Sherburn in Elmet
North Yorkshire LS25 6ES
United Kingdom
Attn:_____
Facsimile:_____

[Signature Page to Note Purchase Agreement]

BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as Agent

By:_____
Name:
Title:

Address for notices:

Black Diamond Commercial Finance, L.L.C.
One Conway Park
100 Field Drive, Suite 140
Lake Forest IL 60045
Attn: Hugo Gravenhorst
hugo@bdcf.com

With a copy to:

Winston & Strawn, LLP
35 West Wacker Drive
Chicago, IL 60601
Attention: Daniel McGuire
Facsimile: (312) 558-6154

Address for payments:

_____
_____
_____

[Signature Page to Note Purchase Agreement]

Schedule I
Commitments

| Purchaser | Amount of Initial New Money Note | Amount of Subsequent New Money Note | Aggregate Note Commitment |
|---|---|---|---|
| AFFILIATES AND MANAGED FUNDS OF BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C. | $7,000,000 | 7,500,000 | 14,500,000 |
| **TOTALS** | **$7,000,000** | **$7,500,000** | **$14,500,000** |

[Signature Page to Note Purchase Agreement]

## Schedule 1.1

### Incligible Pre-Petition Shareholder Debt Holders

SOLA LTD
ULTRA MASTER LTD
NORTHEAST INVESTORS TRUST
COMMINGLED PENSION TRUST FUND (HIGH YIELD) OF JPMORGAN CHASE BANK, N.A.
JPMORGAN INVESTMENT FUNDS - GLOBAL INCOME FUND
HSBC U.S. HIGH YIELD BOND POOLED FUND
JPMORGAN CORE PLUS BOND FUND
JPMORGAN INCOME BUILDER FUND
JPMORGAN INVESTMENT FUNDS - INCOME OPPORTUNITY FUND
JPM US HIGH YIELD BOND MOTHER FUND
JPMORGAN HIGH YIELD FUND
JPMORGAN CHASE BANK N.A. AS TRUSTEE OF THE JPMORGAN CHASE RETIREMENT PLAN
LOUISIANA STATE EMPLOYEES' RETIREMENT SYSTEM
JPM MULTI-ASSET INCOME FUND
JPMORGAN HIGH YIELD US DOLLAR MOTHER FUND
PACHOLDER HIGH YIELD FUND, INC.
PRINCIPAL FUNDS, INC. - HIGH YIELD FUND I
JPMORGAN STRATEGIC INCOME OPPORTUNITIES FUND
SOUTHERN UTE INDIAN TRIBE

## Schedule 4.1

### Purchaser Contacts

| PURCHASER | CONTACT | EMAIL ADDRESS |
|---|---|---|
| c/o BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C. | [_____] | [_____] |
| | | |
| | | |

[Signature Page to Note Purchase Agreement]

## EXHIBIT B

**Budget**

**[to come]**